Steve W. Berman (to be pro hac vice)
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel.: 206.623.7292
Fax: 206.623.0594
Email: steve@hbsslaw.com

Christopher R. Pitoun
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Tel.: 213-330-7150
Fax: 213-330-7512
Email: christopherp@hbsslaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCY CHI, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, BOARD OF TRUSTEES OF THE UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE TYNDALL, M.D.,<br><br>        Defendant. | No.  2:18-cv-4258<br><br>CLASS ACTION COMPLAINT<br><br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................... 3

II.  JURISDICTION AND VENUE ........................................................ 4

III. THE PARTIES ............................................................................. 4

IV.  FACTS ........................................................................................ 5

    A.   Students (and their parents) entrusted their medical care
    to USC. ......................................................................................... 5

    B.   Tyndall's and USC's abuse of trust. ......................................... 7

    C.   Patients complained about Tyndall's behavior to USC,
    and refused to be scheduled with him again. ......................... 11

    D.   USC admits it was on notice of Tyndall's violation of
    female students. ........................................................................ 13

    E.   Plaintiff was violated by Tyndall without a chaperone
    present. ....................................................................................... 15

    F.   The statute of limitations is tolled based on the
    continuing violations doctrine and fraudulent
    concealment. ............................................................................. 17

V.   CLASS ALLEGATIONS ............................................................... 20

VI.  CAUSES OF ACTION .................................................................. 22

COUNT I  VIOLATONS OF TITLE IX, 20 U.S.C. § 1681(A) *ET
    SEQ*. (AGAINST USC AND USC TRUSTEES) ............................. 22

COUNT II   VIOLATION OF THE CALIFORNIA EQUITY IN
    HIGHER EDUCATION ACT [CALIF. ED. CODE §66270]
    (AGAINST THE USC, USC TRUSTEES, AND TYNDALL) ..................... 23

COUNT III  GENDER VIOLENCE [CAL. CIV. CODE §52.4]
    (AGAINST TYNDALL AND USC) ................................................ 23

COUNT IV  GROSS NEGLIGENCE (AGAINST THE USC, USC
        TRUSTEES, AND TYNDALL) ....................................................................... 24

COUNT V  NEGLIGENT SUPERVISION AND RETENTION
        (AGAINST USC AND USC TRUSTEES) ........................................................ 26

COUNT VI  CIVIL BATTERY (AGAINST TYNDALL AND USC) ..................... 26

COUNT VII  INTENTIONAL INFLICTION OF EMOTIONAL
        DISTRESS (AGAINST TYNDALL AND USC) ............................................. 28

COUNT VIII  NEGLIGENT INFLICTION OF EMOTIONAL
        DISTRESS (AGAINST TYNDALL AND USC) ............................................. 29

COUNT IX  RATIFICATION (AGAINST USC AND USC
        TRUSTEES) .................................................................................................. 30

PRAYER FOR RELIEF ........................................................................................... 31

Lucy Chi ("Plaintiff"), individually and on behalf of all women who received a medical examination from Dr. George Tyndall at the University of Southern California, alleges as follows:

## I.    INTRODUCTION

1.    Trust is an essential part of the relationship between physician and patient. "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[1]

2.    George Tyndall, M.D. violated this trust by taking advantage of female students who sought examination by a gynecologist at the University of Southern California's ("USC") student health center. Tyndall used his position of trust to place women in a place of complete vulnerability: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur for medical treatment in accordance with the standard of care.

3.    Tyndall violated this trust by causing physical contact, including in the form of sexual abuse, molestation, and unwanted touching, in violation of his female patients that was not for the purpose of providing medical care, but for the purpose of providing Tyndall with sexual gratification.

4.    USC violated its female students' trust by knowingly putting women in the room for treatment by Tyndall, knowing that inappropriate physical contact and violations would occur. In fact, USC nurses, chaperones and other staff members were regularly present in the examination rooms, observed the inappropriate sexual molestation, and took no steps to stop it as it occurred.

---

[1] Susan Dorr Goold, MD, MHSA, MA, "Trust, Distrust and Trustworthiness, Lessons from the Field," J Gen Intern Med. 2002 Jan; 17(1): 79–81, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495000/ (last accessed May 19, 2018) (citations omitted).

5.      Moreover, even as numerous supervisors and administrators became aware of Tyndall's harmful conduct, USC failed to act to protect its female students by removing Tyndall from his position even though it was clear he was unfit to treat patients.

6.      Defendants' sexual abuse, molestation, unwanted sexual touching and contact has caused widespread damage to Plaintiff and the Class, for which Defendants must be held responsible.

## II.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a State different from that of Plaintiff and members of the Class.

8.      Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, inter alia, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III.    THE PARTIES

9.      Lucy Chi is a resident of Culver City, California and citizen of the United States.

10.     Defendant USC's principal place of business is in Los Angeles County, California.

11.     As a private corporation, USC is governed by the Board of Trustees of The University of Southern California, which has approximately 55 voting members. The board is a self-perpetuating body, electing one-fifth of its members each year for a five-year term of office. Hereinafter, USC and the Board of Trustees will be referred to collectively as the USC Defendants.

12.     Defendant George Tyndall, M.D. is an adult male who is a resident of Los Angeles County and citizen of the United States. Tyndall started working as a gynecologist at USC's student health center in or about 1989, and reportedly examined as many as 16 women per day at the clinic.

## IV.    FACTS

**A.      Students (and their parents) entrusted their medical care to USC.**

13.     Experts have asserted that health is an important factor for academic achievement in higher education.[2] "Health complaints limit students' capacity to perform adequately at university."[3] Thus, a university's promotion of health and well-being of its students promotes effective learning.[4]

14.     To that end, USC touts the services of its student-health center to its students.  It regularly runs workshops designed to invite the trust of students, such as a series of "Feel Better Workshops" entitled"Relationships and Connection," "Addressing Academic Anxiety," "Stress Management," and "Calm Your Anxiety."[5]

---

[2] Ansari, "Is the Health and Wellbeing of University Students Associated with their Academic Performance?" Int J Environ Res Public Health. 2010 Feb; 7(2): 509–527, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2872284/#b3-ijerph-07-00509 (last accessed May 19, 2018) (citations omitted).

[3] Id.

[4] Id.

[5] https://engemannshc.usc.edu/events/ (last accessed May 19, 2018).

15.     Women are encouraged to start seeing a gynecologist once a year when they turn 18 years old.[6] Thus, many of the women who are examined at USC's student health center have never had a gynecological examination before.[7]

16.     USC provides its female students "a full range of women's health care services including well women annual visits, testing, contraceptives and pregnancy counseling."[8] USC explains: "These are yearly comprehensive, individual assessments of your health. These visits include a physical exam, a pelvic exam and screening for any other health problems. Use this visit as an opportunity to discuss any questions or concerns you have about your health with your doctor."

17.     USC's invitation to its female students to discuss concerns about their health presumes a relationship of trust.

18.     Trust is essential to both physician and patient.[9] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[10]

---

[6] http://www.4collegewomen.org/fact-sheets/firstgyno.html (last accessed May 21, 2018).

[7] https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html (last accessed May 21, 2018).

[8] http://sc.edu/about/offices_and_divisions/student_health_services/medical-services/womens-health/index.php (last accessed May 19, 2018).

[9] Susan Dorr Goold, MD, MHSA, MA, "Trust, Distrust and Trustworthiness, Lessons from the Field," J Gen Intern Med. 2002 Jan; 17(1): 79–81, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495000/ (last accessed May 19, 2018).

[10] *Id.*

19.     "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[11] Absent a presumption of trust, patients might avoid essential medical care.[12]

20.     "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[13]

21.     Knowing and inviting female students to place trust in its physicians, USC had a duty to ensure that Tyndall used his trusted position and the safe confines of a doctor's exam room at the USC student health center consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

**B.     Tyndall's and USC's abuse of trust.**

22.     For nearly 30 years, the University of Southern California's student health clinic's only full-time gynecologist was Tyndall. USC hired Tyndall in 1989 after his residency.

23.     According to the first report to expose Tyndall and USC, Tyndall used his position of trust to forego the standard of care. For example, in the exam room, Tyndall was typically accompanied by a female nurse or medical assistant known as a chaperone — a practice embraced by many male gynecologists.[14]

24.     In the years after Tyndall started, some chaperones reportedly became alarmed about the frequency with which he used a camera during pelvic exams.[15]

---

[11] *Id.*, citing Faden R, Beauchamp T. A History and Theory of Informed Consent. New York: Oxford University Press; 1986. pp. 274–80.

[12] *Id.*

[13] *Id.*

[14] https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html (last accessed May 21, 2018).

[15] *Id.*

Tyndall's chaperones questioned his motivations, with one reporting he took multiple pictures of hundreds of patients' genitals, while another said she witnessed 50 to 100 patients photographed. [16]

25.     According to the LA Times, Bernadette Kosterlitzky, a clinic nurse from 1992 to 2013, said that after a chaperone alerted administrators to the camera, then-Executive Director Dr. Lawrence Neinstein ordered it removed.[17]

26.     In fact, a member of the USC student health center's oversight committee purportedly admitted that: (i) in the early 2000s, several students submitted letters concerning inappropriate touching and remarks by Tyndall; and (ii) those complaint letters were read aloud during monthly committee meetings.[18]  One member of the committee confronted Tyndall, and that confrontation is allegedly contained in university records that corroborate his accounts. [19]

27.     After USC's grand opening of its new Engemann Student Health Center in or about 2013, chaperones became concerned regarding Tyndall's treatment of female patients.

28.     Chaperones were concerned about "full body scans," where "Tyndall frequently had women lie naked on the exam table while he slowly inspected every part of their body, down to the area between their buttocks."[20]  While a woman's annual gynecological visit might include a discussion of skin problems, such "meticulous" inspections of a patient's naked body "would be highly unusual if not inappropriate."[21]

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

29.     While Tyndall conducted examinations, he made comments that the nursing staff found "unseemly," describing patients' skin as "flawless," "creamy" or "beautiful." He told students they had "perky breasts." [22]

30.     In the spring of 2013, eight chaperones reported concerns about Tyndall to their supervisor, veteran nurse Cindy Gilbert. Gilbert went to Neinstein, the clinic's executive director, and the then-head of clinic nursing and now the clinic's executive director, Tammie Akiyoshi. Gilbert said Neinstein told her that he had talked to Tyndall about his behavior in the past. [23]

31.     Neinstein reportedly referred the complaints to the university's Office of Equity and Diversity, which investigates sexual misconduct and racial and gender discrimination. USC has stated that an investigator interviewed seven employees and a patient, according to USC. However, Gilbert and multiple chaperones who complained said they were never informed of the probe or questioned by the investigator. [24]

32.     The investigation apparently concluded there was no violation of school policy. The only action that Neinstein took was to bar Tyndall from locking the door of his office when patients were present. [25]

33.     Tyndall then increased his attempts to groom patients, particularly of Chinese ethnicity. [26]

34.     In his office, Tyndall had a map of China and encouraged women to point out their home province. He kept a bamboo plant, the traditional Chinese symbol of longevity and vitality, on a shelf above his desk. He sometimes showed off a photo of his Filipina wife and shared details of their relationship. [27]

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

35.     In addition to grooming, Tyndall took steps to require patients to return for appointments more often. For example, while most physicians will prescribe one year's worth of birth control pill refills, Tyndall would only prescribe two months. He would not extend the prescription until the patients returned for another examination.[28]

36.     However, as Tyndall's grooming efforts increased, so did the chaperones' concerns.

37.     Chaperones began discussing the way Tyndall used his fingers at the outset of the pelvic exam for many young women. Before inserting a speculum, the metal duck-billed device that spreads open the walls of the vagina and enables the doctor to view the cervix, Tyndall would voice concern that the speculum might not fit.[29]

38.     The Los Angeles Times reported:

> "He would put one finger in and say, 'Oh, I think it will fit. Let's put two fingers in,'" said a chaperone who worked with Tyndall for years. Four people familiar with Tyndall's exams said that while he spoke, he was moving his fingers in and out of the patients.

> They said he made nearly identical statements to hundreds of women as he probed them: My, what a tight muscle you have. You must be a runner.

> The chaperone who worked with Tyndall for years said she witnessed at least 70 such exams and remembered thinking the physician would eventually become embarrassed about repeating the same words to student after student.

> "He never was," she said.

> During some exams, Tyndall made explicit reference to sexual intercourse while his fingers were inside patients, according to five people who heard the remarks or were told about them.

---

[28] *Id.*

[29] *Id.*

"He would tell young ladies their hymens are intact. 'Don't worry about it, your boyfriend's gonna love it,'" a chaperone recalled.[30]

39.     The chief of Female Pelvic Medicine and Reconstructive Surgery at University Hospitals Cleveland Medical Center, Dr. Sangeeta Mahajan, has stated that she has never heard of a gynecologist moving his fingers in and out of a vagina to determine whether a speculum fit, calling it "very odd" and "creepy."[31]   An assistant professor of gynecology at Harvard Medical School, Dr. Louise King, said the practice was not standard.[32]

**C.     Patients complained about Tyndall's behavior to USC, and refused to be scheduled with him again.**

40.     One nurse said that in 2013-14, she spoke to at least five women who refused to be scheduled with Tyndall despite having gynecological problems that needed immediate attention.  The patients reported feeling like "he was inappropriately touching them, that it didn't feel like a normal exam," and "like they were violated." The nurse told her immediate supervisor and later Akiyoshi, the head of nursing, who said they would look into it.[33]

41.     During the 2013-2016 period, one clinician received unsolicited complaints from at least three students who said they would never see Tyndall again. The clinician gave the students the email addresses for administrators and encouraged them to put their complaints in writing.[34]

42.     Having already felt uncomfortable on how Tyndall violated her with his hand during a gynecological exam before the speculum was inserted, one student was told on her second visit that Tyndall wanted her to remove all her clothes. After

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

waiting for Tyndall naked, she got dressed, after asking herself why she needed to take off all her clothes. She told a female clinic employee she wanted to see another doctor. That employee reportedly told the student "there were a lot of complaints" about Tyndall.[35]

43.     Chaperones reported the names of women "who seemed particularly shaken" by Tyndall's exams to their supervisor, nurse Gilbert. Gilbert allegedly contacted patients and explained how to make a written complaint against the doctor. Some did, but others responded they just wanted to find another gynecologist and forget about the experience.[36]

44.     Gilbert stated she repeatedly expressed concerns about Tyndall to Akiyoshi, Neinstein and other clinic administrators from 2014 to 2016, but they seemed uninterested.[37]

45.     Chaperones forwarded some complaints about Tyndall to Sandra Villafan, who became the clinic's head of quality and safety in 2013. Villafan has stated she relayed any concerns to clinic administrators and university leadership, but was not privy to the outcomes of any investigations.[38]

46.     Finally, in 2016, Gilbert went to USC's rape crisis center, known as Relationshop and Sexual Violence Prevention and Services, and spoke to Executive Director Ekta Kumar.  That complaint (and the discovery of a box of film of women's genitalia in Tyndall's office) finally prompted the investigation that led to Tyndall's removal.[39]

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

**D.   USC admits it was on notice of Tyndall's violation of female students.**

47.   On May 15, 2018, USC issued a release titled "Summary of Coordinated Investigation of Student Health Physician" ("Statement") from Todd R. Dickey, Senior Vice President for Administration, Gretchen Dahlinger Means, Title IX Coordinator and Executive Director of the Office of Equity and Diversity, and Laura LaCorte, Associate Senior Vice President for Compliance.[40]

48.   The Statement admitted that, in June 2016, USC's Office of Equity and Diversity ("OED") received a complaint from a staff member at the student health center regarding sexually inappropriate comments made to patients in front of medical assistants by Tyndall.[41]

49.   As a result, USC states that it conducted an investigation. USC reported that medical assistants who assisted Dr. Tyndall during clinic visits reported concerns about the way he conducted pelvic examinations. Specifically, these medical assistants questioned Tyndall's practice of a digital insertion prior to insertion of a speculum.[42]

50.   USC purportedly consulted with a gynecology expert who stated that this could be considered an acceptable practice, but then contracted with an outside medical review firm, MD Review, to review Dr. Tyndall's clinical practice. MD Review concluded that this examination practice not the standard of care.[43]

51.   USC stated that, during its investigation, a box of clinical photos of cervixes and surrounding internal tissue allegedly from 1990-1991 was found during a search of Tyndall's office.[44]

---

[40] *See* http://pressroom.usc.edu/statement-of-facts-may-15-2018/ (last accessed May 19, 2018).

[41] *See Id.*

[42] *See Id.*

[43] *See Id.*

[44] *See Id.*

52.     USC reported that it also reviewed the files of Dr. Larry Neinstein, the former health center director from 1995-2014 (who is now deceased), which showed earlier patient complaints about Tyndall, including complaints about his clinical practice. The files contained eight complaints logged between 2000 and 2014 that were concerning. These included racially insensitive and other inappropriate comments, concerns that he was not adequately sensitive to patient privacy, a complaint of feeling "uncomfortable," another that Tyndall "gave me the skeevies," and another that he was "unprofessional." [45]

53.     USC admitted that these complaints were sufficient to terminate Tyndall, and should have been elevated for "proper investigation."

54.     Dr. Neinstein's notes also purportedly indicated that he brought in outside experts to review his clinical practices, although the Statement does not identify those experts nor the results of those engagements.[46]

55.     USC stated that OED had previously conducted a review in 2013 of complaints of inappropriate comments made by Tyndall raised by staff members, but that there was insufficient evidence to find a violation of university policy. [47]

56.     USC was silent on its failure to report Tyndall to criminal authorities, the attorney general or anyone outside the university for the purposes of conducting an independent investigation. [48]

57.     USC concluded its 2016 investigation, finding that "Tyndall had violated the university's policy on harassment by making repeated racially discriminatory and

---

[45] *See Id.*

[46] *See Id.*

[47] *See Id.*

[48] *See Id.*

sexually inappropriate remarks during patient encounters." The Statement was silent as to any conclusions concerning sexual assault, violation or molestation. [49]

58.    Ultimately, in 2017, the university began termination proceedings. However, USC did not contact law enforcement, the attorney general or the medical licensing board. [50] Nor did USC inform Tyndall's patients.[51] Because Tyndall threatened a lawsuit against USC, USC entered into a separation agreement with Tyndall. [52]

59.    USC states that, once Tyndall sent a letter to USC asking to return to his position at the student health center in 2018, USC finally made a report to the California Medical Board on March 9, 2018. According to USC, this was the first report to authorities it had made despite being on notice of Tyndall's behavior for decades. [53]

**E.    Plaintiff was violated by Tyndall without a chaperone present.**

60.    In 2012, Plaintiff Lucy Chi was a first-year graduate student at USC. She called USC's student health center and asked for the first available appointment for her annual exam.

61.    The scheduling desk told her the first appointment available (which was within a couple of days) was with Tyndall. Chi asked if the clinic had any female doctors instead. The office told her the wait for a female doctors would be three weeks. So Chi made the appointment with Tyndall.

---

[49] *See Id.*

[50] *See Id.*

[51] https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html

[52] *See* http://pressroom.usc.edu/statement-of-facts-may-15-2018/ (last accessed May 19, 2018).

[53] *See Id.*

62.    When Chi arrived for her appointment, Tyndall told her he didn't have any chaperones available to accompany him for her appointment. He told her she would have to wait for at least 30 minutes if she wanted to wait for a chaperone. Chi decided to proceed with the examination.

63.    While alone with Tyndall in the examination room, Tyndall kept looking Chi up and down. Tyndall's demeanor was making Chi very uncomfortable because her experience was that male doctors take on a more detached or clinical demeanor when examining female patients. However, Tyndall was acting in a more suggestive manner, and seemed nervous.

64.    Chi lay on the examination table for her gynecological examination. Tyndall put on gloves, and penetrated her with his fingers. He told her that he wanted to check whether the speculum would fit. She was uncomfortable and did not think this was normal. However, she was not sure and did not feel like she was in a position to second guess the doctor.

65.    Tyndall moved his fingers in and out of her vagina, saying he wanted to loosen up her vaginal muscles for the speculum. Chi told Tyndall that was unnecessary, but he insisted the penetration and movement prevented discomfort. Tyndall's conduct caused Chi significant distress, but she could not move at this point.

66.    When it was time for the breast examination, Tyndall asked Chi to move the sheet covering her upper body so he could see both breasts at the same time.  Chi's prior experience was that doctors typically drape the sheets over one breast while examing the other. However, she kept telling herself that maybe doctors on the West Coast conducted examinations differently than in the Midwest. Moreover, Chi was in a vulnerable position, naked and laying on an examination table, without any power to question the doctor.

67.    Tyndall then took off his gloves and began squeezing her breasts, fondling her in an atypical way. The way Tyndall squeezed her breasts was very

different than the way physicians typically use their finger pads to check for any irregularities in a woman's breasts. Chi continued to try and reassure herself that she would be ok, that maybe this is how an examination was conducted at USC. However, she vowed silently to herself to never see Tyndall again.

68.     The examination took approximately 15 minutes. Chi left the examination room feeling distressed and upset. At that point, a chaperone had appeared and told Tyndall and Chi she had been waiting outside. The chaperone asked Tyndall why he hadn't waited for her given that she had told him she was going on a short break. Tyndall replied that Chi had given him permission to proceed without a chaperone, as if the violation of protocol and standard of care was Chi's fault.

69.     Chi felt shaky and unsure if what she had experienced was normal. Chi felt violated and embarrassed. She did not go back to him.

70.     On May 15, 2018, Chi read the articles that disclosed Tyndall's wrongdoing. Chi became extremely upset and angry that USC let Tyndall violate her and others over such a long period of time. She felt distressed all over again, replaying Tyndall's violation of her in her mind.

**F.     The statute of limitations is tolled based on the continuing violations doctrine and fraudulent concealment.**

71.     Tyndall concealed the existence of Plaintiff's claims and that Plaintiff had a cause of action against Tyndall and/or USC at the time his sexual assaults occurred making a material representation(s) to Plaintiff involving a past or existing fact by:

a.     Misrepresenting that his acts and/or conduct were for the purpose of conducting a vaginal examination;

b.     Misrepresenting that digital penetration of a woman's vagina at the outset of a gynecological examination was medically appropriate, contemporaneously and/or shortly before the abrupt, sudden, quick and unexpected sexual assaults by Tyndall;

c.     Misrepresenting that his acts and/or conduct were for the purpose of conducting a breast examination;

d.    Misrepresenting that it was necessary for a female patient to be fully naked for a gynecologist to conduct a full body scan for skin irregularities;

e.    Misrepresenting that his acts and/or conduct was "treatment" and/or conformed to accepted medical practice.

72.    The material representation(s) to Plaintiff and the Class were false, in that Tyndall was actually performing these examinations for his own sexual gratification and pleasure.

73.    When Tyndall made the material representation(s), he knew that they were false, in that he knew that the examinations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or gynecology.

74.    Tyndall made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff and the Class, in that Plaintiff and the Class Members should believe that the examinations were proper, appropriate, and legitimate; should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults; should continue to be seen by him so that he could continue to sexually assault them; should not question and/or report the conduct to appropriate authorities; and should not reasonably believe and not be aware of a possible cause of action that they have against Tyndall and/or USC.

75.    Plaintiff and Class Members acted in reliance upon the material representation(s), in that they:

a.    reasonably believed that the examinations were proper, appropriate, and legitimate;

b.    reasonably did not believe that they had been sexually assaulted;

c.    did not believe that they should question and/or report the conduct to appropriate authorities; and,

d.  did not reasonably believe that they had and were not aware of a possible cause of action that they had against Tyndall and/or USC.

76.  Plaintiff and Class Members suffered injury, in that they could not stop the sexual assault and suffered discomfort, severe emotional distress, shock, humiliation, fright, grief, embarrassment, and disgrace.

77.  Tyndall further concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.  Misrepresented to other medical professionals in the examination room that digitally penetrating female patients was medically necessary and appropriate;

b.  Prevented other medical professionals, chaperones, and/or caregivers from being in the room during examinations and treatments of Plaintiff and Class Members so that he could sexually assault them;

c.  Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients.

78.  Directors, managers, supervisors, physicans, nurses, chaperones in USC's student health center took affirmative steps to fraudulently conceal Tyndall's misconduct, including but limited to by depressing complaints made by patients by imposing onerous reporting requirements on them.

79.  Directors, managers, supervisors, physicans, nurses, chaperones in USC's student health center also misrepresented that Tyndall's conduct during examinations was proper, including but not limited by (i) watching Tyndall's conduct as a purported chaperone without stopping the improper conduct; (ii) permitting Tyndall to conduct examinations without a chaperone present; and (iii) scheduling female patients for appointments with Tyndall despite having full knowledge of his improper conduct.

80.     The actions and inactions of Tyndall and USC constituted fraudulent concealment.

81.     At all times pertinent to this action, Tyndall was an agent, apparent agent, servant, and employee of USC and operated within the scope of his employment and his negligence is imputed to USC.

82.     Plaintiff and Class Members did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Tyndall and/or USC until the May 15, 2018 publication of a story by the Los Angeles Times.

## V.     CLASS ALLEGATIONS

83.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were examined by George Tyndall, M.D. at the University of Southern California.

84.     The Class consists of hundreds, if not thousands, of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by USC.

85.     The claims of Plaintiff are typical of the Class. The claims of the Plaintiff and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

86.     There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

87.     Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

a.   Whether Tyndall engaged in a sexual harassment, assault, and battery;

b.   Whether Tyndall's sexual harassment, assault and battery was committed within the scope of his employment at USC;

c.   Whether the USC Defendants had knowledge of Tyndall's sexual harassment, assault, and battery;

d.   Whether the USC Defendants facilitated Tyndall's pattern and practice of sexual harassment, assault, and battery;

e.   Whether the USC Defendants or Tyndall engaged in conduct designed to suppress complaints or reports regarding Tyndall's conduct;

f.   Whether the USC Defendants negligently retained or supervised Tyndall;

g.   Whether the USC Defendants ratified Tyndall's conduct;

h.   Whether the USC Defendants are responsible for Tyndall's conduct under the doctrine of respondeat superior.

88.   Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to USC's legal responsibility for Tyndall's actions, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

89.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members,

and have the financial resources to do so. Neither Plaintiff nor their counsel have any interests adverse to those of the other members of the Class.

## VI.    CAUSES OF ACTION

### COUNT I

### VIOLATONS OF TITLE IX, 20 U.S.C. § 1681(a) *et seq*.
### (AGAINST USC AND USC TRUSTEES)

90.    Plaintiff restates and incorporates herein by reference the precedingparagraphs as if fully set forth herein.

91.    Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance …" 20 U.S.C. § 1681 *et seq*.

92.    Plaintiff and members of the Class are "persons" under Title IX.

93.    USC receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), *et seq*.

94.    USC is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

95.    Tyndall's conduct described above constitutes sexual harassment, abuse and assault, and constitutes sex discrimination under Title IX.

96.    The USC Defendants were on notice of Tyndall's conduct as described above. The USC Defendants nonetheless failed to carry out their duties to investigate and take corrective action under Title IX.

97.    As a direct and proximate result of the USC Defendants' actions and/or inactions, Plaintiff and members of the Class were damaged.

**COUNT II**

**VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT [CALIF. ED. CODE §66270] (AGAINST THE USC, USC TRUSTEES, AND TYNDALL)**

98.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

99.    Section 66281.5 of the California Sex Equity in Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

100.    The USC Defendants' conduct as alleged herein consistutes sexual harassment as a form of sexual discrimination against Plaintiffs and the members of the Class, and violated the Equity in Higher Education Act. Plaintiff is entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

101.    As a result of Defendants' conduct, Plaintiff and the members of the Class have been damaged in an amount to be proved at trial.

**COUNT III**

**GENDER VIOLENCE [CAL. CIV. CODE §52.4]
(AGAINST TYNDALL AND USC)**

102.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

103.    California Civil Code § 52.4 provides that gender violence is a form of sex discrimination and includes "[a] physical intrusion or physical invasion of a sexual nature under coervice conditions...." *Id.* at §52.4(c)(2).

104.   California Civil Code § 52.4 incorporates the definition of "gender" from California Civil Code § 51, which provides: "'Gender means sex, and includes a person's gender identity and gender expression.'"

105.   Here, Plaintiff and the Class Members are female.

106.   Tyndall physically intruded and/or invaded the bodies of Plaintiff and the Class Members during medical examinations in a sexual manner.  The conditions were coercive in that Plaintiff and Class Members were required to place their trust in their physician because he was held out to be an expert in gynecology by USC.

107.   USC participated in the physical instrusion and/or invasion of the bodies of Plaintiff and the Class Members during medical examinations by either being physically present in the room through agent chaperones or other clinic staff members and/or bringing Plaintiff and the Class Members into the examination rooms and providing instructions to remove their clothing knowing that Tyndall would assault them in a sexual manner.

108.   Plaintiff was injured as a result of the gender violence, and seeks all remedies provided for in Civil Code Section 52.4(a), including but not limited to actual damages, compensatory, damages, punitive damages, costs and attorneys' fees.

### COUNT IV

### GROSS NEGLIGENCE
### (AGAINST THE USC, USC TRUSTEES, AND TYNDALL)

109.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

110.   The USC Defendants owed Plaintiff and Class Members a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Tyndall.

111.   Tyndall owed Plaintiff a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of the USC Defendants.

112.   By seeking medical treatment from Tyndall in the course of his employment, agency, and/or representation of the USC Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Tyndall was created, resulting in Tyndall owing Plaintiff a duty to use due care.

113.   The USC Defendants' failure to adequately supervise Tyndall, especially after USC knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during medical examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

114.   Tyndall's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of the USC Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

115.   The USC Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiff' safety.

116.   The USC Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiff and Class Members.

117.   The USC Defendants breached duties owed to Plaintiff and Class Members and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiff and Class Members' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

118.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff and Class Members were damaged.

# COUNT V

## NEGLIGENT SUPERVISION AND RETENTION
### (AGAINST USC AND USC TRUSTEES)

119.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

120.   At all times material since 1989 and until Tyndall was removed in 2016, the USC Defendants employed Tyndall.

121.   Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating and assaulting them.

122.   The USC Defendants knew or should have known that Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating and assaulting them, and that this unfitness created a particular risk to Plaintiff and the Class.

123.   Tyndall's unfitness and particular risk to female patients harmed Plaintiff and the Class.

124.   The USC Defendants negligence in supervising and or retaining Tyndall was a substantial factor in causing harm to Plaintiff and the Class.

# COUNT VI

## CIVIL BATTERY
### (AGAINST TYNDALL AND USC)

125.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

126.   Tyndall intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff and the Class Members. He did so by, *inter alia*:

    a.    Isolating Plaintiff and Class Members in closed quarters and dismissing any bystanders; and

    b.    Causing sexual contact.

127.   Tyndall did commit an unwanted contact with Plaintiff and the Class Members' person or property in a harmful or offensive manner, including but not limited to by causing molestation or sexual contact between Tyndall and each woman.

128.   Tyndall's battery of Plaintiff and the Class caused harm, including physical, mental, and/or emotional harm of each Class Member.

129.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women.  Each act of battery of a Class Member was foreseeable given, *inter alia,* USC's knowledge that Tyndall failed to follow protocol, including but not limited with respect to the use of chaperones and taking of photographs of genitalia, complaints from patients and staff members, and the commission of the acts at USC's student health center.

130.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, when women are the most vulnerable but who put themselves in that situation in order to get the medical care they need, are exactly why female patients would expect physician offices and student health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

131.   Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of USC.

# COUNT VII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST TYNDALL AND USC)

132.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

133.   Tyndall's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff and the Class Members.

134.   Tyndall's outrageous conduct was not the type of ordinary physician examination or even rude or obnoxious behavior that women should be expected to tolerate. Rather, Tyndall's conduct exceeded all possible bounds of decency.

135.   Tyndall acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress given the relationship and trust placed in physicians by patients.  In fact, he used this trust to subdue the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

136.   Tyndall's conduct caused suffering for Plaintiff and the Class Members at levels that no reasonable person should have to endure.

137.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to intentionally inflict emotional distress the women.  Each act of battery or assault of a Class Member was foreseeable given, *inter alia,* USC's knowledge that Tyndall failed to follow protocol, including but not limited with respect to the use of chaperones and taking of photographs of genitalia, complaints from patients and staff members, and the commission of the acts at USC's student health center.

138.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, when women are the most vulnerable but who

put themselves in that situation in order to get the medical care they need, are exactly why female patients would expect physician offices and student health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

139.   Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of USC.

**COUNT VIII**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST TYNDALL AND USC)**

140.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

141.   Tyndall's conduct negligently caused emotional distress to Plaintiff and the Class Members.

142.   Tyndall could reasonably foresee that his action would have caused emotional distress to Plaintiff and the Class Members.

143.   Plaintiff and the Class Members were in a specific zone of danger meeting with Tyndall in the examination room and at risk of physical harm, causing their fear when the examination became sexual in nature.

144.   Plaintiff and the Class Members, during their medical examination, suffered distress and emotional harm.

145.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to negligently inflict emotional distress on the women.  Each act of battery or assault of a Class Member was foreseeable given, *inter alia,* USC's knowledge that Tyndall failed to follow protocol, including but not limited with respect to the use of

chaperones and taking of photographs of genitalia, complaints from patients and staff members, and the commission of the acts at USC's student health center.

146.  Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, when women are the most vulnerable but who put themselves in that situation in order to get the medical care they need, are exactly why female patients would expect physician offices and student health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

147.  Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT IX

### RATIFICATION
### (AGAINST USC AND USC TRUSTEES)

148.  Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

149.  Tyndall was an agent and employee of USC between 1989 and 2016.

150.  Tyndall was acting at all times in his position as an agent of and on behalf of USC.

151.  All acts or omissions alleged were ratified by USC and USC Trustees. As alleged *supra,* many of USC's employees, managers, and supervisors, including other medical personnel in the student health center, knew Tyndall was sexually abusing female students and refused to take any action to stop him. Moreover, USC's managers, supervisors, executives, and directors hid this information so Tyndall could continue to work for USC.

152.   With knowledge of Tyndall's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with female students who attended USC.

153.   USC is thus responsible for Tyndall's acts of assault, battery, and intentional or negligent infliction of emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class Members prays that this Court:

A.   Certify the Class, name Plaintiff as representatives of the Class, and appoint her lawyers as Class Counsel;

B.   Enter judgment against George Tyndall in favor of Plaintiff and the Class;

C.   Enter judgment against University of Southern California in favor of Plaintiff and the Class;

D.   Enter judgment against the Board of Trustees of the University of Southern California in favor of Plaintiff and the Class,

E.   Award Plaintiff and the Class Members damages for pain and suffering, and compensatory and punitive damages,

F.   Award Plaintiff her attorneys' fees and costs.


Dated:  May 21, 2018                         Respectfully submitted,

                                             HAGENS BERMAN SOBOL SHAPIRO LLP

                                             By:   _/s/ Christopher R. Pitoun_
                                                   Christopher R. Pitoun
                                             301 N. Lake Ave., Suite 920
                                             Pasadena, CA 91101
                                             Tel.: 213-330-7150
                                             Fax: 213-330-7152
                                             Email: christopherp@hbsslaw.com

Steve W. Berman (*pro hac vice* pending)
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel.: 206.623.7292
Fax: 206.623.0594
Email: steve@hbsslaw.com

Elizabeth A. Fegan (*pro hac vice* pending)
Emily Brown (to be *pro hac vice* pending)
HAGENS BERMAN SOBOL
SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Tel.: (708) 628-4949
Fax: (708) 628-4950
Email: beth@hbsslaw.com
        emilyb@hbsslaw.com