# EXHIBIT 1

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3252**

WRITER'S EMAIL ADDRESS
**shonmorgan@quinnemanuel.com**

April 25, 2019

**VIA PERSONAL DELIVERY**

The Honorable Stephen V. Wilson
United States District Court
Central District of California
First Street Courthouse, 350 W. 1st Street
Courtroom 10A, 10th Floor
Los Angeles, California 90012

Re:   *In Camera* Submission of Complaints to USC Concerning Dr. George Tyndall

Judge Wilson:

As provided in the Court's April 18, 2019 Order, the USC defendants provide for *in camera* review documents reflecting complaints received by USC concerning Dr. George Tyndall during his employment as a Student Health Center physician, and USC's actions in response.

Although the Court appears primarily concerned with alleged sexual misconduct, the Order contains no subject matter limitation.  In an abundance of caution, USC thus provides complaints of any type.  Dr. Tyndall generated a variety of comments over his almost 30 years of employment, the vast majority unrelated to sexual incidents.  For this reason, many documents now provided to the Court were not exchanged with plaintiffs' counsel in connection with the mediation, because those discussions focused solely on complaints related to the lawsuit allegations.[1]

---

[1]   In addition, at the time of the mediation, USC had not completed a comprehensive collection and review of all potentially relevant documents.  The entire set of documents submitted to the Court have now been provided to plaintiffs' counsel in this action (subject to a confidentiality agreement), and were produced to the plaintiffs in the state court litigation on April 19, 2019 (subject to a protective order).  Because the relevant liability question is USC's knowledge during the period Dr. Tyndall was employed, this submission does not include legal filings that followed the May 16, 2018 Los Angeles Times article that contain accusations against Dr. Tyndall or other complaints that have since come to USC's attention through various channels.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

USC also offers the following brief explanatory context to assist the Court's review:[2]

**1989-1999**. From Dr. Tyndall's hiring in August 1989 to 1999, USC did not receive any documented complaints concerning purported sexual misconduct by Dr. Tyndall.[3] The handful of complaints during this period related to possible misdiagnoses, **(Tabs 4, 7, 10)**, issues of general demeanor (*e.g.*, voicing political views, **(Tab 4)**, speaking curtly to a patient, **(Tabs 2 (at -6410), 5)**, or failing to follow up on an insurance issue, **(Tab 8)**), and insufficient confidentiality protocols, which briefly enabled a patient to view the medical details of other patients, **(Tab 9)**. Each of these non-sexual complaints was addressed with Dr. Tyndall by his supervisor, either verbally or in writing.

In 1995, Dr. Tyndall's supervisors were made aware he was photographically documenting the condition of certain patients, utilizing a cerviscope and a camera-ready colposcope—equipment specifically designed for cervicography and colpophotography. **(Tab 2 at -6414-6415.)** There was nothing surreptitious about these clinical photographs. When asked about the purpose of the photos, Dr. Tyndall provided detailed written explanations indicating that patients appreciated the opportunity to view the progress of their treatment in order to make informed medical decisions. *Id*. **at -6414**. It appears the photos do consistently reflect the presence clinical conditions, such as genital warts. Dr. Larry Neinstein, who served as Dr. Tyndall's supervisor for the bulk of Dr. Tyndall's tenure, personally addressed this and other issues with Dr. Tyndall, who agreed to cease the practice of photography.

In sum, of Dr. Tyndall's estimated 19,000-23,000 patient visits between 1989-1999, the University did not receive a single complaint regarding sexually inappropriate conduct or statements by Dr. Tyndall.[4]

**2000-2009**. Between 2000-2009, most complaints concerning Dr. Tyndall again involved non-sexual issues: misdiagnosis **(Tabs 11, 12, 20, 24, 31)**; improper prescriptions of birth control **(Tabs 14, 16, 20, 32, 55)**; failure to follow up with patients **(Tab 18)**; general

---

Currently there are approximately 760 individual claims pending in the state court and federal actions combined.

[2] This letter does not purport to discuss every complaint included in the production and although USC has endeavored to summarize these complaints in a neutral manner, it notes that this document does not reflect the input of the settling plaintiffs, though they have been provided a copy.

[3] There was reference to a complaint in the mid-90s by a nurse about Dr. Tyndall handing out "filth" to students, which was identified as an article from an OB/GYN journal. **(Tab 2 at -6415.)**

[4] The sole potential outlier is a 1998 note included in a Patient Satisfaction Survey that covered all health center doctors, referencing an anal exam in a gynecological setting, for which the patient believes she did not receive sufficient notice. The complaint does not reference any practitioner by name. *See* **Tab 6** (a doctor "during a gynecology exam… suddenly, unannounced, examined me anally as well. This was essentially a shocking, invasive procedure that upset me extremely…"). No source indicated this complaint refers to Dr. Tyndall.

demeanor (including tardiness for an appointment, **(Tab 25)**, and curtness towards patients, **(Tabs 36-38)**); and confidentiality protocols (such as a student's complaint that she overheard calls to other patients on speakerphone, **(Tab 51)**).

Fewer than 20 such complaints arose from the 18,258 patient visits conducted by Dr. Tyndall between 2000-2009. The documents confirm that Dr. Neinstein and Dr. William Leavitt (Dr. Tyndall's supervisors) discussed these issues with Dr. Tyndall, either orally or in writing.

During this period, USC began to receive more concerning complaints regarding Dr. Tyndall. The documentation again suggests that supervisors addressed these issues with Dr. Tyndall:

- On April 28, 2000, a student reported Dr. Tyndall made a comment about a rock musician having sex in the street. Though the comment did not occur during a gynecological exam, she found it "degrading and humiliating." **(Tab 14.)** Dr. Tyndall apologized in writing to the student; Dr. Neinstein both followed up with Dr. Tyndall and addressed the complaint directly with the student. **(Tab 15.)**

- In 2002, several nurses and medical assistants began to complain that Dr. Tyndall was not permitting them access behind the curtain during gynecological exams. **(Tab 22.)** Dr. Neinstein counselled Dr. Tyndall that the "particularly sensitive" nature of the exams required supervision. **(Tab 28.)** When the issue arose again in 2003, Dr. Neinstein addressed it with Dr. Tyndall in September and December **(Tabs 33, 40)**—and included in his handwritten notes that Dr. Tyndall "understood" he must cease doing this. A similar issue was raised in February 2004—though for logistical reasons regarding the placement of the curtain rather than Dr. Tyndall's unwillingness to permit chaperones inside—and Dr. Neinstein addressed it by altering the physical layout of the exam room. **(Tab 43.)** No further complaints regarding chaperones' access arose after that time. (To the contrary, in 2003 a student complained because a medical assistant *was* permitted in the room during a gynecological exam, **(Tab 35)**.)

- Also beginning in 2002, several reports were received—with little accompanying detail—indicating Dr. Tyndall made patients "uncomfortable." **(Tabs 27, 42.)** These complaints were discussed by Dr. Neinstein and others at a Quality Management & Improvement meeting. **(Tab 54.)**

- In October 2009, a student complained Dr. Tyndall had complimented her pubic hair grooming during an exam, asking if she had laser hair removal. **(Tab 59.)** Dr. Tyndall offered a medical justification for the inquiry, and Dr. Neinstein explained that such comments were inappropriate. He included in his notes that Dr. Tyndall said he "understood" and would comply. **(Tab 60.)**

Thus, during the 10-year period from 2000-2009, USC's records do not reflect any unequivocal complaints of inappropriately motivated contact. Dr. Tyndall's supervisors brought each incident to his attention and obtained assurances it would not be repeated.

**2010-2016**.  In April 2010, a former student reported that, sometime between 2003-2005, in response to her statement that she was unable to orgasm, Dr. Tyndall "put an ungloved finger in my vagina and told me to squeeze."  This remains the first and only complaint USC received during Dr. Tyndall's employment suggesting he performed an ungloved vaginal examination.  Dr. Neinstein immediately raised this issue with Dr. Tyndall, who said he would never perform an ungloved examination on a patient, and understood that would be prohibited.  Dr. Neinstein interviewed the student, and escalated the issue outside of student health to the Office of Equity and Diversity.  The OED ultimately took no action given the lack of corroborating witnesses (such as a supervising medical assistant); that Dr. Tyndall patently denied ever engaging in an ungloved exam and agreed it would have been improper; and the alleged incident occurred seven years earlier.  Nevertheless, Dr. Neinstein followed up with Dr. Tyndall, as well as the complaining student, who reported she was satisfied and did not intend to further pursue the matter.  Dr. Neinstein documented the incident. **(Tab 62)**.

In 2013, USC began to receive complaints that Dr. Tyndall was making inappropriate racial or sexual comments.  In April 2013, a student reported Dr. Tyndall made her uncomfortable by speaking about his "beautiful wife" who was a "Filippina." **(Tabs 66 (at -6566), 67.)**  Dr. Neinstein addressed this comment with Dr. Tyndall, documenting the meeting and noting that, while Dr. Tyndall "felt [he] did not say any of these comments," nevertheless the University was addressing the complaint seriously because "[t]he student felt very uncomfortable with these comments." *Id.*  There was also a complaint that Dr. Tyndall had said "Mexicans are taking over," and there would be a "Reconquista."  Drs. Neinstein and Leavitt met with Dr. Tyndall in June 2013; Dr. Neinstein's documentation indicates he told Dr. Tyndall in no uncertain terms: "we cannot be saying racial statements like this in the workplace PERIOD." *Id.*  Dr. Neinstein also again escalated the issue to the OED, **(Tabs 67, 98, 100, 101)**, which separately investigated the incidents. **(Tab 72.)**  Drs. Neinstein and Leavitt met with Dr. Tyndall multiple times to address his comments and practices—including locking his office door when meeting with patients or nursing staff, which Dr. Neinstein indicated "is not good practice and should be stopped immediately," **(Tab 28)**, and that Dr. Tyndall agreed to stop. **(Tabs 28, 70, 74.)**  Dr. Neinstein told Dr. Tyndall that "failure to make changes in job performance in these areas in our patient care environment could result in disciplinary action." **(Tab 28.)**

In September 2013, the OED found no policy violation by Dr. Tyndall based on witness interviews and in light of Dr. Tyndall's agreement to leave his door unlocked in the future.  **(Tab 66 at -6610.)**  On October 9, 2013, the OED officially concluded there was no actionable evidence of any University policy violation by Dr. Tyndall. **(Tab 67.)**  Significantly, Cindy Gilbert, the nurse who later reported Dr. Tyndall in 2016, was interviewed in 2013 and did not raise any instances of inappropriate sexual conduct or statements by Dr. Tyndall, although she referenced certain behaviors as "creepy."[5]  She described Dr. Tyndall as "a little 'different' but not in [a] negative way." *Id.*

---

[5]  *See* October 9, 2013 OED Memorandum from Karen Nutter to File **(Tab 67)** (Ms. Gilbert testified that "while [Dr. Tyndall] seemed a little 'rough' in his exams, he did not do or say anything inappropriate").

4

Complicating the University's ability to contextualize the full history of Dr. Tyndall's conduct, the Student Health Center experienced leadership turnover during this period due to a serious illness of Dr. Neinstein.  In late 2013 Dr. Jim Jacobs took over from Dr. Neinstein as Medical Director of the Student Health Center, and was himself succeeded by Dr. Leavitt in February 2016; Dr. Neinstein passed away April 27, 2016.

In any event, for more than two years following the 2013 OED investigation, there were no additional complaints of any type of sexually inappropriate comments or conduct concerning Dr. Tyndall.  Then in early 2016, a series of events transpired that led to his separation from the University.  In January 2016, an African-American student who was denied access to the Student Health Center building after hours by Dr. Tyndall stated that "Dr. Tyndall is a racist. He treated me like a criminal and made me feel less than a person." **(Tab 79.)**   In April 2016, students reported separate incidents in which Dr. Tyndall said "a Chinese woman has backed up my schedule because she needed a translator," and "black people have too many children."  **(Tab 83.)**  In May 2016, a patient complained Dr. Tyndall used two fingers during an exam against her instructions. She also indicated Dr. Tyndall told her she could "fake being a virgin" while discussing her Middle Eastern culture. **(Tab 87.)**  In June 2016, OED interviews with various medical assistants and nurses indicated that Dr. Tyndall had a practice of commenting on patients' pelvic tone and asking patients if they were runners during vaginal examinations. **(Tab 90.)**

On June 2, 2016, Cindy Gilbert, then the Nursing Supervisor at the Student Health Center, reported Dr. Tyndall to the Relationship and Sexual Violence Prevention and Services center at USC—which informed OED of Ms. Gilbert's concerns. **(Tab 82.)**  She described only comments by Dr. Tyndall that she believed were objectionable, and did not identify any purported inappropriate physical contact.  **(Tab 82.)** (Notably, Ms. Gilbert was interviewed in 2013 and did not report any specific instances of inappropriate touching or sexual comments by Dr. Tyndall, **(Tab 67)**).  On June 16, 2016, while Dr. Tyndall was on vacation, old photographs and slides of patient cervices were discovered in Dr. Tyndall's office, **(Tab 91)**, following which the University placed Dr. Tyndall on administrative leave as of June 21, 2016.

At this stage, USC engaged an independent physician auditor, MD Review, to conduct a comprehensive review of Dr. Tyndall's record and practices on November 15-16, 2016, producing a report on November 30.  **(Tab 98.)**  Although MD Review took issue with certain of Dr. Tyndall's practices and recommended significant counseling, they also discussed "a pathway for Dr. Tyndall's safe return to practice." *Id.* **at -6772.**   Thus, regardless if hindsight reveals termination would have been advisable at that point, even independent medical evaluators did not conclude he was necessarily unfit.

Once placed on leave, Dr. Tyndall never treated another USC patient. In January 2017, the OED concluded its second investigation, finding that Dr. Tyndall had violated University policies against racial and sexual harassment. **(Tabs 100-101.)**  Dr. Tyndall was terminated on May 16, 2017, and, following mediation, resigned on June 30, 2017.

* * *

The foregoing discussion focuses on complaints that were documented in USC's records. Since the lawsuits were filed, additional patients contend that they had contemporaneously expressed concerns or complaints orally to health center staff or other University personnel that are not reflected in these documents. Patients also allege numerous unreported incidents of sexual misconduct by Dr. Tyndall. And plaintiffs' counsel has contended that Dr. Tyndall engaged in regular practices (including, for example, bi-manual digital exams before use of a speculum) that they assert fell outside prevailing best practices or the standard of care, but that were not reported by patients as improper at the time. All of these considerations of course factored into the parties' extensive settlement negotiations.

Very truly yours,

Shon Morgan