# EXHIBIT 2

# Tab 01

February 21, 1995


Interview Notes


██████████████ responded to a call from Bernadette Kosterlitzky, Quality Management, to come to the Student Health Center for a conversation. Bernadette was filling in at the Faculty/Staff Clinic. She asked me to talk with him.

██████████ told me he planned to sue USC Student Health Center, Dr. Tyndall, Dr. Chan and Dr. Figatner and maybe Dr. Gardner.

He reported he is a patient of Dr. Jones and is satisfied with her care.

He plans to sue Dr. Tyndall for misdiagnosis and giving him medication that caused him his medical troubles. I believe his claim is that this drug gave him toxic hepatitis. He reports he has "permanent damage' as a result.

He also believes Dr. Chan misdiagnosed him i.e., missed the diagnosis of toxic hepatitis.

He will sue Dr. Figatner and perhaps Dr. Gardner for an "ego conflict" with Dr. Jones. They took her off his case when he "needed close supervision for strong medication". They lied to him and said "She was sick" (and denied him access to Dr. Jones).

He reports being treated in an emergency room. He had no insurance and was told by Student Health Center (Dr. Gardner?) that the bills were his responsibility. He is angry about this as well as his treatment by Dr. Tyndall and Dr. Chan.

I have asked Quality Management (Bernadette) to inform Risk Management (Doug Moore). She and Dr. Figatner have reviewed the chart. Dr. Figatner reports that Dr. Jones may actually be the prescribing physician (evidence are the Pharmacy slips).

I believe Dr. Bernstein reviewed this chart because it was one where Dr. Gardner had raised issue with Dr. Jones about her care of this case.

In my opinion Dr. Jones is coaching this patient in seeking legal action against the Student Health Center and the above named physicians.

This makes Dr. Jones a high risk employee who uses poor judgment in terms of

her own liability which is also our liability. On the other hand, Dr. Figatner informs me the medication prescribed was appropriate for his condition and that drug reactions are possible. However, after over six months, his current medical condition can't be a drug reaction. There of course could be more to this. I requested Dr. Figatner to consult with Dr. Leavitt about this case last week when he reported Dr. Jones had alluded to legal action by ▮▮▮▮▮. Dr. Figatner reported at that time that ▮▮▮▮▮▮ treatment was not progressing.

Dr. Figatner and Dr. Leavitt concurred that Dr. Jones needed to refer ▮▮▮▮▮ for a consultation by a Rhematologist and she could continue to follow him at the Student Health Center. This was communicated to Dr. Jones.

Finally, it supports the clear pattern that when Dr. Jones doesn't get what she wants, she will do something to create uproar and blame someone else. This pattern of defying authority (and rational behavior) has been documented back to discussion with Dr. Gardner when he placed her on probation. This center is at risk due to her unprofessional conduct and disregard for reasonable policy and procedures on both administrative and medical matters.


Bradford D. King, Ed.D.
Interim Executive Director
Student Health Center

# Tab 02

# On Matters Between

# George Raymond Tyndall, M.D.

# And

# The University of Southern California

June 13, 1996

CONFIDENTIAL

# Contents

Part One................................................................................................1
Introduction........................................................................................1
My Annual Performance Evaluation.........................................................1
The State Of The UPHC In 1989 ...........................................................2
The Kaiser Opportunity.........................................................................2
The UPHC Opportunity........................................................................3
First, The Opportunity To Have A Very Nice Office...............................3
Second, Opportunities To Earn Extra Compensation.............................3
Third, Opportunities To Earn Extra Time Off Beyond The Usual Vacation Time....3
The CME System ......................................................................3
The Beeper-Compensatory Time Off System ..................................3
But The UPHC Opportunity Also Entailed A Major Trade-Off....................4
So I Chose To Become A Member of The Trojan Family ...........................5
Unfortunately, The "Honeymoon" Was Short .......................................5
And The Controversy Continues ..........................................................6
A Hypothetical Courtroom Scenario................................................6
The Snub.................................................................................7
Questions For Larry Neinstein .....................................................7
This Is Why In The Case Of The UPHC A Separate Women's Clinic And Men's Clinic Is Retrogressive....................................................................................8
We May Still Not Be Properly Organized For Accreditation.........................8
Part Two...............................................................................................11
Five Requests ...................................................................................11
1) Allegations That Patients Do Not Wish to Follow Up With Me...............11
Request #1........................................................................................11
2) Your Proposal To Change Practitioners' Office Locations ....................11
Request #2......................................................................................12
3) Your Proposal To Change The System For Granting Compensatory Time ....12
Request #3......................................................................................13
4) Your Proposal To Alter The Current System Of Staffing The UPHC Between The Hours Of 5 p.m.-7p.m. ...................................................................13
Request #4......................................................................................14
5) The Proposal For A "Women's Clinic" and "Men's Clinic" In The Context Of My Employment Contract.........................................................................14
Request #5......................................................................................15
Appendix—Special Note To Larry Neinstein .........................................16
California Contract Law—Lawsuits Over Contracts.................................16

# Part One

## Introduction

First of all, I wanted to thank you for taking the time to meet with me on June 5 to discuss my interest in being actively involved with the process of accreditation of the University Park Health Center (UPHC). As you can see from the set of enclosed documents which I wrote prior to your arrival, I have been very interested in moving the UPHC toward accreditation.

Secondly, I wanted to tell you how much I enjoyed the June 11 retreat. Especially during this time of rapid change in the health care industry across our nation, I believe such all-staff meetings are invaluable for both informational purposes and morale. As you no-doubt gathered from my comments at that time, you have my complete support with regard to your concept of taking a pro-active, as opposed to a re-active, position during this time of change. In light of that meeting, it seems to me that my position differs from that of certain other staff members only in terms of *degree*. I believe that all the evidence currently available supports my opinion that the UPHC is highly-regarded among our clients and that, therefore, only some tweaking and fine-tuning here and there is indicated. Others, particularly members of the Department of Health Prevention and Promotion (DHPP), obviously are anxious for more substantial changes—and the sooner the better.

My main concern continues to be that we do not allow obvious dissatisfaction and frustration within the DHPP regarding their current roles at the UPHC to result in us throwing out the baby with the dirty bath water, so to speak. *The current manner of operation of the UPHC is one which has evolved over a period of many years in response to the demands and needs of our clients.* Not only the various polls of the students but also the current low rate of turnover among UPHC staff would indicate that the current manner of operation is quite satisfactory. That is why I take a more moderate position regarding change than some.

For the remainder of this paper, I want to take you up on your offer of June 5 that I discuss any concerns I have, regarding proposed changes in our operations, with you directly. My plan is to first put all my concerns here in writing so that you can review them at your leisure, then meet with you in a week or two after you have had time to consider each one of them to discuss them in detail.

## My Annual Performance Evaluation

During the meeting of you, Dr. Figatner and me on Wednesday, April 24, which I requested in response to a comment which was made on my annual performance evaluation—"There have been occasional reports that patients do not wish to have follow-up appointments with Dr. Tyndall"—no evidence was presented which would justify such a comment on my evaluation.

You indicated that there was an ongoing collation being done of the comments of students regarding their impressions of the care they received at the UPHC, but no evidence was presented at that time which would indicate that patients are not wanting to follow up with me to a degree that is different from any other UPHC practitioner. Now that the results of Student Satisfaction Survey are in, I still am not aware of any justification for the subject comment in my evaluation.

2

As to the origin of such comments, I believe I have been the victim over the past years of a campaign to smear my professional reputation, and I am saddened that this campaign seems to have re-surfaced long after the individual(s) whom I had thought responsible for it have departed the UPHC. The strangest part of all this is that if you will review my personnel file, you will note that I have a dozen or so highly-complimentary letters from patients regarding my care—a fact which makes the continued innuendo especially puzzling.

It is very important to me that you have a clear picture of how, in my view, all this came about, so I hope you will bear with me while we go back in time.

# The State Of The UPHC In 1989

I know from your comments of May 3 that you were a consultant at the UPHC during the period 1975-1983. But there are events that occurred between 1983 and 1989 about which, as Executive and Medical Director, I want you to know.

When I arrived nearly seven years ago, it was following a period in which the UPHC had been in great turmoil. By all accounts at least five highly-regarded physicians, plus other personnel, resigned before the *governing body* (the Division of Student Affairs) took action. Only after the Executive Director and the Medical Director (two different individuals) had departed did relative tranquility return to the UPHC. That was just before I arrived in August, 1989. (I filled an opening that had been created by one of the resignations.)

I arrived at the UPHC shortly after completing a residency in obstetrics-gynecology here in Los Angeles at Kaiser. Outside the field of obstetrics-gynecology, it is not commonly known that Kaiser's residency in obstetrics-gynecology is one of the most sought after in the nation. In fact, there were 550 graduates of United States' medical schools who applied for the five positions, and of the five of us who were accepted, four, including myself, had been "AOA" in medical school. (I obtained my medical degree from The Medical College of Pennsylvania, formerly Woman's Medical College of Pennsylvania.)

# The Kaiser Opportunity

Once having completed my residency in 1989, the choice I had to make regarding employment was not an easy one. On the one hand, Kaiser had offered me a position as staff obstetrician-gynecologist at Zion Medical Center in San Diego, a position which would normally lead to full partnership in two years. When I was chosen for that position, a representative from the Southern California Permanente Regional Personnel Office called to congratulate me. She added: "Dr. Tyndall, did you know that there are nearly two dozen staff obstetrician-gynecologists who have been on a waiting-list for San Diego, some of them for nearly a decade?" When I replied that I had not known that, she said, "Well, I want you to know that you are very fortunate." The starting salary in 1989 was $96,000 for a forty-hour week, with the opportunity to increase one's earnings by as much as one-half that amount in the first year by taking *optional* extra duty. Even without extra duty, the salary schedule for obstetrics-gynecology at Kaiser increases by $1,000 per month during the first few years—to, I believe, a base salary of about $150,000 in five years for a forty-hour week.

The job market of course, is much different today. Nowadays, I understand, Kaiser is not even hiring physicians, and the employment situation for physicians is generally bleak throughout Southern California.

3

# The UPHC Opportunity

Apart from the Kaiser offer, an attractive offer was made by the management of the University Park Health Center. Although the starting salary was much lower— $65,000 for a 37-1/2 hour week—I was informed that there existed opportunities to earn extra compensation by working extra hours in the evenings and on Saturday mornings. In addition, there was the opportunity to earn extra time off. Here are the details of what were offered to me.

## First, The Opportunity To Have A Very Nice Office

Interim Director Dr. Ron Mandel indicated that, if I came to the UPHC, he would give me one of the nicest offices, Room 218, which I have occupied since I first arrived in 1989.

## Second, Opportunities To Earn Extra Compensation

Dr. Mandel stated that I would work from 8:30 a.m. to 5 p.m. (with a one-hour lunch) for a total of 37-1/2 hours per week. But in addition, I was offered the opportunity to work from 5 p.m. to 7 p.m. on Monday through Thursday evenings, for a total of eight extra hours per week. The record will show that I in fact have been working those eight extra hours per week every year since my arrival in 1989. The compensation that I currently receive from this extra work amounts to about $10,000 per year.

## Third, Opportunities To Earn Extra Time Off Beyond The Usual Vacation Time

Apart from vacation time, the following were described to me in 1989 as being long-standing benefits that were available to all physicians who practiced at the UPHC:

### The CME System

Physicians are allowed to take up to 8 paid days per year off for California-required continuing medical education; those physicians who take their CME on their scheduled time off—such as weekends and holidays—are allowed to take an equivalent number of compensatory days off at another time, usually during the slower summer months. (UPHC policy was and continues to be that two-thirds of all scheduled time off must be taken during the lower-patient-census summer months.). For example, if a physician attended a conference on a Saturday, s/he would subtract 7-12 hours from her or his CME balance but then be compensated with an equivalent 7-/12 hours of time off at a future date.

### The Beeper-Compensatory Time Off System

As you know, USC currently has an enrollment of well over 20,000 students, each and every one of whom is entitled to seek medical advice over the telephone at any time of the day or night. When the UPHC is closed, a physician is on-call throughout the evening/night and on weekends. Physicians who carry the on-call beeper receive approximately 1.4 hours off for each weekday evening/night and each weekend 24-hour day/evening/night that they carry it.

4

# But The UPHC Opportunity Also Entailed A Major Trade-Off

But to choose the UPHC over Kaiser involved a major trade-off—*a trade-off that will follow me for the rest of my professional career*; namely, loss of the opportunity to become certified by the American Board of Obstetrics-Gynecology (ACOG).

As you may know, unlike your field of expertise, Pediatrics, whose Academy I believe grants board certification after completion of the required three-year residency and passing the written examination, ACOG requires both completion of an approved 4-year residency and passage of the written exam *plus* two-years of practice of the full range of the specialty, including the performance of surgery at an acute-care hospital, before final certification is granted following an oral exam

I passed ACOG's written exam at the end of my residency, but because I can not practice the full range of the specialty here at the UPHC, *the decision to come here meant giving up the opportunity to become board-certified*. That consideration was by far the most profound aspect of the decision I had to make, as lack of board certification—especially in today's world of managed care—can mean virtual exclusion from employment.

I discussed this issue with Interim Director Ron Mandel, and he agreed that the situation I was in posed a real dilemma. But if I were to take the Kaiser job and obtain board certification after two years, he could not guarantee me that a position at the UPHC would still exist. In fact, Interim Director Mandel informed me in 1989 that, prior to the recent spate of resignationss, it was quite rare for openings at the UPHC to occur.

"How secure is employment at USC?" I asked him.

"Short of a major blunder, like stealing University property, it's almost impossible to get fired," he replied. "The University protects its employees by requiring that certain clearly-specified procedures be followed before an employee can be dismissed. Speaking as a manager, I can tell you that if you are a good employee job security at USC is very high."

So my choice was clear: good salary/good job security/partnership status/board certification at Kaiser, but only very limited time off vs. acceptable salary/good job security/no board certification but the opportunity—one that is very important to me—to earn extra time off in the summer at the UPHC, in an employment opportunity that might come along only once in a lifetime.

Last but not least, of course, was the opportunity and privilege of taking care of the wonderfully-interesting students of the University of Southern California.

# So I Chose To Become A Member of The Trojan Family

Kaiser-Permanente gave me until November, 1989, to make up my mind. After giving it much thought, I decided to stay at the UPHC where, because of my background in both obstetrics-gynecology and family practice (I had moonlighted for about 40 hours per week at Kaiser's busiest Family Practice Urgent Care Center during the last two years of my residency), I was perceived as a very desirable new employee.

*And treated as such*: In addition to the benefits described above, Interim Director Ron Mandel granted virtually all my requests, including the purchase of a $2500 Cervicscope from the National Testing Laboratories, plus a camera-ready colposcope, instruments that I had become familiar with as a result of my fellowship with the American Society for Colposcopy and Cervical Pathology (ASCCP). As the many letters in my personnel file regarding this equipment will attest, the students were extremely pleased that the University authorized the purchase of such equipment, mostly because they liked having the opportunity to view their lesions—usually condylomata—both "before-treatment" and "after-treatment." (See further discussion below.)

In short, apart from attractive employee benefits, I joined the Trojan Family because I was made to feel that I would be a highly-valued employee who would be encouraged to introduce to the UPHC the latest techniques and equipment for the care of my gynecology patients.

# Unfortunately, The "Honeymoon" Was Short

Unfortunately, my use of this equipment caused much consternation among some of the staff (primarily some of the R.N.'s and some of the medical assistants). Although I gave a number of all-staff talks and demonstrations regarding this equipment and the reason for its use, controversy abounded. Interim Director Dr. Ron Mandel explained this to me as follows:

> You have to understand the mentality of some of the employees. For many years, the UPHC has employed certain individuals who believe that male students should be seen only by male practitioners, while female students should be seen only by female practitioners. You are the first full-time staff we've had who's been trained in obstetrics-gynecology, and, you being a male, it may take them some getting used to.

"But there's Dr. Howard Mandel, who's also an obstetrician-gynecologist and male" I replied.

"Yes, but he's only here for one or two half-days a week. Let's have you give another talk regarding your equipment. Explain to the R.N.'s and M.A.'s once more what you are doing with your cameras and why you are doing it. Show them some examples."

We closed the UPHC for one-half hour so all the interested personnel could come to my office and view the equipment plus sample photographs and slides. After my presentation, the then-Director of Nursing said to me,

"But why is your practice so different from that of the others gynecologists, like Dr. Mandel?"

I replied that since I had the conferences of the American Society for Colposcopy and Cervical Pathology (the mouthpiece of the American College of Obstetrics-Gynecology regarding diseases of the female lower genital tract) I had learned about these techniques, which the instructors utilize in the conferences and seminars, and then begun to utilize them myself.

"Many of the patients really like being able to see the progress of treatment and that their genital warts are gone," I said.

"Also, because in many cases patients have elected to have minor-grade lesions of the cervix serially followed rather than treated, cervicography and colpophotography allow the patient and I to keep a serial record of whether their lesions are disappearing without treatment," I added.

"If serial observation does not show that their lesions are regressing, then there is a legitimate reason for therapy. This is exactly what the American Society for Colposcopy recommends for compliant patients who can be relied on to come in for regular follow-up and who elect serial observation over treatment, as most of my patients do."

"But why aren't the other gynecologists using these techniques?"

"For the answer to that question, you'll have to ask them," I replied.

And I gave more talks. Just after the arrival of our former Executive and Medical Director, Stephen Gardner, M.D., M.P.H., I gave a talk on Human Papilloma Virus (HPV) infections and genital condylomata. One of the practitioners, a physician, raised her hand and asked this question:

"What about oral sex? Can patients become infected in the oropharynx from oral-genital contact?"

Now Larry, I thought this was a very reasonable question when asked among a group of medical practitioners, R.N.'s and M.A.'s who are providing care to young people on a college campus. But as I began to answer the question, I noticed that the then-Director of Nursing, who was seated at the back of the room, became red in the face, covered it with her hands, and then began shaking her head. She was apparently appalled that such a question had been asked. As I went on to answer Dr. Weinheimer's question, the then-Director of Nursing continued to shake her head while it was buried in her hands.

It was after that experience that I informed Dr. Gardner that, in the future, I probably should give gynecology lectures only in the presence of the medical practitioners.

6

And there is still more to this topic of the discomfort of certain members of the staff regarding my practice.

In 1995, just after Brad King took over as Interim Director, the then-Director of Nursing (not the same one) reportedly approached him to complain:

"Dr. Tyndall, who is not even trained in obstetrics-gynecology but only has an interest in it, has been taking pictures of the female patients."

When, according to him, she was informed by Dr. Figatner that I was fully trained in obstetrics-gynecology, she replied, "I am not going to accept that." As I recall, it was shortly after that the allegation—"Some patients are cancelling their follow-up appointments with Dr. Tyndall"—first began circulating.

Based on the comment in my April, 1996 evaluation, it has become obvious to me that—even after the departure of the individuals who seemed to have a particular problem with my use of photography—there is still someone in the UPHC who is seeing to it that the innuendo continues and, it seems, my professional reputation *slandered*. Yet, to repeat, not one shred of evidence has ever been presented to me—or to anyone else to the best of my knowledge—that any of my patients have not wanted to follow up with me to a degree that is different from any other practitioner at the UPHC.

This innuendo as best I can tell has to do with two phenomena:
• the innovative photographic techniques—cervicography and colpophotography (techniques without which there would be no such thing as a textbook of colposcopy)—that I introduced to the UPHC in 1989; and
• nearly-unimaginable prudery among certain UPHC staff members for a field such as student health, in which problems with human sexuality, menstrual difficulties and sexually-transmitted diseases—to name just a few—are especially common.

# And The Controversy Continues

Let's move on to other indicators of the degree to which I have been, in my view, unjustly controversial.

It so happens that I am a rather voracious reader. When I first arrived at the UPHC, it was my habit to distribute to the other practitioners photocopies of interesting articles I had come across in the obstetrics-gynecology literature. One day, I was informed that one of the R.N.'s, then the "Quality Assurance Coordinator "(there was no "Director of Quality Management" until Bernadette Kosterlitzky came along)—had complained to Dr. Figatner about "the filth that Dr. Tyndall is distributing."

"And he is wasting our Xerox paper, too," she reportedly added.

That "filth," Larry, turned out to be an article from *The Female Patient*, a recognized journal of importance in the obstetrics-gynecology literature.

Then another strange event occurred. I learned that a female physician had complained to Dr. Figatner that it was inappropriate that I nearly always ask reproductive-age female patients (the vast majority at the UPHC) the date of their last menstrual period (LMP), regardless of their complaint.

"That's an invasion of privacy," she reportedly said to him.

Now I ask you this question, Larry: Practically speaking, can you think of any significant medical complaint that a reproductive-age woman could have regarding which her LMP is not important? Apart from the fact that pregnancy is in the differential diagnosis of so many complaints in our population, virtually all medications, including those sold OTC, have some sort of disclaimer about usage in pregnancy. Strictly speaking (and how else should we be speaking in today's medico-legal environment), it may be a case of *prima facie* medical malpractice to prescribe most medications to a reproductive-age woman without first determining whether she might be pregnant. Yet, according to at least one UPHC physician, to ask such a question was not medically necessary but an "invasion of privacy."

## A Hypothetical Courtroom Scenario

From that story, let's construct a short courtroom scenario.

**Attorney for the plaintiff:** "Now, Dr. X, the record shows that my patient's newborn infant has a severe birth defect. Isn't it true that you prescribed medication Y to her when she was about 7 weeks pregnant, that is, during the critical period of gestation in which organogenesis occurs?"

**Dr. X:** "Yes, I prescribed that medication, but I asked the patient whether she was pregnant, and she said, 'No.'"

**Attorney for the plaintiff:** "And you accepted that? Have you not heard during your medical training of the psychological concept called 'denial,' which is especially common among students, who don't want to believe that they could be pregnant, especially when they have two final exams coming up?"

**Dr. X:** "Yes, I'm familiar with the concept called 'denial.'"

**Attorney for the plaintiff:** "But did you ask your patient whether her menstrual periods are regular and when her last menstrual period was, whether it came at the right time and lasted the right number of days? In other words, did you make a careful attempt to ascertain that she was not pregnant before prescribing her medication?"

**Dr. X:** "Perhaps not as careful as I could have"

**Attorney for the plaintiff:** "Why not?"

**Dr. X:** "Because I think such questions are an invasion of the patient's privacy."

Larry, given such a mentality, here's a question for you: Are you beginning to see why I have given up on gynecology talks or handouts—now, even for the practitioners—at the UPHC?

## The Snub

But there is still more to this sad story.

Last year, the *Continuing Quality Insurance (CQI) Committee*—which was then chaired by an R.N. (Bernadette Kosterlitzky) and which was composed mostly of medically-untrained members of the *allied health staff* (department heads and such)—implemented a new gynecology form without ever offering the UPHC's only fully-trained obstetrician-gynecologist—or any other members of the UPHC's *medical staff (D.O.'s and M.D.'s),* to the best of my knowledge— any opportunity whatsoever to comment on it.

How's that for a snub, Larry?

And the stated reason for creating the new form?

"Some patients are uncomfortable with questions about orgasms, frequency of intercourse, and such."

Now, I'm sure we'll be discussing this topic later in great detail, but for now, as you very well know, oral contraceptives (OC's) can and do affect libido and, in turn, frequency of intercourse as well as the ability to achieve orgasm. Thus, a question about orgasm or changes in libido is perfectly legitimate on an "Oral Contraceptive Follow-Up" form. Over the years, I have had many patients describe near-breakups (including marital breakups) because of changes in libido that subsequently could be traced to an OC. That is one reason—just one among many, as you can see from the enclosed memo dated February 22, 1995—why I do not utilize the new "Oral Contraceptive Follow-Up" form.

## Questions For Larry Neinstein

Larry, with regard to the OC follow-up form: Could we have here still another example of prudery on the part of certain members of the UPHC staff taking precedence over good medical/gynecologic care?

*If* it is really true that "some patients are objecting to certain questions on the form," then is that an acceptable reason to lower our standard of care for the majority of patients, who appear to have no problem at all with these questions?

Many of our patients know nothing of Masters and Johnson and their description of the stages of human sexual response and many have never heard of USC's own Arthur Kegel and his *Kegel exercises.* Having the question about orgasm on the form lets these many patients know that this topic is suitable for discussion, *if they are so inclined.* Those few who are uncomfortable with the question regarding orgasm usually leave it and the following question ("Concerns _____?") blank, in which case we might never discuss the issue.

But then again, we might, if the patient gives any indication that she wishes to do so. Larry, as you very well know, every medical school in America teaches that a Sexual History is an integral part of the Medical History. And articles on human sexuality permeate today's magazines and periodicals that are targeted at the general public.

Yet, think about this: Dr. Figatner once said to me during a discussion regarding the OC follow-up form, "I think you are the only practitioner who gives a handout on Kegel exercises if the patient indicates that she has concerns about anorgasmia. The other gynecologists don't even address the issue, as far as I know."

Larry, my handout on Kegel exercises comes from an issue (an old issue at that) of—are you ready for this?— the *Reader's Digest* which, as you may know, is read by more people throughout the world than any other single publication.

8

Are you understanding what I am saying here? The editors of the most widely-read publication on Planet Earth believe that the subject of anorgasmia is suitable for discussion in their publication, yet here at the UPHC—a practice-setting in which issues of human sexuality are ubiquitous—I am reportedly the only gynecologist who responds when a patient writes down that she has questions about problems achieving orgasm.

That is why I continue to believe that the relevant question ought to be *not* "Why is Dr. Tyndall's practice so different from that of the other gynecologists?" but rather, "Why are their practices so different from mine?"

When I happened, by pure chance, to learn that the new OC form was about to be implemented, I presented a very lengthy and detailed memorandum (a copy is in the enclosed set of documents) concerning the inadequacies of this new form. Yet I never received so much as an acknowledgment of that memorandum, on which I had spent many hours of my personal time. The new form was simply implemented by the *CQI Committee* without further discussion.

Larry, would you not be offended if a form pertaining to pediatrics or adolescent medicine was implemented by mostly untrained members of the *allied health staff* without so much as a solicitation of your views?

You indicated in our meeting of April 24 that we will be discussing our medical forms during the summer. I look forward to presenting you with my views at that time. Enough said for now.

# This Is Why In The Case Of The UPHC A Separate Women's Clinic And Men's Clinic Is Retrogressive

With that history, you can perhaps see why, in my paper of May 15, I saw these clinics as a not-so-well-disguised attempt to retrogress to the UPHC's not-so-distant past, when male patients were assigned mostly to male practitioners and female patients mostly to female practitioners.

The proponents of these clinics would have us believe that such clinics provide superior care. Yet, they have offered not one iota of evidence in support of this claim. The concept that *we should do this because other student health centers are doing it* has no more credibility, in my view, than the concept (one I know you dislike, too) that *we do it this way because we've always done it this way.*

As I said in my paper of May 15, if it is our intention to become accredited by the AAAHC then proposals such as this one should be submitted—with sufficient detail regarding where the clinics will be located, who will staff them, what the costs are, etc.—to the *medical executive committee* prior to submission to the *medical staff [D.O.'s and M.D.'s]* as a whole, for consideration, per ARTICLE XII of the *Model Bylaws* of the AAAHC.

# We May Still Not Be Properly Organized For Accreditation

Which brings us to this final section of Part One of this paper.

As you know, the accreditation process involves interviews with many, if not most, of the UPHC staff. A "Guiding Principle" of accreditation, whether by the AAAHC or the JCAHO, is that "The medical staff will be self-governing with respect to all professional activities." Should AAAHC surveyors learn that the *medical staff* has not been self-governing, that is, that changes in their professional activities were made without their express approval, then our years of effort prior to the survey may well have been wasted.

9

Larry, I don't know any good way to say this tactfully, but I am going to try my best. You have said that Bernadette Kosterlitzky, R.N. will be attending an upcoming AAAHC conference, and I assume that means that you will be relying on her for advice and guidance as we proceed through the process of becoming accredited. Since she purportedly has years of experience in the area of accreditation, she is a logical choice to attend the seminar. All I am going to say at this time is that a number of the staff, including me, have attempted on a number of occasions to confirm the authority for some of the directives and statements that she has issued but we have been unable to do so. Our perception is that Bernadette has a very strong yen to be seen as a manager and as a person in authority and that this yen sometimes, how shall we say, *clouds* her interpretation of what she reads.

A good example is the current composition of our *medical executive committee*. I know she says that it is commonplace to have non-physicians sitting as voting members on the *medical executive committee* but despite being invited to do so, she has never furnished even one example of an ambulatory health organization that is so organized. We are aware that sometimes the *medical executive committee* will invite, say, the Director of Nursing or the Quality Assurance Coordinator—excuse me, the Director of Quality Management (a title, by the way that came to the UPHC with Bernadette's arrival) to attend certain parts of a *medical executive committee* meeting if their presence is necessary, but we have been unable to confirm an instance in which any non-physicians have actually sat as regular voting members of this committee.

By the way, I hope you can find the time to review the attached documents which summarize the definitions, guidelines and requirements of the AAAHC regarding the structural organization that an ambulatory health center (AHC) that seeks to become accredited should possess. I have spent hours upon hours plus a fair amount of my own money (mostly on phone calls) researching these issues over the past years. Here's what is contained in that set of documents:

- Paper A is a summary of the *Model Bylaws* of the AAAHC. The most important points are these:
  - *allied health professional* includes physician assistants, nurse practitioners, podiatrists, psychologists or, in general, "licensed health care professionals other than a physician"
  - *medical staff* is defined as D.O.'s and M.D.'s
  - *allied health staff* includes all other professionals at the AHC (R.N.'s, M.A.'s, medical records professionals, lab techs and so on)
  - *governing body* means the Division of Student Affairs or, in general, the management staff of the University of Southern California, including the UPHC's Executive Director
  - appointment authority to the *medical staff* lies with the *medical staff* together with the *governing body*
  - applications for such appointment should be developed by the *medical executive committee*
  - the *governing body* may accept the recommendation of the *medical executive committee* or refer it back
  - *medical staff* privileges are granted, continued, modified or terminated by the *medical executive committee* or, in the case of the UPHC, by the *governing body* upon recommendation of the *medical executive committee*
  - in the case of hearings involving an *arbitrator* the hearing officer shall be an *attorney at law*
  - the *officers of the medical staff* include the *medical director*, the *assistant medical director* and, probably not in our case, a *secretary-treasurer*
  - the *medical director* is the chief officer of the *medical staff* (thus, when there is a combined Executive Director/Medical Director such as at the UPHC, that person both heads the *medical staff* and is a member of the *governing body*
  - *committees*—Larry please note that the functions of these committees are to be "performed by a solo practitioner or group of practitioners acting as a committee of the whole"—that is to say, if there are separate committees, each of these committees should be headed by a *practitioner* and this chairperson and the members of the various committees "shall be appointed by the medical director subject to consultation with and approval by the *medical executive committee*"(this is in line with "the guiding principle" for accreditation; namely, "the medical staff will be self-governing with respect to all professional activities")
  - the *medical executive committee* "shall consist of the officers of the *medical staff* [the *medical director* and the *assistant medical director*, in our case]" and, optionally, "the standing committee chairpersons" [as defined in the last paragraph]—note that all members of the *medical executive committee* should thus be D.O.'s and M.D.'s
  - the *medical records committee* shall have a chairperson [who is a member of the *medical staff* appointed by the *medical director*] and "it shall consist of [] *medical staff* members [note the plural]" plus, optionally, "a nurse representative and employees in charge of maintaining medical records"

- similarly, the *utilization review committee* "shall consist of [] *medical staff* members"—note once again that these committees are composed primarily of members of the *medical staff*, in other words, the D.O.'s and M.D.'s
- as another example, the *pharmacy and therapeutics committee* "shall consist of at least [] *medical staff* members" plus, optionally, "a voting representative from the pharmaceutical service, a non-voting representative from the nursing service" and, again optionally, "a non-voting representative from the *governing body*"
- the *quality assurance committee* "shall consist of [] *medical staff* members of the organization, a member of the nursing service" and, optionally, "a member of the *governing body*"
- and so on for the rest of the committees, with the exception of the *joint conference committee*—note that this committee consists of "an equal number of members of the *governing body* and of the *medical executive committee*" and "the chairmanship of the committee shall alternate yearly" between the two groups
- I have already discussed elsewhere ARTICLE XII regarding rules and regulations, which can concisely be summed up as follows: "The *medical staff* shall initiate and adopt such rules and regulations as it may deem necessary for the proper conduct of its work" by submitting proposed changes to the *medical executive committee* "for review and evaluation prior to presentation for consideration by the *medical staff* as a whole under such review or approval mechanism as the *medical staff* shall establish." According to the *Model Bylaws*:"The mechanism described herein shall be the sole method for initiation, adoption, amendment, or repeal of the *medical staff* rules and regulations."

To sum up, in matter affecting the professional activities of the *medical staff*, the *medical staff* shall be self-governing. The *medical executive committee* represents the interests of the *medical staff* at annual meetings of the *joint conference committee*. The *joint conference committee* should have an equal number of members coming from each side —the *medical executive committee* and the *governing body*—and the chair alternates between the two sides. Each of the various committees is chaired by a *practitioner* who has been appointed by the *medical director*. This is all part of a "guiding principle" that attempts to maintain the autonomy of the *medical staff* in matters relating to the practice of medicine.

- **Paper B** is a memo which I wrote to Brad last year after a phone conversation with Ms. Pat Ferrigno of the AAAHC. Please note the lengthy quotation from our phone conversation.
- **Paper C** is also a memo that I wrote last year. Note that the *medical executive committee* that you have created, which also includes two R.N.'s who are regular voting members, would quite possibly not pass muster for the accreditation purposes. That's why it seems to me that the best course of action would be to have only members of the *medical staff* on the *medical executive committee* as is done in other organizations and as is clearly suggested in the *Model Bylaws*, which specify that the composition of the *medical executive committee* shall include the *medical director*, the *assistant medical director* and, optionally, "the standing committee chairpersons."
- **Paper D** is a lengthy effort I made to communicate to the members of the *CQI Committee* directly that we were not properly organized. Larry, I don't expect that you will actually read this through, but I am including it here anyway to give you an idea of
  - what was going on here before your arrival
  - how much time and effort I have expended with this issue.
- **Paper E** was written in March, 1995, when I was informed that the new "Oral Contraceptive Follow-Up" form was about to be implemented. Bernadette never responded to my request to be allowed to review the ACOG documents.
- **Paper F** is my February 22, 1995, memo on tthe deficiencies of the new "Oral Contracepitve Follow-Up" form—a memo that was simply disregarded.
- **Paper G** depicts how Bernadette tried during Brad's tenure to set herself up as a *hearing officer* regarding a dress code, even though the *Model Bylaw* specifically state that any *hearing officer* will be an *attorney at law*. This is another exxample of what I meant above when I mentioned Bernadette's yen to be seen as an authority figure. Another good example is how she convinced Brad to allow her to change her title from Quality Assurance Coordinator (which suggests the traditional advisory capacity for this position) to Director of Quality Management (which suggests a management role).

# Part Two

# Five Requests

With that extensive background in mind, I would like to proceed with the following requests.

## 1) Allegations That Patients Do Not Wish to Follow Up With Me

Please conduct a full investigation of this allegation—an allegation which has caused me great emotional distress—that patients do not wish to follow up with me at a rate that is greater than that of any other of the UPHC practitioners. (As I'm sure you know, it is not at all uncommon—throughout the medical profession and not just at the UPHC—for *isolated cases* to occur of patients not wanting to see again a given practitioner.) As I have already stated, if such an allegation can be substantiated, then I am more than ready to accept constructive criticism and take corrective action, as it is my intention to offer only the very best care to our clients.

## Request #1

Please advise me as soon as possible of the results of your investigation of this allegation. If it is groundless, then I trust it will be removed from annual performance evaluation forthwith and the person or persons responsible for slandering my professional reputation promptly sought out and disciplined.

## 2) Your Proposal To Change Practitioners' Office Locations

Also during our meeting of April 24, you mentioned that, in the interest of continuity of patient care, you are considering a strategy that might involve practitioners changing their office locations. As I mentioned to you at that time, a problem regarding the (in)ability of patients to obtain follow-up from the same practitioner has in fact existed for some time at the UPHC. But that problem has to do with the inadequacy of our appointment system, which does not allow for the booking of patients more than a week or ten days hence. If *continuity of care* means the ability of a patient to follow up with the *one and the same practitioner* who first saw him or her, then I do not see how moving practitioners' office locations to establish *practice groups* would not improve the desired continuity. Furthermore, there are other issues involved with the concept of moving the office locations of the practitioners, including:

## Request #2

As I detailed above, Room 218 was specifically offered to me during negotiations regarding my employment. It is my understanding that verbal promises made by an employer during contract negotiations carry the same weight as written promises (see Appendix). If, as a representative of the *governing body*, it is your intention to break the implied contract between me and the University (the details of which can be substantiated by the behavior of the two parties to the contract since 1989), then please so inform me as soon as possible.

12

# 3) Your Proposal To Change The System For Granting Compensatory Time

At your meeting with the practitioners in your office on Friday, May 3, you indicated that you are considering a change in the system of compensating practitioners for carrying the on-call beeper during evenings/nights and weekends. You stated, "Since some practitioners are complaining that they receive inadequate funds for continuing medical education, perhaps the present system should be changed to one in which additional CME money could be earned by carrying the beeper."

With all due respect, Larry, that idea makes little or no sense. There are only a handful of physicians willing to carry the beeper under the *current* system which—although it provides rather minimal compensation—is certainly better than the compensation that you proposed. I have received as many as twenty calls while carrying the beeper over the 63-hour Friday 5 p.m.-Monday 8 a.m. weekend, many in the wee hours of the night, so that my weekend plans are often ruined. The compensation for the physicians, to repeat, is really quite minimal: 4.2 hours compensatory time off, for example, for taking calls throughout the 63-hour weekend starting at 5 p.m. Friday through 8 a.m. Monday morning. (Two-thirds of those 4.2 compensatory-time hours off) as I said, must be taken during the lower-patient-census summer months.)

Larry, does 4.2 hours off during the summer for being available to over 20,000 students for 63 hours on a weekend seem excessive to you? How about 1.4 hours for being available to them from 5 or 7 p.m. to 8 a.m.—13-15 hours per evening/night—on a weekday? Perhaps the best evidence that this compensation for carrying the beeper is minimal is the fact that, of the 10 physicians at the UPHC who are eligible to carry the beeper, only 3 or 4 of us regularly sign up for it.

*The system is a great deal for the University.* In return for a practitioner being available to the students 24 hours a day during the busy part of the school year, the practitioners take their compensatory time off during the lower-patient-census summer months. *Thus, it costs the University nothing beyond the practitioner's base salary to have this coverage available 365 days a year.*

I know you are not a fan of history/the past, but please consider the following:

*   The current system of allowing compensatory time (CT) to physicians for various activities—including staying beyond the end of their assigned shifts to see patients—has existed for much longer than the seven years that I have worked at the UPHC. Current 15-year+ employees of the UPHC confirm that the system was in existence when *they* arrived. Thus, it seems that the current system has been in existence for *decades*.
*   Presumably, your reason for suggesting a change is to save on costs. *But is it correct to state that the existing system costs the UPHC any significant money?* As you know, current UPHC rules and regulations stipulate that two-thirds of all vacation and CT must be taken during the summer months, when the UPHC patient-census is lower. Medical staff who accrued a few hours of CT as a result of staying late to see patients during the busy part of the school year usually take their CT during this slower part of the year. In short, the existing CT system efficiently reallocates or redistributes compensatory off-time from the busy time of the school year to the slow part of the year and, it seems to me, everyone benefits:

    *   *The 20,000+ USC students benefit* from having practitioners who are willing to take as much time as necessary for their care, regardless of when the practitioner's shift ends and her of his off-time begins; and
    *   *The practitioners benefit* from being compensated—on an hour-for-hour basis (*not* time and one-half as "non-exempt" employees would receive)—for taking care of patients during their scheduled time off.

One observer has stated, "If you were in private practice, you would be expected to see the extra patient without getting compensatory time off." I disagree. If we were in private practice we would be receiving extra compensation for seeing the additional patient—and the extra compensation might very well pay for extra time off at a future date. (See box below.)

Regarding specifically CT for carrying the beeper, the current system for compensating physicians for taking after-hours beeper-call has been in existence, according to my research, for *decades*. It is a *long-established benefit of employment at the UPHC*, one which was specifically offered to me during negotiations regarding my employment with the UPHC. Larry, please excuse the legalese, but I believe that a decision to change the current system would constitute a breach of contract and should be considered in that light. Personally, I doubt that the University of

13

Southern California administration has any intention of breaching a contract with any of its employees, especially benefits that are so great for the students and for the University and that cost the University as little as this one does.

# Request #3

If it is your intention to take away or modify the current method of compensating physicians with compensatory time, then please so inform me as soon as possible.

---

Is It Appropriate To Compare Employment at a Student Health Center With Private Practice?

I believe that it is fundamentally inappropriate to compare employment at the UPHC either with the private practice of medicine or with other situations in which one is an employee-physician. Why? Because student health centers, precisely because they care for student populations with the usual vacation times, are unique places of employment that offer unique lifestyle advantages that are only rarely found in private practice.

But there is also quite literally a price to be paid for these lifestyle advantages; namely, far lower dollar compensation, as I detailed for you earlier with regard to my own case.

Now, I'll be the first to admit that USC and the UPHC offer attractive benefits to its employees—that is one reason the University is able to attract good employees who are willing to work for it for little more than half what they could earn elsewhere. And I, for one, am quite proud of the "civilized" manner in which the University treats its professional staff.

With regard to this subject of compensation, I am not aware of any evidence that we are overpaid for what we do. It was only two or three years ago that the salary schedules for the **medical staff** and the **allied health professional staff (Physician Assistants)** and some of the **allied health staff** (R.N.'s) were raised (in some cases dramatically)—after an official salary survey by the University's personnel office revealed that some of us were being underpaid.

I'm sure that you can find examples of physicians who earn less than us, but given that our salaries are based on a professionally-run survey, would such a finding indicate that we are overpaid—or, rather, that the physicians you have found are in fact *underpaid*?

---

# 4) Your Proposal To Alter The Current System Of Staffing The UPHC Between The Hours Of 5 p.m.-7 p.m.

Also at your meeting with the practitioners on Friday, May 3, and again at the May 12 retreat, you voiced the idea of changing the current system of staffing the UPHC during the hours of 5 p.m.-7 p.m. I am not a lawyer (and hate sounding like one, believe me), but once again your proposal appears to raise the issue of breach of an implied contract between the University of Southern California and its employees.

As you know, the current system came about as a result of complaints by evening students many years ago that, although they, too, were paying the health fee, they were being denied access. You propose to have physicians work staggered shifts (for example, 10:30 a.m. - 7 p.m. with an hour for lunch) as opposed to working an extra two hours, from 5 p.m.-7 p.m., for extra compensation under the current system.

My research into the pertinent history reveals that when practitioners and other employees, who had originally been hired to work from 8:30 a.m.-5 p.m., were told a number of years ago that they would have to work staggered shifts, they refused. Subsequently, the University offered extra compensation for working late, but even then the shifts were difficult to fill. In fact, that is the reason I was offered, when I was hired in 1989, the opportunity to

14.

work all four nights that the UPHC is open—Interim Director Ron Mandel told me that there were insufficient volunteers even with the extra pay.

For me, as detailed above, coming to work for the UPHC involved a loss in the first year alone of about $30,000 *per annum* compared to Kaiser, therefore, I gladly accepted the opportunity to work every evening for extra compensation. Since 1989, I have been earning about $10,000 *per annum* in extra compensation as a result of working eight extra hours per week in the evenings at the UPHC. Any change in the current system would cause me substantial financial distress. You have not stated any reason for changing the present system. (It is widely known throughout the UPHC that certain personnel who do not have the opportunity to earn extra compensation are extremely dissatisfied—not to say envious—of the current system. But I doubt your proposal is based on such concerns.)

I presume that your proposal is based on budgetary considerations. And although the cutting of staff and staff costs in the name of a "fiscal emergency" has recently been successfully challenged in a court of law (see "CUNY Misused Fiscal 'Emergency' To Cut Staff and Costs, Judge Rules," *The New York Times,* May 3, 1996), I am cognizant of, and agree with you regarding, the need for the UPHC to provide the best care at the lowest possible cost to the students. As I said above, I am behind you 100% with your pro-active concept of trying to provide service more efficiently and more cost-effectively—even to the extent of taking a pay cut.

# Request #4

Therefore, since:
- I work more hours in the evening clinic than any other practitioner—and thus have the most to lose financially from a change in policy; and
- I was the only employee in 1989 to accept the University's request for additional volunteers to work in the evening clinics; then
- I would like to be offered the following by the University:
  - The *first opportunity* to work the proposed 1030 a.m.-7 p.m. shift on a *permanent basis.*
  - A raise in my base pay of $5,000-$7,500 *per annum* to *partially* offset the $10,000 in annual income that I will lose from a change in the current system.

# 5) The Proposal For A "Women's Clinic" and "Men's Clinic" In The Context Of My Employment Contract

On May 15, 1996, I distributed my paper on the subject proposal. The purpose of that paper was to show that there are a great many issues lurking below the surface of the proposed change in how the *medical staff* will practice medicine at the UPHC. There is one issue, however, that I did not take up in that paper, as it involves a matter solely between me and the University (whereas the May 15 paper was simply a response by a member of the medical staff to a proposal that had been submitted to it).

When I was hired in 1989, I was told by Interim Director Ron Mandel that I would be dividing my time approximately equally between gynecology and general-practice patients. From 1989 until the present, I have in fact conducted at least three formal half-day gynecology clinics per week, in addition to seeing a smattering of gynecology patients in my regular non-gynecology clinics.

As I pointed out in my paper of May 15, if it is the intention of the proponents of the Women's Clinic that it be "preferably staffed, for the most part, by female medical personnel," as stated in their memorandum of April 26, then I need to know what their intention is with regard to my practice. I am presuming that, since I am the only fully-trained obstetrician-gynecologist at the UPHC, I am the exception envisioned by the phrase, "for the most part"—and I do fully expect to continue with my three formal gynecology clinics each week.

# Request #5

If the proposal for a Women's Clinic will in any way result in a breach of the contract between me and the University, then please so inform me as soon as possible. Specifically, if it is *not* the intention of the proponents of the Women's Clinic to include me as part of it so that as my current patients graduate I will have no gynecology

15

patients to care for, then please so inform me so that we may begin discussion of this attempt to breach my contract immediately.

CONFIDENTIAL

# Appendix—Special Note To Larry Neinstein

Larry, regarding this Appendix, please do not misunderstand why I am quoting the text below herein. The farthest thing from my mind at present is to get into a legal dispute with an exceptional employer for whom I have great admiration, pride and regard; namely, the University of Southern California. I quote this piece only to demonstrate that with this paper I am simply doing what is suggested therein, that is, "try to negotiate." I don't know you personally, but I am assuming that, like me, you are a person of integrity. Thus, if you were in my situation, I dare say you would find yourself forced to write to your superior just the way I am writing to you now. After you've had time to digest the contents contained herein, please let me know so I can schedule a follow-up appointment. At your leisure—but as soon as possible—please ask Lucy to schedule a one-hour (or more) appointment between the two of us so we can discuss the issues that I have raised in this paper in detail.

Thank you very much for taking the time to read this.

## California Contract Law—Lawsuits Over Contracts

A contract is an agreement between two people in which each promises to do something for the other. The key to a contract is that each side must promise or do something of value. . . . . Many everyday transactions are contracts, such as opening a checking account. . . . . In most cases, an oral contract is legally valid and binding. . . . . . If one person doesn't keep his or her promise, the contract has been broken ("breached"). The other person may try to negotiate, seek mediation or arbitration to settle the dispute, or take the breaching party to court.[1]

---

[1]Guerin, Attorney Lisa; Gima, Patti; Nolo Press Editors. *Nolo's Pocket Guide to California Law, Third Edition.* Berkeley: Nolo Press, 1995. Chapter entitled "Courts and Lawsuits," pp. 43-57.

# Tab 03

October 16, 1996



Dear ████████

I wish to express my concern that you felt your care was not what you
would have hoped for at the University Park Health Center. It is our desire
to provide the highest quality and cost-effective care possible. I have
discussed your concerns with the practitioner involved in your care. I have
always suggested to students that if they are not happy with their care to let
us know and also that there are choices of practitioners at the Health
Center. If you would like follow-up care at the University Park Health
Center with another gynecologist, we would be happy to accommodate you.

As a gesture of our concern that you paid twice for this problem, I have
asked our business office to credit your USC account the $65.25 that you
paid us. If you have any further concerns, I would be happy to discuss
those with you.

Sincerely yours,


Lawrence Neinstein, MD
Associate Professor of Pediatrics and Medicine
Executive Director
University Park Health Center


LN/srp

cc: Dr. Tyndall

# Tab 04

USC
UNIVERSITY OF SOUTHERN CALIFORNIA

USC-University Park Health Center

Student Health and Counseling Services

DATE: May 12, 1997
TO: Larry Neinstein, M. D., Executive Director
FROM: George Tyndall, M.D., Staff Physician and Gynecologist
RE: Our meeting of May 9, 1997

As always, I enjoyed the opportunity to engage in still another wide-ranging private discussion like the one we had for about an hour on May 9. In particular, I was glad that you showed me the comments that had been made by three students with regard to my practice style. During the weeks that the Student Satisfaction Survey (SSS) was conducted, I was careful not to "spruce up" or otherwise alter in any way my usual manner of interacting with the students, precisely so I might learn of any possible problems.

As you know (see "Mzuri Box Updat" in *The Script* of March 1997 in which a student states "What a great gentleman Dr. Tyndall is. I really enjoyed our conversation....") I nearly always attempt to engage my patients in short conversations during their visits. I like to get to know my patients personally—what year they are in, what their major is, what their career plans are, and so on. That is because I am a firm believer in the UPHC "core value" referred to in the UPHC Mission Statement as *the biopsychosocial approach* to providing care.

Unfortunately, based on the three comments that you showed me on May 9, it appears that not every single one of all my many patients—past surveys have shown that I see more patients per month than most of the other practitioners—is necessarily happy with this approach. On the other hand, the vast majority of my patients *do* appear to enjoy my personalized approach to care so, as I left your office on May 9, the message that I took with me is that perhaps I need to be a bit more careful not to give patients the impression that, in the process of conversing with them, I have forgotten their needs, that is, that I have forgotten the reason that they visited in the first place. Thank you for bringing this minor problem of practice *style* to my attention.

My purpose in writing to you now is that after our meeting I happened to mention our discussion to Dr. Figatner. He asked me whether you had informed me that, as a result of these comments about my style of practice, you were intending to award me on July 1 a *less than average* salary adjustment. Upon hearing this, I was aghast.

As you know, I wrote to you on May 7 to ask you for a *larger than average* salary adjustment on July 1 in recognition of the many financial and other efforts and sacrifices that I have made for you, the UPHC and the other practitioners over the past year, as detailed in that May 7 letter. To suddenly learn that you are considering a *lower than average* adjustment merely because a tiny fraction of my many patients do not like my *style* of practice is no less than flabbergasting.

To my mind, a legitimate reason for awarding me a less than average salary adjustment is that I have in some way seriously compromised a patient's *care*. For example, about three weeks ago (as we discussed at the noontime Journal Club meeting of April 16) I helped to save the life of one of our students, who was literally bleeding to death. If as his primary physician I had missed the diagnosis of GI bleeding, then that would be a reason for an adverse action by you against me. But no such serious compromise was demonstrated by you to me at our meeting of May 9; on the contrary, only issues of *style* were presented.

Therefore, at your earliest convenience, please arrange another meeting at which both the *SSS comments* and the *medical charts* of the three patients that you presented on May 9 are on hand. Then, we shall discuss in detail whether it appears that the medical care of these patients was in any way compromised.

Would you kindly set aside an hour during the week of May 12 for such a discussion? Thank you.

University of Southern California
849 West 34th Street
Los Angeles, California 90089-0311
Tel: 213 740 5344



**USC**

UNIVERSITY
OF SOUTHERN
CALIFORNIA

USC-University Park
Health Center

Student Health and
Counseling Services

University of
Southern California
849 West 34th Street
Los Angeles,
California 90089-0311
Tel: 213 740 5344

Date:        May 07, 1997
To:          Lawrence S. Neinstein, M. D.,Executive Director
From:        George Raymond Tyndall, M.D., Staff Physician
Subjects:    1)Withdrawal of My Proposal for Reduction in Annual
             Hours (My Memo of February 11, 1997)
             2) the July 1, 1997, Salary Adjustment

As you know, I would like to do my part in helping to make the University Park
Health Center (UPHC) leaner and more efficient, especially if it will help to
prevent a hostile take-over by an outside organization, as we've discussed on
many occasions this past year.  That is one reason why I submitted to you on
February 11 a proposal for reduction in annual hours.

But since that time, new developments have taken place. Recently, I consulted
my  tax adviser for the purpose of filing my annual tax return. At that time he
informed me that, because I will be losing some deductions, I need to reduce the
number of personal exemptions that I claim on my W-4 to be sure that I am
witholding enough income for next year's tax bill.

This reduction in witholding exemptions has had a disastrous effect on my take-
home pay—so disastrous that now it has become impossible  to make ends meet
even at my current full-time pay. This is especially true because of the fact that,
by accepting your call to work "flexible hours" in lieu of "overload hours" for
extra compensation, I have incurred a loss of some $10,000 per year. For these
reasons, I must hereby withdraw my February 11 proposal to reduce my annual
hours to less than 100% of full time.

Further, because it has now become impossible to make ends meet even at full
pay, and because you will soon be deciding pay raises for the upcoming year, I
wanted to  remind you once again of the contributions and sacrifices that I have
made to help ensure smooth operations at the UPHC:

• from 1989 through 1996, I alone of all the practitioners accepted—for all 4
  nights that we are open beyond 5 p.m.—the call of the Director to work
  overload

• since January of 1997, I alone of all the practitoners accepted—again, for all
  four nights that we are open beyond 5 p.m.—your request for volunteers to
  work flexible hours in lieu of overload; as a direct result of this action on my
  part, much dissension among the practitioners has been avoided (my
  understanding is that, if there was a shortage of volunteers, you were
  intending to simply assign the hours, whether the practitioner(s) liked it or
  not and regardless of any family, ride-sharing or other obligations that might
  prevent him/them from working beyond 5 p.m. )

• then most recently, upon learning that, because of a shortage of practitioners,
  it was unlikely that practitioners would be able to have 3-day weekends this
  summer like all the UPHC employees have enjoyed for many years in the past,
  I alone volunteered to work both Monday and Friday while taking my day off
  during the middle of the week; as a result, all the other practitioners have
  gotten the schedules they'd  requested and the dissension that would
  otherwise surely have arisen has once again been avoided thanks to me.

As  you contemplate the amount of my salary adjustment for July 1, I will be
very  pleased to learn that you do value the efforts and sacrifices that I have
made  over the past years to maintain morale among the practitioners —so much
so  that the result is an above-average salary adjustment.

## On The Phone

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Ease of getting through to the person or service you wanted — | 1 | (2) | 3 | 4 | 5 |
| 2. | Courtesy and professionalism of person who took your call — | 1 | 2 | 3 | 4 | (5) |
| 3. | Availability of staff to talk on the phone — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 4. | How promptly your calls were returned — — — — — — | 1 | 2 | 3 | 4 | (5) |
| 5. | Clarity of information given to you by the Advice Nurse — | (1) | 2 | 3 | 4 | 5 |

Comments: _Poor voicemail system - have to press too many buttons just to get a recording._

_I was told by med care co. advice nurse could authorize follow up visit to specialist - nurse let me explain entire sit. before telling me she couldn't authorize each referrals._

## Appts./Registration

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How was your appointment made? ☒ By Phone ☐ In person | | | | | |
| 2. | Courtesy and helpfulness of person making your appointment — | 1 | 2 | 3 | (4) | (5) |
| 3. | Ease of getting an appointment — — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 4. | Courtesy and professionalism of personnel at the patient registration area (front desk) — — — — — — — — | 1 | 2 | 3 | 4 | (5) |
| 5. | Speed of your visit registration at the reception area — — | 1 | 2 | 3 | 4 | (5) |

Comments: _____

## Patient Visit

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of person taking your temperature, blood pressure, weight, height, etc.— — — — | 1 | 2 | 3 | 4 | (5) |
| 2. | Comfort and pleasantness of waiting area — — — — — | 1 | 2 | 3 | (4) | 5 |
| 3. | Courtesy and professionalism of medical assistants or nurses — | 1 | 2 | 3 | 4 | (5) |
| 4. | Concern medical assistants or nurses showed for your problem — | 1 | 2 | 3 | (4) | 5 |
| 5. | Attention to your needs during treatment — — — — — | 1 | 2 | 3 | (4) | 5 |
| 6. | Helpfulness of education received regarding your care — — | 1 | 2 | 3 | (4) | 5 |
| 7. | Respect and interest practitioner showed for your questions — | 1 | 2 | 3 | (4) | 5 |
| 8. | How clearly did your practitioner explain your problem or condition — — — — — — — — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 9. | Practitioner's concern to make your treatment as convenient and comfortable as possible — — — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 10. | Adequacy of time the practitioner spent with you — — — | 1 | 2 | 3 | 4 | (5) |
| 11. | Do you feel your confidentiality was respected — — — — | 1 | 2 | 3 | 4 | (5) |
| 12. | Cleanliness of patient care areas — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 13. | Overall rating of treatment received from medical assistants, nurses and practitioners — — — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 14. | After you were seen by the medical assistant, how long was your wait to see a practitioner — — — — — — — — — | ☐ Less than 10 minutes | ☒ 10-20 mins. | ☐ 20-30 mins. | ☐ More than 30 minutes | |

Comments: _I have received outstanding care from Dr. ___ She has been patient & thorough in her explanations, and I feel treats me with respect. I was dissatisfied with care I previously received from Dr. Tyndall. Though he might have been well-intentioned, I felt part of that he talked about his political views during our consultation. I felt he was unclear about what & I would recieve, and this caused me great anxiety. (see back page)_

## Lab/X-Ray/Pharmacy

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of laboratory personnel | 1 | 2 | 3 | 4 | 5 |
| 2. | Skill with which tests were taken (quick, little pain, etc.) | 1 | 2 | 3 | 4 | 5 |
| 3. | Courtesy and professionalism of x-ray personnel | 1 | 2 | 3 | 4 | 5 |
| 4. | Courtesy and professionalism of pharmacy personnel or pharmacists | 1 | 2 | 3 | 4 | 5 |
| 5. | Education/instructions received on medication | 1 | 2 | 3 | 4 | 5 |
| 6. | Was your waiting time: | | | | | |

Less than 10 mins. to have your blood drawn in the Lab — ☐ Yes  ☐ No
Less than 15 mins. to have your x-ray taken — ☐ Yes  ☐ No
Less than 30 mins. to have your prescription filled — ☐ Yes  ☐ No

_____
_____

## Other Services

Please rate the quality of service you received in each of the areas whose services you used:

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Health Promotion and Prevention Services | 1 | 2 | 3 | 4 | 5 |
| 2. | Physical Therapy | 1 | 2 | 3 | 4 | 5 |
| 3. | Medical Records Department | 1 | 2 | 3 | 4 | 5 |
| 4. | Student Insurance Office | 1 | 2 | 3 | 4 | 5 |
| 5. | The Measles Office | 1 | 2 | 3 | 4 | 5 |

Comments: _____
_____
_____

## Billing & Cashier

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How adequately were you informed of costs from each department | 1 | 2 | 3 | 4 | 5 |
| 2. | If you had questions about a bill, or a charge you incurred, how well were your questions answered | 1 | 2 | 3 | 4 | 5 |
| 3. | Courtesy of cashier | 1 | 2 | 3 | 4 | 5 |
| 4. | How long was your wait for the cashier | ☐ Less than 10 minutes | ☐ 10-20 mins. | ☐ 20-30 mins. | ☐ More than 30 minutes |

Comments: _____
_____
_____

## Final Rating

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Decor of Patient Care Area | 1 | 2 | 3 | 4 | 5 |
| 2. | Convenience of office/clinic hours | 1 | 2 | 3 | 4 | 5 |
| 3. | Adequacy of signs and directions | 1 | 2 | 3 | 4 | 5 |
| 4. | Likelihood of your recommending our clinic to others | 1 | (2) | (3) | 4 | 5 |
| 5. | Overall satisfaction with your health care | 1 | 2 | (3) | 4 | 5 |

Comments: Dr. Tindell, A doctor I have seen in the past - but will never see again! - is the worst doctor I have ever seen in my life. He has mis-diagnosed myself + probably 20 other people I could name off-hand, including telling a girl I know that she had cancer when she didn't.

When you've completed this survey, please place it in the survey box. For your convenience, there are survey boxes located throughout the Health Center.

If you don't want a huge future lawsuit on your hands, I highly suggest the termination of this man. (please see over →)

( 2 )

## On The Phone

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Ease of getting through to the person or service you wanted | 1 | 2 | 3 | (4) | 5 |
| 2. | Courtesy and professionalism of person who took your call | 1 | 2 | 3 | (4) | 5 |
| 3. | Availability of staff to talk on the phone | 1 | 2 | 3 | 4 | (5) |
| 4. | How promptly your calls were returned | 1 | 2 | 3 | 4 | (5) |
| 5. | Clarity of information given to you by the Advice Nurse | 1 | 2 | 3 | 4 | (5) |

Comments: _____
_____
_____

## Appts./ Registration

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How was your appointment made? ☒ By Phone ☐ Inperson | | | | | |
| 2. | Courtesy and helpfulness of person making your appointment | 1 | 2 | 3 | (4) | 5 |
| 3. | Ease of getting an appointment | 1 | 2 | 3 | (4) | 5 |
| 4. | Courtesy and professionalism of personnel at the patient registration area (front desk) | 1 | 2 | 3 | 4 | (5) |
| 5. | Speed of your visit registration at the reception area | 1 | 2 | 3 | 4 | (5) |

Comments: _____
_____
_____
_____

## Patient Visit

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of person taking your temperature, blood pressure, weight, height, etc. | 1 | 2 | 3 | 4 | (5) |
| 2. | Comfort and pleasantness of waiting area | 1 | 2 | 3 | 4 | (5) |
| 3. | Courtesy and professionalism of medical assistants or nurses | 1 | 2 | 3 | 4 | (5) |
| 4. | Concern medical assistants or nurses showed for your problem | 1 | 2 | 3 | 4 | (5) |
| 5. | Attention to your needs during treatment | (1) | 2 | 3 | 4 | 5 |
| 6. | Helpfulness of education received regarding your care | (1) | 2 | 3 | 4 | 5 |
| 7. | Respect and interest practitioner showed for your questions | (1) | 2 | 3 | 4 | 5 |
| 8. | How clearly did your practitioner explain your problem or condition | (1) | 2 | 3 | 4 | 5 |
| 9. | Practitioner's concern to make your treatment as convenient and comfortable as possible | (1) | 2 | 3 | 4 | 5 |
| 10. | Adequacy of time the practitioner spent with you | (1) | 2 | 3 | 4 | 5 |
| 11. | Do you feel your confidentiality was respected | (1) | 2 | 3 | 4 | 5 |
| 12. | Cleanliness of patient care areas | 1 | (2) | 3 | 4 | 5 |
| 13. | Overall rating of treatment received from medical assistants, nurses and practitioners | 1 | (2) | 3 | 4 | 5 |
| 14. | After you were seen by the medical assistant, how long was your wait to see a practitioner | ☐ Less than 10 minutes | ☐ 10-20 mins. | ☐ 20-30 mins. | ☐ More than 30 minutes | |

Comments: Attn: Dr Neinstein (re: Dr. Tyndall)
he was shielding pupu when I came
in, pura had me open my mouth and
asked me what I should have en medici
He turned back the records to the last time
i came and monaited in what same thing

( 2 )

## On The Phone

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Ease of getting through to the person or service you wanted | 1 | 2 | 3 | (4) | 5 |
| 2. | Courtesy and professionalism of person who took your call | 1 | 2 | 3 | (4) | 5 |
| 3. | Availability of staff to talk on the phone | 1 | 2 | 3 | 4 | 5 |
| 4. | How promptly your calls were returned | 1 | 2 | 3 | 4 | (5) |
| 5. | Clarity of information given to you by the Advice Nurse | 1 | 2 | 3 | 4 | (5) |

Comments: _____

_____

_____

## Appts./Registration

How was your appointment made? ☒ By Phone ☐ Inperson

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | Courtesy and helpfulness of person making your appointment | 1 | 2 | 3 | (4) | 5 |
| 3. | Ease of getting an appointment | 1 | 2 | 3 | (4) | 5 |
| 4. | Courtesy and professionalism of personnel at the patient registration area (front desk) | 1 | 2 | 3 | 4 | (5) |
| 5. | Speed of your visit registration at the reception area | 1 | 2 | 3 | 4 | (5) |

Comments: _____

_____

## Patient Visit

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of person taking your temperature, blood pressure, weight, height, etc. | 1 | 2 | 3 | 4 | (5) |
| 2. | Comfort and pleasantness of waiting area | 1 | 2 | 3 | 4 | (5) |
| 3. | Courtesy and professionalism of medical assistants or nurses | 1 | 2 | 3 | 4 | (5) |
| 4. | Concern medical assistants or nurses showed for your problem | 1 | 2 | 3 | 4 | (5) |
| 5. | Attention to your needs during treatment | (1) | 2 | 3 | 4 | (5) |
| 6. | Helpfulness of education received regarding your care | (1) | 2 | 3 | 4 | |
| 7. | Respect and interest practitioner showed for your questions | (1) | 2 | 3 | 4 | |
| 8. | How clearly did your practitioner explain your problem or condition | (1) | 2 | 3 | 4 | 5 |
| 9. | Practitioner's concern to make your treatment as convenient and comfortable as possible | (1) | 2 | 3 | 4 | 5 |
| 10. | Adequacy of time the practitioner spent with you | (1) | 2 | 3 | 4 | 5 |
| 11. | Do you feel your confidentiality was respected | 1 | 2 | 3 | 4 | 5 |
| 12. | Cleanliness of patient care areas | 1 | (2) | 3 | 4 | 5 |
| 13. | Overall rating of treatment received from medical assistants, nurses and practitioners | 1 | 2 | 3 | 4 | 5 |
| 14. | After you were seen by the medical assistant, how long was your wait to see a practitioner | ☐ Less than 10 minutes | ☐ 10-20 mins. | ☐ 20-30 mins. | ☐ More than 30 minutes | |

Comments: atns Dr Neinstein (re: Dr. Tyndall)
He was shredding paper when I came
in presha had me open my mouth and
asked me what I should have as medicine
He turned back the records to the last time

(3)

## Lab/X-Ray/Pharmacy

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of laboratory personnel — | 1 | 2 | 3 | 4 | 5 |
| 2. | Skill with which tests were taken (quick, little pain, etc.) — | 1 | 2 | 3 | 4 | 5 |
| 3. | Courtesy and professionalism of x-ray personnel — | 1 | 2 | 3 | 4 | 5 |
| 4. | Courtesy and professionalism of pharmacy personnel or pharmacists — | 1 | 2 | 3 | 4 | 5 |
| 5. | Education/instructions received on medication — | 1 | 2 | 3 | 4 | 5 |
| 6. | Was your waiting time: | | | | | |
| | Less than 10 mins. to have your blood drawn in the Lab — ☐ Yes ☐ No | | | | | |
| | Less than 15 mins. to have your x-ray taken — ☐ Yes ☐ No | | | | | |
| | Less than 30 mins. to have your prescription filled — ☐ Yes ☐ No | | | | | |

NA

## Other Services

Please rate the quality of service you received in each of the areas whose services you used:

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Health Promotion and Prevention Services — | 1 | 2 | 3 | 4 | 5 |
| 2. | Physical Therapy — | 1 | 2 | 3 | 4 | 5 |
| 3. | Medical Records Department — | 1 | 2 | 3 | 4 | 5 |
| 4. | Student Insurance Office — | 1 | 2 | 3 | 4 | 5 |
| 5. | The Measles Office — | 1 | 2 | 3 | 4 | 5 |

Comments: NA

## Billing & Cashier

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How adequately were you informed of costs from each department — | 1 | 2 | 3 | 4 | (5) |
| 2. | If you had questions about a bill, or a charge you incurred, how well were your questions answered — | 1 | 2 | 3 | 4 | (5) |
| 3. | Courtesy of cashier — | 1 | 2 | 3 | 4 | (5) |
| 4. | How long was your wait for the cashier — ☐ Less than 10 minutes ☐ 10-20 mins. ☐ 20-30 mins. ☐ More than 30 minutes | | | | | |

Comments: _not very friendly_

## Final Rating

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Decor of Patient Care Area — | 1 | 2 | 3 | 4 | (5) |
| 2. | Convenience of office/clinic hours — | 1 | 2 | 3 | 4 | (5) |
| 3. | Adequacy of signs and directions — | 1 | 2 | 3 | 4 | (5) |
| 4. | Likelihood of your recommending our clinic to others — | | 2 | 3 | 4 | (5) |
| 5. | Overall satisfaction with your health care — → | (1) | 2 | 3 | 4 | 5 |

Comments: _I am not usually a complainer, even I was concerned about my feedback, filled it out with the awesome nurses in room 215, and Miss referred me to the ___ ___ ___ ___ ___ ____

When you've completed this survey, please place it in the survey box. For your convenience, there are survey boxes located throughout the Health Center.

(3)

## Lab/X-Ray/Pharmacy

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of laboratory personnel | 1 | 2 | (3) | 4 | 5 |
| 2. | Skill with which tests were taken (quick, little pain, etc.) | 1 | 2 | 3 | (4) | 5 |
| 3. | Courtesy and professionalism of x-ray personnel | 1 | 2 | 3 | 4 | 5 |
| 4. | Courtesy and professionalism of pharmacy personnel or pharmacists | 1 | 2 | (3) | 4 | 5 |
| 5. | Education/instructions received on medication | 1 | 2 | (3) | 4 | 5 |
| 6. | Was your waiting time: | | | | | |

Less than 10 mins. to have your blood drawn in the Lab — ☑ Yes   ☐ No
Less than 15 mins. to have your x-ray taken — ☐ Yes   ☐ No
Less than 30 mins. to have your prescription filled — ☑ Yes   ☐ No

*forgot to run a couple of tests that PA requested and performed some he didnt Request.*
*(again, PA was very agitated)*

## Other Services

Please rate the quality of service you received in each of the areas whose services you used:

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Health Promotion and Prevention Services | 1 | 2 | 3 | 4 | 5 |
| 2. | Physical Therapy | 1 | 2 | 3 | 4 | 5 |
| 3. | Medical Records Department | 1 | 2 | 3 | 4 | 5 |
| 4. | Student Insurance Office | 1 | 2 | 3 | 4 | 5 |
| 5. | The Measles Office | 1 | 2 | 3 | 4 | 5 |

Comments: _____

## Billing & Cashier

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How adequately were you informed of costs from each department | 1 | 2 | (3) | 4 | 5 |
| 2. | If you had questions about a bill, or a charge you incurred, how well were your questions answered | 1 | 2 | (3) | 4 | 5 |
| 3. | Courtesy of cashier | 1 | 2 | 3 | (4) | 5 |
| 4. | How long was your wait for the cashier | | | | | |

4. How long was your wait for the cashier — ☑ Less than 10 minutes   ☐ 10-20 mins.   ☐ 20-30 mins.   ☐ More than 30 minutes

Comments: _____

## Final Rating

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Decor of Patient Care Area | 1 | 2 | 3 | (4) | 5 |
| 2. | Convenience of office/clinic hours | 1 | 2 | 3 | (4) | 5 |
| 3. | Adequacy of signs and directions | 1 | 2 | 3 | (4) | 5 |
| 4. | Likelihood of your recommending our clinic to others | 1 | 2 | (3) | 4 | 5 |
| 5. | Overall satisfaction with your health care | 1 | 2 | (3) | 4 | 5 |

Comments: _____

When you've completed this survey, please place it in the survey box.  For your convenience, there are survey boxes located throughout the Health Center.

( 3 )

## On The Phone

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Ease of getting through to the person or service you wanted — — | 1 | 2 | 3 | (4) | 5 |
| 2. | Courtesy and professionalism of person who took your call — — | 1 | 2 | (3) | 4 | 5 |
| 3. | Availability of staff to talk on the phone — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 4. | How promptly your calls were returned — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 5. | Clarity of information given to you by the Advice Nurse — — | 1 | 2 | 3 | (4) | 5 |

Comments: _____
_____
_____

## Appts. / Registration

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How was your appointment made? ☑ By Phone ☐ In person | | | | | |
| 2. | Courtesy and helpfulness of person making your appointment — | 1 | 2 | (3) | 4 | 5 |
| 3. | Ease of getting an appointment — — — — — — — — — | 1 | 2 | (3) | (4) | 5 |
| 4. | Courtesy and professionalism of personnel at the patient registration area (front desk) — — — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 5. | Speed of your visit registration at the reception area — — — | 1 | 2 | (3) | 4 | 5 |

Comments: _____
_____
_____

## Patient Visit

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of person taking your temperature, blood pressure, weight, height, etc.— — — — | 1 | 2 | (3) | 4 | 5 |
| 2. | Comfort and pleasantness of waiting area — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 3. | Courtesy and professionalism of medical assistants or nurses — | 1 | 2 | (3) | 4 | 5 |
| 4. | Concern medical assistants or nurses showed for your problem — | 1 | 2 | (3) | 4 | 5 |
| 5. | Attention to your needs during treatment — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 6. | Helpfulness of education received regarding your care — — — | 1 | 2 | (3) | 4 | 5 |
| 7. | Respect and interest practitioner showed for your questions — — | 1 | 2 | (3) | 4 | 5 |
| 8. | How clearly did your practitioner explain your problem or condition — — — — — — — — — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 9. | Practitioner's concern to make your treatment as convenient and comfortable as possible — — — — — — — — — — | 1 | 2 | 3 | (4) | 5 |
| 10. | Adequacy of time the practitioner spent with you — — — — | 1 | 2 | (3) | 4 | 5 |
| 11. | Do you feel your confidentiality was respected — — — — — | 1 | 2 | (3) | 4 | 5 |
| 12. | Cleanliness of patient care areas — — — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 13. | Overall rating of treatment received from medical assistants, nurses and practitioners — — — — — — — — — | 1 | 2 | (3) | 4 | 5 |
| 14. | After you were seen by the medical assistant, how long was your wait to see a practitioner — — — — — — | ☐ Less than 10 minutes | ☑ 10-20 mins. | ☐ 20-30 mins. | ☐ More than 30 minutes | |

Comments: during my visit, the phone rang about 6-7X (receptionist?/screening person?) This was very disruptive! In addition, I felt that Mr Mayo carried himself very unprofessionally because he abruptly picked up the phone each time & responded in a very irritated fashion each time which didn't seem

*(right margin, vertical text):* which looks very unprofessional to a patient at any time

( 2 )

## On The Phone

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Ease of getting through to the person or service you wanted | 1 | 2 | 3 | 4 | 5 |
| 2. | Courtesy and professionalism of person who took your call | 1 | 2 | 3 | 4 | 5 |
| 3. | Availability of staff to talk on the phone | 1 | 2 | 3 | 4 | 5 |
| 4. | How promptly your calls were returned | 1 | 2 | 3 | 4 | 5 |
| 5. | Clarity of information given to you by the Advice Nurse | 1 | 2 | 3 | 4 | 5 |

Comments: _The line is kind of long._
_If somebody's been here before you_
_no need to repeat the info_

## Appts./ Registration

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | How was your appointment made? ☒ By Phone ☐ In person | | | | | |
| 2. | Courtesy and helpfulness of person making your appointment | 1 | 2 | 3 | 4 | 5 |
| 3. | Ease of getting an appointment | 1 | 2 | 3 | 4 | 5 |
| 4. | Courtesy and professionalism of personnel at the patient registration area (front desk) | 1 | 2 | 3 | 4 | 5 |
| 5. | Speed of your visit registration at the reception area | 1 | 2 | 3 | 4 | 5 |

Comments: _____

## Patient Visit

| | | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|---|
| 1. | Courtesy and professionalism of person taking your temperature, blood pressure, weight, height, etc. | 1 | 2 | 3 | 4 | 5 |
| 2. | Comfort and pleasantness of waiting area | 1 | 2 | 3 | 4 | 5 |
| 3. | Courtesy and professionalism of medical assistants or nurses | 1 | 2 | 3 | 4 | 5 |
| 4. | Concern medical assistants or nurses showed for your problem | 1 | 2 | 3 | 4 | 5 |
| 5. | Attention to your needs during treatment | 1 | 2 | 3 | 4 | 5 |
| 6. | Helpfulness of education received regarding your care | 1 | 2 | 3 | 4 | 5 |
| 7. | Respect and interest practitioner showed for your questions | 1 | 2 | 3 | 4 | 5 |
| 8. | How clearly did your practitioner explain your problem or condition | 1 | 2 | 3 | 4 | 5 |
| 9. | Practitioner's concern to make your treatment as convenient and comfortable as possible | 1 | 2 | 3 | 4 | 5 |
| 10. | Adequacy of time the practitioner spent with you | 1 | 2 | 3 | 4 | 5 |
| 11. | Do you feel your confidentiality was respected | 1 | 2 | 3 | 4 | 5 |
| 12. | Cleanliness of patient care areas | 1 | 2 | 3 | 4 | 5 |
| 13. | Overall rating of treatment received from medical assistants, nurses and practitioners | 1 | 2 | 3 | 4 | 5 |
| 14. | After you were seen by the medical assistant, how long was your wait to see a practitioner | ☐ Less than 10 minutes ☒ 10-20 mins. ☐ 20-30 mins. ☐ More than 30 minutes | | | | |

Comments: _Dr. Mayo made an unpatient impression._

# Tab 05

Date:   September 15, 1997
To:     George Tyndall M.D.
From:  Lawrence Neinstein M.D.
Regarding: multiple memos

Regarding your request about comments from patients. I have always had the philosophy and always will to get as much feedback from patients to all staff as possible. Comments, compliments and concerns that I receive from students are given to involved staff.

Regarding ████ As I mentioned I have already explained to her that ultrasounds are not always needed in the case of ovarian cysts and that the presence of ovarian cysts are not necessarily correlated to abdominal pain. I always explain to students that our practitioners are working to provide them with the best care possible. However, I also always explain to them, that if they are not satisfied with their individual practitioner, then they are free to choose another practitioner on staff. One possible approach that may have facilitated less negative response from this student was in the method of referring to Dr. Mandel. Another statement may have been: "I understand that you would like to obtain an ultrasound and I appreciate your knowledge of your condition, however, I would like to refer you to Dr. Mandel to get another opinion regarding the need for an ultrasound. In addition, this approach may be able to save you money." Rather than "you should not demand" which might put certain students on the defensive, this other approach might validate the student's feelings and opinions.

George, I did not mention this patient to predominantly discuss the validity or lack of validity of her complaint. This was a very upset student. That was real and her feelings were real. I am looking for other approaches whenever situations like this arise to help facilitate communication with students who may be more difficult to deal with.

Regarding ████
Comparisons between birth control pills are very difficult to make because precise studies that have randomized them all have never been done. Even the comparison sheet that you attached states that "these rates are derived from separate studies conducted by different investigators in several population groups, and therefore, a precise comparison cannot be made". The estrogenic content of O/N 7/7/7 and O/N 10/11 is an identical 35 micrograms. The progestational component is slightly higher in O/N 10/11 giving rise to the slightly higher endometrial activity of O/N 10/11. However, this is all academic. The reality is that in most of the newer second and third generation pills there is no exact rhyme or reason for one pill leading to BTB and another not. I have seen many, many women who have BTB resolve when they switch from one pill to another, regardless of dose. The BTB rates are related to not just estrogen activity, but progestational activity and the relative amounts of both. These are also related to the type of estrogen, mestranol versus ethinyl estradiol. Mestranol is converted at about a 70% rate so that 50 micrograms of mestranol is equal to about 35 of EE. In addition, each woman metabolizes these compounds differently.
        I have enclosed the chapter from my book on OCPS that Anita Nelson and I have written than summarizes my thoughts on this topic. In addition, I have included the

chapter from my book on contraception and women with chronic illness on cardiac problems as well as the index.  If other chapters are of interest to you, let me know.
    I would agree that OCPs are not contraindicated in ███████  My concern with ████ is whether she needs OCPs with her elevated cholesterol when she is not sexually active and not in the need of contraception.  While she may very well prefer to stay on OCPs for other reasons, this is not an unreasonable conversation to have with her.  In addition, the best OCPs regarding lipids at the moment contain either norgestimate or desogestrel.  This is also a consideration in further deciding her OCP choice.

Regarding active problem list:  I have mentioned at multiple times in past two years that we need to implement some type of active problem list.  I appreciate your suggestion and think this needs to be discussed at a practitioner meeting to decide on the best method to do this until the information system allows us to record this.

Regarding by laws: I will try to get these together this week and get xeroxed to you. Thanks for your input.

# Tab 06

**UPHC PATIENT SATISFACTION SURVEY 1998**
**PRACTITIONERS**



Case 2:18-cv-04258-SVW-GJS Document 143-2 Filed 05/23/19 Page 43 of 79 Page ID #:4089



While the care I have received here has in general been good, I had a very upsetting experience last year that I would like to mention. I came in with a concern about a lower abdominal pain that I thought was gynecologically-related. I was first treated with sensitivity and concern by a practitioner. This practitioner referred me to another doctor here at the clinic. Although I prefer to see only female doctors this individual proceeded to alarm me extremely about the worst case scenario of my symptom (which I truly believe was jjust stress-related). Then during a gynecology exam, this practitioner suddenly, unannounced, examined me anally as well. This was essentially a shocking, invasive procedure that upset me extremely for the next few days. Please, please, please [underlined] impress upon the doctors that any genital exam is an extremely sensitive procedure, psychologically as well as physically. I was shocked at me treatment and too near tears to discuss this with the doctor at that time. My care here otherwise has been fine, but I am relieved to have the opportunity to mention this finally.



While the care I have received here has in general been good, I had a very upsetting experience last year that I would like to mention. I came in with a concern about a lower abdominal pain that I thought was gynecologically-related. I was first treated with sensitivity and concern by a female practitioner.  She was concerned about one symptom I had, and referred me to a male doctor here at the clinic for internal medicine. Although I prefer to see only female doctors for gyn. exams. He proceeded to alarm me extremely about the worst case scenario of my symptom (which I truly believe was jjust stress-related).  Then during a gynecology exam, he suddenly, unannounced, examined me anally as well.  This was essentially a shocking, invasive procedure that upset me extremely for the next few days. Please, please, please [underlined] impress upon the doctors that any genital exam is an extremely sensitive procedure, psychologically as well as physically.  I was shocked at me treatment and too near tears to discuss this with the doctor at that time. My care here otherwise has been fine, but I am relieved to have the opportunity to mention this finally.

# Tab 07

| From: | Tammie Akiyoshi <akiyoshi@rcf.usc.edu> |
|---|---|
| To: | Lawrence Neinstein <neinstei@rcf.usc.edu> |
| Sent: | |
| Subject: | Re: upset student |

Larry,
I spoke with Sona, Summer, Corinne and Bernie. Susie is not here today.
Sona took the advice call. She took all the information and conferred
with Dr. Walker who was in ACC. Dr. Tyndall was at lunch so the options
were to come to ACC or wait for Dr. Tyndall to return. She placed the
message on Dr. Tyndall's door to call ASAp and told Morlina to help expedite. Dr.Tyndall
(who usually dictates)still had the chart so all they had to go by was what the boyfriend
was saying. The boyfriend called back and told Summer "I will give you one minute to give
me a doctor and that is someone with a PhD" Summer then got Corinne who caught Bernie in
the hallway. Bernie took the call and asked him to bring his girlfriend to ACC. They
presented within minutes and Dr. Walker saw the student in ACC. This is when ████ asked
for directions to your office.
Did anyone confer with Dr. Tyndall after he returned from lunch - I don't know.
Do we have a mechanism for coverage for a MD who is out - yes when they are
out for a day, not for hours (lunch or meeting) If needed, ACC who was
consulted in this case.
At no point did anyone talk to the patient until she presented in ACC.
Would someone prescribe Pyridium over the phone by verbal history only - when
Dr. Tyndall will be back in an hour?

Tammie
At 03:58 PM 4/14/98 -0700, you wrote:
>I talked with a student this afternoon named ████████  He was
>referred by Bernie because he was quite upset yesterday. He came with his
>girlfriend yesterday because of severe UTI. She was treated in AM but only
>given antibiotics and not Pyridium. She continued to have severe pain in
>her room. boyfriend tried to reach the MD but was told no MD could talk
>with him until afternoon. I believe he spoke with Summer, Corrine, Susie
>and Bernie. I am a little unclear why a practitioner could not get on the
>phone at some point and perhaps prescribe pyridium, even if the original
>practitioner was not here. Any thoughts?
>Larry
>
>Lawrence Neinstein M.D.
>Executive Director
>USC University Park Health Center
>Associate Professor of Pediatrics and Medicine
>USC School of Medicine
>
>

# Tab 08

| | |
|---|---|
| **From:** | ████████████ |
| **To:** | neinstei@almaak.usc.edu |
| **Sent:** | 10/19/1998 12:13:44 AM |
| **Subject:** | Re: Not receiving call backs |

Dear Dr. Neinstein~

Wow, I am so impressed that you did get back to me--and so quickly. Last
year your assistant suggested I email you about a concern I had, saying
that you read all your email and were very conscientous. You have proved
her right.

I want to tell you some of the people on your staff are supportive and
responsive. I'm sorry I did not think to mention that during my first
correspondance. The advice nurse, Suzi Gomez, was very helpful during a
crisis I had last year, and was willing to spend some time on the phone
with me to direct me toward help. The nurses upstairs that take your
blood pressure, etc. are all just excellent. They seem to put the
patients first, they are sympathetic and nonjudgemental, and have made me
feel comfortable when I was nervous.

In addition, I have never had to wait an undue length of time to be seen
by any of the doctors. That, itself, is a feat in this medical world.
Dr. Walker has always been very helpful when I have had an appointment
with her. She is thorough in her exam and questions and she takes the
time to explain to me what is happening. In fact, she explained to me
that all migraine medications do not help all people & that we may have
to experiment to find the best for me.

I appreciate all that you have done to make the clinic operate this
smoothly. Thank you for your prompt response to my problems.

Sincerely,

████████████

On Sun, 18 Oct 1998 10:40:42 -0700 (PDT) Lawrence Neinstein
<neinstei@almaak.usc.edu> writes:
>We are committed to getting back to students on a timely manner and
>are
>working hard to redo our telephone and communications systems. I
>apologize
>for the difficulty you have had. I will forward your insurance
>concern to
>Cathy Defrancesco our associate director for administration and also
>insurance coordinator and will see if she can help with your first
>issue. I
>will also forward your message to Dr. Tyndall and Dr Walker with your
>first
>and second issues to help facilitate this.
>Again my apology.
>Dr. Neinstein
>
>
>At 10:06 PM 10/16/98 -0700, you wrote:
>>
>>Dear Dr. Neinstein:
>>
>>Incident #1
>>I called an advice nurse to request that Dr. Tyndall, Dr. Price or
>Dr.
>>Walker write a letter to Chickering Insurance telling them that the
>>Estrace & Provera that they have prescribed is for Hormone Therapy,
>not

```
>>birth control.
>>
>>She connected me to an answering machine to leave a message for Dr.
>>Tyndall. I did that about 3 weeks ago. I never received a call
>back. I
>>did leave my telephone number.
>>
>>I called 5 or so days later to check, left another message. Still no
>>call back.
>>
>>Since I am nervous that Chickering won't pay since they are no longer
>our
>>insurance company, I call the Business & Personnel listing
>(740-0242).
>>Middle of the day but no one answered the phone, but I left a
>message,
>>including my id # & tel. #.
>>
>>No call back a/o today (Oct 16). Called again & left a message, I
>think.
>> The answering machine does not identify the department, nor say why
>no
>>one is answering the phone.
>>
>>Incident #2
>>I also called last Friday with a terrible migraine & left a message
>on
>>the advice nurse's answering machine if she would please ask Dr.
>Walker
>>if she could call a different migraine medication into my drugstore,
>>since the Midrin (she had prescribed months earlier) had not worked
>for
>>me. I left my tel. number & probably my id # & the drugstore #. I
>>never received a call back from the nurse or the doctor.
>>
>>Is there any policy about returning students phone calls? This is so
>>very different from any experience I've had with other doctors.
>>
>>Can I expect to be called or emailed about either one of these
>matters?
>>
```

```
>>You don't need to buy Internet access to use free Internet e-mail.
>>Get completely free e-mail from Juno at http://www.juno.com
>>or call Juno at (800) 654-JUNO [654-5866]
>>
>>--QAA16550.908581519/mizar.usc.edu--
>>
>>
>>--------- End forwarded message ----------
>>
>>
>>You don't need to buy Internet access to use free Internet e-mail.
>>Get completely free e-mail from Juno at http://www.juno.com
>>or call Juno at (800) 654-JUNO [654-5866]
>>
>>
>
>


You don't need to buy Internet access to use free Internet e-mail.
Get completely free e-mail from Juno at http://www.juno.com
or call Juno at (800) 654-JUNO [654-5866]
```

# Tab 09

| | |
|---|---|
| **From:** | Susan Biddlecomb |
| **To:** | wleavitt; neinstei |
| **CC:** | saakian; defrance |
| **Sent:** | 3/9/1999 8:49:53 PM |
| **Subject:** | clinician issue |

Larry and Bill,

There is an issue Eric and I would like you to bring up with the clinicians. We do not feel comfortable doing computer support in a clinician's office when a patient is present for an appointment. There are a couple of clinicians who call us in under those circumstances, and one in particular who insists on Eric going in even when Eric has told him that this is uncomfortable for him. As a side issue, there was a situation today where this clinician forced Eric into a situation where he had to either argue about the appropriateness of coming in in front of the patient or just come in even though he was uncomfortable. Eric chose to do the latter (which I think was a good call), but then he found something that made him even more uncomfortable, which is that the clinician was demonstrating a Pyramed problem to the patient in a way that let the patient see the entire clinical workplace (other patients with appointments and their complaint/reason for that visit!). This seems like a big confidentiality problem to me (especially for the clinician to show it to the patient).

What I would ask of you is:

1 - If Eric and I are wrong about not wanting to do computer support while a patient is present, let me know. I think it is different from calling an MA in because that is clinical support and the MA's relate to the patients in the clinical context. But, I could be wrong.

2 - Address with the clinicians as a group the issues of whether appropriate to call in computer support with a patient there and the appropriateness of showing the patient the complaint/reason for visit of other patients. The former issue has come up with more than one clinician although it mainly comes up with one particular one. A reminder to the others will not hurt.

3 - Address the issues specifically with Dr. Tyndall (the one in question).

If I'm out of line in asking for this, please let me know.

Thanks
Susan

Susan Biddlecomb Phone: (213)740-8312
Director of Information Systems Fax: (213)740-0214
University of Southern California E-Mail: biddleco@usc.edu Student
Health & Counseling Services

| | |
|---|---|
| **From:** | Lawrence Neinstein |
| **To:** | 'Susan Biddlecomb' |
| **Sent:** | 3/9/1999 9:07:50 PM |
| **Subject:** | Re: clinician issue |

this sounds appropriate i will bring up
larry

At 12:49 PM 3/9/99 -0800, you wrote:
>Larry and Bill,
>
>There is an issue Eric and I would like you to bring up with the
>clinicians. We do not feel comfortable doing computer support in a
>clinician's office when a patient is present for an appointment. There are
>a couple of clinicians who call us in under those circumstances, and one in
>particular who insists on Eric going in even when Eric has told him that
>this is uncomfortable for him. As a side issue, there was a situation
>today where this clinician forced Eric into a situation where he had to
>either argue about the appropriateness of coming in in front of the patient
>or just come in even though he was uncomfortable. Eric chose to do the
>latter (which I think was a good call), but then he found something that
>made him even more uncomfortable, which is that the clinician was
>demonstrating a Pyramed problem to the patient in a way that let the
>patient see the entire clinical workplace (other patients with appointments
>and their complaint/reason for that visit!). This seems like a big
>confidentiality problem to me (especially for the clinician to show it to
>the patient).
>
>What I would ask of you is:
>
>1 - If Eric and I are wrong about not wanting to do computer support while
>a patient is present, let me know. I think it is different from calling an
>MA in because that is clinical support and the MA's relate to the patients
>in the clinical context. But, I could be wrong.
>
>2 - Address with the clinicians as a group the issues of whether
>appropriate to call in computer support with a patient there and the
>appropriateness of showing the patient the complaint/reason for visit of
>other patients. The former issue has come up with more than one clinician
>although it mainly comes up with one particular one. A reminder to the
>others will not hurt.
>
>3 - Address the issues specifically with Dr. Tyndall (the one in question).
>
>If I'm out of line in asking for this, please let me know.
>
>Thanks
>Susan
>
>Susan Biddlecomb Phone: (213)740-8312
>Director of Information Systems Fax: (213)740-0214
>University of Southern California E-Mail: biddleco@usc.edu Student
>Health & Counseling Services
>
>
>
Lawrence Neinstein M.D.
Executive Director
USC University Park Health Center
Associate Professor of Pediatrics and Medicine
USC School of Medicine

# Tab 10

The Student Health Center is interested in providing you with the best possible medical care during your years at USC. The following questionnaire will help us identify what you think we are doing well and where we need to improve your care.

11/10/99   ℘08

1. **Overall, how satisfied were you with your visit at the Student Health Center?**
( ) Very Satisfied ( ) Satisfied (√) Dissatisfied

2. **How satisfied were you with the appointment system?**
( ) Very Satisfied (√) Satisfied ( ) Dissatisfied

3. **How satisfied were you with the sign-in process?**
( ) Very Satisfied (√) Satisfied ( ) Dissatisfied

4. **How satisfied were you with your encounter with the medical assistants in room 100 or 215?**
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

5. **How satisfied were you with your encounter with the nurses?**
(√) Very Satisfied ( ) Satisfied ( ) Dissatisfied

6. **How satisfied were you with your encounter with the Laboratory?**
( ) Very Satisfied ( ) Satisfied (√) Dissatisfied

7. **How satisfied were you with your encounter with the Pharmacy?**
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

8. **How satisfied were you with your encounter with the X-Ray Department?**
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

9. **How satisfied were you with your encounter with Physical Therapy?**
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

10. **How satisfied were you with your encounter with the Cashier?**
(√) Very Satisfied ( ) Satisfied ( ) Dissatisfied

11. **How satisfied were you with your encounter with the medical practitioner?**
( ) Very Satisfied ( ) Satisfied (√) Dissatisfied

12. **Did the practitioner:**

| | | |
|---|---|---|
| Pay attention to your concerns and worries? | (YES) | NO |
| Inform you about your problem or disease? | YES | (NO) |
| Explain procedures and treatment? | YES | (NO) |
| Instruct you about your continuing care? | YES | (NO) |
| Introduce him or herself? | (YES) | NO |

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you.

Dr Tindel was treating me for a soar throat and told me that it would go away → It has gotten worse + worse and friends of mine with the same problem exactly got antibiotics and feel fine now, I can't even eat solid food, and haven't for 2 days now

Time to call: _____

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

11/19 - no answer
11/16 - message left      RSN

11/16/99 *PDB*                                                                    2

The Student Health Center is interested in providing you with the best possible medical care during your years at USC. The following questionnaire will help us identify what you think we are doing well and where we need to improve your care.

1.  **Overall, how satisfied were you with your visit at the Student Health Center?**
    (X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

2.  **How satisfied were you with the appointment system?**
    (  ) Very Satisfied   (X) Satisfied   (  ) Dissatisfied

3.  **How satisfied were you with the sign-in process?**
    (  ) Very Satisfied   (X) Satisfied   (  ) Dissatisfied

4.  **How satisfied were you with your encounter with the medical assistants in room 100 or 215?**
    (  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

5.  **How satisfied were you with your encounter with the nurses?**
    (X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

6.  **How satisfied were you with your encounter with the Laboratory?**
    (  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

7.  **How satisfied were you with your encounter with the Pharmacy?**
    (  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

8.  **How satisfied were you with your encounter with the X-Ray Department?**
    (  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

9.  **How satisfied were you with your encounter with Physical Therapy?**
    (  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

10. **How satisfied were you with your encounter with the Cashier?**
    (  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

11. **How satisfied were you with your encounter with the medical practitioner?**
    (X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied
    One of the 2 best doctors I've visited in my life!

12. **Did the practitioner:**
    Pay attention to your concerns and worries?   (YES)   NO
    Inform you about your problem or disease?   (YES)   NO
    Explain procedures and treatment?   (YES)   NO
    Instruct you about your continuing care?   (YES)   NO
    Introduce him or herself?   (YES)   NO

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you. *(No need to call – Thanks.)*

I greatly appreciate Dr. Tyndall's thoroughness. He listens and addresses all of my concerns and has a wonderful personality. Additionally, I appreciate the time built into the appointment process, so that I am able to be educated on necessary medical treatments.

▮▮▮▮▮▮▮▮▮▮

Time to call: evening

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

cc: Tyndall / Jewitt     PSN

# Tab 11

| | |
|---|---|
| **From:** | Tammie Akiyoshi |
| **To:** | Lawrence Neinstein |
| **Sent:** | 2/8/2000 10:41:54 PM |
| **Subject:** | Re: Concerns about the Health Center (fwd) |

At 12:08 PM 2/8/00 -0800, you wrote:
>tammie,cathy, can you problem solve with nursing/front desk as to what
went wrong with this student?
>bernadette can you log this student concern and I will be writing back to
her.
>larry
>
>Forwarded message:
>> From ▮▮▮▮▮▮▮▮▮Tue Feb 8 10:52:54 2000
>> Date: Tue, 8 Feb 2000 10:52:51 -0800 (PST)
>> X=Sender: ▮▮▮▮▮▮▮▮▮
>> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>> From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>> Subject: Concerns about the Health Center
>>
>> Dr. Neinstein,
>>
>> I write you as a concerned student. I have recently had to make several
>> visits to the health center as a result from a nagging cold I haven't been
>> able to shake in the past few weeks. One week ago I made an appointment
>> and after less than five minutes with the doctor, his recommendation was to
>> continue to take Sudafed and the cold would clear up.
>
Student was seen 12/16/99 by Emily for cold symptoms. Was given Symmetrel
and told to increase fluids and rest.

The student then saw Dr. Tyndall on 2/1. "the patient is in no acute
distress"
assessment "viral upper respiratory infection" plan: sudafed, cold-eeze and
afrin, RTC if no improvement, and discusses lack of efficacy of antibiotics
for viral illness.

> Instead, it got worse and after another appointment, this one with a
>> different doctor, yesterday afternoon, I have been diagnosed with
>> bronchitis. I was very satisfied with the through nature of the diagnosis
>> and care given during my visit with Dr. McKinney.

Saw Dana yesterday during her regular clinic. There are no notes in the
chart as of yet. What I am told is that the student was told he has
bronchitis and given an aerosol treatment in ACC. Apparently Dana told
the front desk and the student to return today to ACC for another aerosol
treatment. This was not conveyed to the ACC doc or nurse so when the
student was checked in to ACC and determined to be in no acute distress,
he was redirected to the front desk for an appointment. The student
was informed that this was to establish continuity of care.

>> This was complicated, however, by her recommendation that I return Tuesday
>> morning to the health center to listen to my breathing and determine if
>> another breathing treatment would be in order. Since Dr. McKinney would
>> not be in today, both she and the front desk staff instructed me to return
>> this morning and check in for acute care and they would take care of it.
>> I did just that and after checking in and having the nurse check my
>> temperature, pulse, and blood pressure, the nurse in charge of acute care
>> said I couldn't be seen through acute care. I was taken back out to the
>> front desk to make yet another appointment. At this time, the nurse again
>> came out and made it very clear to myself and the front desk staff that I
>> was not to be seen through acute care and that Dr. McKinney had been wrong.

Dr. Lim and Sharon were in ACC. By looking in Pyramed and the chart and the
student, it appeared not to be "acute".
The problem with discussing anything like this in front of the student, is
that it splits the staff and appears that one doesn't want to see the patient
and the other does.

>> All in all, the ordeal took 30 minutes and I received zero treatment.
>> Luckily I am feeling well and my breathing feels clear, but I feel the way
>> in which my case was handled was very poor and I fear other students may be
>> treated the same way. I feel this is not in line with the ultimate goal of
>> the health center and all in the health profession- the care and well-being
>> of the patients.

The student was given an appointment after 5:00 today per his request.

>> After having two experiences with the health center which were less than
>> satisfactory, I felt the need to inform you. I hope cases such as mine are
>> isolated, but I hope you follow up on these instances to help ensure
>> students receive the best and most convenient health care possible at the
>> health center.

Issues:

1. Front desk/ACC communication has been strained. They both feel the
other is telling them what to do. Regardless, this shouldn't
have taken place in front of the student.
2. Dana failed to communicate her plan, and is this where the follow-up
should take place.
3. The ol' "what is ACC" question. Is it only acute?
4. There appears to be some question about the use/overuse of aerosol
treatments.
I'm sure there are more issues but that's all for now.

Tammie




>> Thank you for your time,
>>
>> ███████████
>>
>>
>>
>
>


Tammie Akiyoshi, BSN, MA
Director of Nursing
University of Southern California
University Park Health Center
(213) 740-0233

# Tab 12

The Student Health Center is interested in providing you with the best possible medical care during your years at USC. The following questionnaire will help us identify what you think we are doing well and where we need to improve your care.

1. **Overall, how satisfied were you with your visit at the Student Health Center?**
(X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

2. **How satisfied were you with the appointment system?**
(X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

3. **How satisfied were you with the sign-in process?**
(X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

4. **How satisfied were you with your encounter with the medical assistants in room 100 or 215?**
(  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

5. **How satisfied were you with your encounter with the nurses?**
(X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

6. **How satisfied were you with your encounter with the Laboratory?**
(  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

7. **How satisfied were you with your encounter with the Pharmacy?**
(  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

8. **How satisfied were you with your encounter with the X-Ray Department?**
(  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

9. **How satisfied were you with your encounter with Physical Therapy?**
(  ) Very Satisfied   (  ) Satisfied   (  ) Diss. ...fied

10. **How satisfied were you with your encounter with the Cashier?**
(  ) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

11. **How satisfied were you with your encounter with the medical practitioner?**
(X) Very Satisfied   (  ) Satisfied   (  ) Dissatisfied

12. **Did the practitioner:**

| | YES | NO |
|---|---|---|
| Pay attention to your concerns and worries? | YES | NO |
| Inform you about your problem or disease? | YES | NO |
| Explain procedures and treatment? | YES | NO |
| Instruct you about your continuing care? | YES | NO |
| Introduce him or herself? | YES | NO |

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you.

Berni is fabulous. She's helped me a few times & each visit is great.
Dr. Tyndall is the practitioner as I usually visit & he is also exceptional!

These staff members should be commended!

(Optional)
N a m e : _____

T e l e . # : _____   Time to call: _____

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

P.O.B. 04-19-00P02:58 RCVD

The Student Health Center is interested in providing you with the best possible medical care during your years at USC. The following questionnaire will help us identify what you think we are doing well and where we need to improve your care.

**1.** Overall, how satisfied were you with your visit at the Student Health Center?
( ) Very Satisfied ( ) Satisfied (✗) Dissatisfied

**2.** How satisfied were you with the appointment system?
( ) Very Satisfied ( ) Satisfied (✗) Dissatisfied

**3.** How satisfied were you with the sign-in process?
(✗) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**4.** How satisfied were you with your encounter with the medical assistants in room 100 or 215?
(✗) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**5.** How satisfied were you with your encounter with the nurses?
(✗) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**6.** How satisfied were you with your encounter with the Laboratory?
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**7.** How satisfied were you with your encounter with the Pharmacy?
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**8.** How satisfied were you with your encounter with the X-Ray Department?
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**9.** How satisfied were you with your encounter with Physical Therapy?
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**10.** How satisfied were you with your encounter with the Cashier?
( ) Very Satisfied ( ) Satisfied ( ) Dissatisfied

**11.** How satisfied were you with your encounter with the medical practitioner?
( ) Very Satisfied ( ) Satisfied (✗) Dissatisfied

**12.** Did the practitioner:
| | | |
|---|---|---|
| Pay attention to your concerns and worries? | YES | NO |
| Inform you about your problem or disease? | YES | NO |
| Explain procedures and treatment? | YES | NO |
| Instruct you about your continuing care? | YES | NO |
| Introduce him or herself? | YES | NO |

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you.

I have been here 4 times for various reasons. When I hurt my wrist and when I had to get an employee physical, the Drs where great. But, I saw Tyndall 3 yrs ago for an infection & he misdiagnosed me and treated me w/ antibiotics & that could have had serious consequences →

to call: after 5 pm

SHC is 12-4 M W

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

P.O.B. 04-19-00P02:58 RCVD

# Tab 13

| | |
|---|---|
| **From:** | Elizabeth Davenport |
| **To:** | neinstei |
| **Sent:** | 4/20/2000 5:56:09 PM |
| **Subject:** | appointment |

Larry,
I have an appointment on your calendar for Monday morning with student
███████████ and I just wanted to brief you a little. It's concerning an
incident with Dr. Tyndall, whom she saw at the end of March. Her RA
escorted her to the Health Center, and witnessed what happened. The RA then
encouraged ██████ to work with me and Casey (my grad assistant), which ██████
has been doing. I've been encouraging her to tell you what happened with
Dr. Tyndall, and I'm really pleased that she's summoned up the courage to
do so. I'm not sure whether the RA will be present or not on Monday, but
the RA will certainly be willing to talk with you about it also.

Elizabeth

Elizabeth J.L. Davenport
Assistant Dean for Student Affairs
University of Southern California
Los Angeles, CA 90089-0890
213.740.4900

# Tab 14

George Raymond Tyndall, M.D.
849 West 34th Street
Los Angeles, CA 90089-0311

Dear Dr. Tyndall,

This letter is in regard to your extremely unprofessional behavior during my appointment on Tuesday, April 11, 2000. The story you told me about the rock guitarist from Megadeth and his experience having sexual relations on the street in Chicago with the woman who had to first remove her tampon was disgusting and inappropriate. It was degrading and humiliating for me to listen to such talk from anyone, let alone a supposed professional in a very intimate and invasive field of expertise such as gynecology. After such a repulsive display of un-professionalism, I have lost all trust in you as my physician.

In addition, when you recommended I take birth control pills to prevent cancer, I said I would like to do some research on my own before taking a hormone medication. You completely ignored my wishes and ordered the prescription anyway. You are practicing cookbook medicine by prescribing a medication that could deplete my mineral balance and alter my hormonal balance when *I have no menstrual problems*. Because of your lack of consideration, I will never return to you again. It is my sincere hope that the University addresses this problem so that another innocent woman does not have to suffer the stress and shame that I have anguished over since our visit.

Consider this my formal request to release my medical records and test results so I can seek the care of another, more professional, physician.



CC: Larry Neinstein M.D.

The Student Health Center is interested in providing you with the best possible medical care during your years at USC. The following questionnaire will help us identify what you think we are doing well and where we need to improve your care.

1. **Overall, how satisfied were you with your visit at the Student Health Center?**
   ( ) Very Satisfied   ( ) Satisfied   (✓) Dissatisfied

2. **How satisfied were you with the appointment system?**
   ( ) Very Satisfied   (✓) Satisfied   ( ) Dissatisfied

3. **How satisfied were you with the sign-in process?**
   ( ) Very Satisfied   (✓) Satisfied   ( ) Dissatisfied

4. **How satisfied were you with your encounter with the medical assistants in room 100 or 215?**
   ( ) Very Satisfied   (✓) Satisfied   ( ) Dissatisfied

5. **How satisfied were you with your encounter with the nurses?**
   ( ) Very Satisfied   (✓) Satisfied   ( ) Dissatisfied

6. **How satisfied were you with your encounter with the Laboratory?**
   ( ) Very Satisfied   (✓) Satisfied   ( ) Dissatisfied

7. **How satisfied were you with your encounter with the Pharmacy?**
   ( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

8. **How satisfied were you with your encounter with the X-Ray Department?**
   ( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

9. **How satisfied were you with your encounter with Physical Therapy?**
   ( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

10. **How satisfied were you with your encounter with the Cashier?**
    ( ) Very Satisfied   (✓) Satisfied   ( ) Dissatisfied

11. **How satisfied were you with your encounter with the medical practitioner?**
    ( ) Very Satisfied   ( ) Satisfied   (✓) Dissatisfied

12. **Did the practitioner:**

| | | |
|---|---|---|
| Pay attention to your concerns and worries? | YES | (NO) |
| Inform you about your problem or disease? | YES | NO |
| Explain procedures and treatment? | YES | NO |
| Instruct you about your continuing care? | YES | NO |
| Introduce him or herself? | YES | NO |

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you.

_____

_____

_____

_____

_____

_____

(Optional)
N a m e : _____

Tele # _____   Time to call: _____

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

04-28-09 P01:34

# Tab 15

Re: ███████ 5/1/00: talked with student and her concerns and she is feeling better.  She will be making an appointment with another clinician in the future.  She felt that the discussion of her health care was unprofessional but appreciated both the letter from Dr. Tyndall and my phone call.

Two items:
1) you are welcome to send the letter that you typed out,  However, just some feedback. Sometimes your written responses are very long (I can have the same tendency). Often it is better received and heard if it is kept short and to the point.  Below is one example of how this might be done.
2) Lucy is setting up a short meeting with Elizabeth davenport and myself to discuss a student who had some concerns.  Thanks, larry


Thank you for your letter post marked April 19.  I am always happy to hear back from students with both positive and negative feedback.  First let me assure you, that all students always have a choice of clinicians.  If you are unhappy with the care I provided, than absolutely, you should seek another clinician.  However, I would like to respond to you concerns.

First, let me apologize, if you misunderstood the intent of the Megadeth conversation.  It is my medical practice to utilize the biopsychosocial approach to health care.  This involves, not just knowing about the medical complaint but also how the student is functioning in terms of psychological and social health.  I thought that since you are a music major and interested in the music industry that this recent article in The New York Times Magazine might be of interest and a good lead in to a discussion of safe and unsafe sexual practices.  I apologize if you found the conversation unprofessional.

Regarding the use of oral contraceptive pills.  It is common practice to prescribe oral contraceptive pills to women in their 40s for both contraception and the non-contraceptive benefits of lowering significantly the risk of uterine and ovarian cancer. Because you indicated you wanted to explore this further, I offered you a prescription at the pharmacy that you could pick up, if you decided you wanted the Ortho-Cyclen.  Since you indicated that this was okay, I sent the script over.  There was no intention that you must pick up and utilize the prescription.  There are woman whose lives could have been saved by the use of oral contraceptive pills in preventing these unfortunate cancers. Again, I apologize if there was a misunderstanding about this prescription.

Again, than you for you feedback,  As you reqeusted etc.

# Tab 16

The ⦰dent Health Center is interested in providing you with the ⦰ poss⦰e medical care during your years at USC. The follow⦰g questionnaire will help us identify what you think we are doing well and where we need to improve your care.

**1.** Overall, how satisfied were you with your visit at the Student Health Center?
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**2.** How satisfied were you with the appointment system?
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**3.** How satisfied were you with the sign-in process?
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**4.** How satisfied were you with your encounter with the medical assistants in ~~room 100 or 215~~? *hallway*
(X) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**5.** How satisfied were you with your encounter with the nurses?
(X) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**6.** How satisfied were you with your encounter with the Laboratory?
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**7.** How satisfied were you with your encounter with the Pharmacy?
(X) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**8.** How satisfied were you with your encounter with the X-Ray Department?
( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**9.** How satisfied were you with your encounter with Physical Therapy?
( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**10.** How satisfied were you with your encounter with the Cashier?
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

P.O.B. 06-09-00 P02:33 IN
CC: Dr. Leavitt

**11.** How satisfied were you with your enc⦰ter with the medical practitioner?
( ) Very Satisfied   ( ) Satisfied   (X) Dissatisfied

**12.** Did the practitioner:

| | YES | NO |
|---|---|---|
| Pay attention to your concerns and worries? | YES | (NO) |
| Inform you about your problem or disease? | YES | (NO) |
| Explain procedures and treatment? | YES | (NO) |
| Instruct you about your continuing care? | YES ? | (NO) |
| Introduce him or herself? | YES | (NO) |

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you.

Tindel - I had the most cursory pap & exam I've ever had last semester.

The following day I developed a yellow discharge (vaginal) I thought it was the jelly used for exam. I've had it ever since - never before.

█████████████████

⦰ime to call: *pm*

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

I was there because I had a ⦰ different problem - his advice was I should take the pill. It has no connection to the problem I ~~am~~ have. ⦰

# Tab 17

The S[ ]t Health Center is interested in providing you with the be[ ] possible medical care during your years at USC. The following questionnaire will help us identify what you think we are doing well and where we need to improve your care.

**1.** **Overall, how satisfied were you with your visit at the Student Health Center?**
( ) Very Satisfied   ( ) Satisfied   (X) Dissatisfied

**2.** **How satisfied were you with the appointment system?**
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**3.** **How satisfied were you with the sign-in process?**
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**4.** **How satisfied were you with your encounter with the medical assistants in room 100 or 215?**
( ) Very Satisfied   ( ) Satisfied   (X) Dissatisfied

**5.** **How satisfied were you with your encounter with the nurses?**
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**6.** **How satisfied were you with your encounter with the Laboratory?**
( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**7.** **How satisfied were you with your encounter with the Pharmacy?**
( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**8.** **How satisfied were you with your encounter with the X-Ray Department?**
( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**9.** **How satisfied were you with your encounter with Physical Therapy?**
( ) Very Satisfied   ( ) Satisfied   ( ) Dissatisfied

**10.** **How satisfied were you with your encounter with the Cashier?**
( ) Very Satisfied   (X) Satisfied   ( ) Dissatisfied

**11.** **How satisfied were you with your encoun[ ]r with the medical practitioner?**
( ) Very Satisfied   ( ) Satisfied   (X) Dissatisfied

**12.** **Did the practitioner:**

| | YES | NO |
|---|---|---|
| Pay attention to your concerns and worries? | YES | (NO) |
| Inform you about your problem or disease? | YES | (NO) |
| Explain procedures and treatment? | YES | NO |
| Instruct you about your continuing care? | (YES) | NO |
| Introduce him or herself? | YES | (NO) |

Thank you for taking the time to evaluate our performance. If you would like to further describe your experiences with us, would you please do so below. If you have special concerns you would like to discuss, please leave your name, telephone number, date and time of your visit, and the best time to contact you.

Dr's Tyndal and Creamer are terrible. I knew more about what was wrong & what to do about it. Additionally, I had to wait for an hour and a half to see the doctor.

(Optional)
N a m e : _____

T e l e . # : _____   Time to call: _____

Once completed, please fold and drop into the suggestion box located on the wall, next to the reception desk, in the main lobby of the Student Health Center.

Sept. 2000

CC: Dr. Leavitt

# Tab 18

| | |
|---|---|
| From: | William Leavitt |
| To: | Larry Neinstein |
| Sent: | 9/7/2000 3:20:04 PM |
| Subject: | Re: 2 cases of concern |

Dear Larry:

In response to your inquireys:
>
>1) student came in today to see carmella for murmur. She was seven minutes
>late and Carmella did not see her. She was rescheduled with Dr. Tyndall.
>He saw her but said he could not see her because he was a gynecologist and
>not a cardiologist. Student was rescheduled tomorrow to see you. Student
>is less than pleased.

This happens here a lot, you just do not hear about it. Part of the problem
is that the UPHC Clinical Staff has drawn boundrys over what they consider
primary care. To everyone except myself and Dr. Walker, a murmur is an
Internal Medicine problem. Irregardless of whom the patient saw, she would
have been referred to Internal Medicine and that visit considered waisted.
This is by no means restricted to Dr. Tyndall.


>
>a) We need to look at that late policy fairly soon and see about
>implementation

As for the late policy, we discussed my recommendation yesterday. The
sooner we implement the proposed policy, the better.
>
>b) I thought George was primary care clinician and hired as such and not as
> gynecologist?

Dr. Tyndall's training is in Gynecology. I do not know the specifice of the
terms of his hiring. In the past he has served as a Gynecologist who also
sees primary care cases.
>
>2) We had pap smear that was done by George in april and came back as CIN
>II. there was never any followup. We finally traced student down to
>Berkely this week and she assumed everything was alright. There is
>sign-off on pap slip by George but nothing in chart about followup and
>student was never called.

I will look into this. Could you provide me with the students name and or
Social Security Number?

Bill
>

William Leavitt, MD, FAAP
Staff Physician
University Park Health Center
University of Southern California
849 West 34th Street #216
Los Angeles, California 90089-0311
(213) 740-0456 Office
(213) 740-0214 Fax
wleavitt@bcf.usc.edu E-Mail

# Tab 19

Appointment Department
Research Data Sheet

Date: _11/16/01_

Patient's Name ███████████████

SS#/USC ID#_███████████_ Telephone n ██████████████

Appt. time: _11.40 AM_ Date _11/12/01_  Practitioner: _Dr. Tyndall_

Explanation: _Pt. was seen on monday by Dr. Tyndall._
_Pt. was not informed of the stu.health fee prior_
_to appt. — Pt. feels that she should not pay the_
_stu.health fee! If pt. would have been informed_
_prior to seeing the Dr. Pt. would have opted to_
_cancelling the appt. instead._
_R.P._          _11 16 01_          _12 PM_
Given To:          Date:          Time:

Complaint submitted by: _Pt. — inperson_

Research:_____
_Do not Bill ___ visit- approved by_
_Dr neushein _____

[X] Approved          [ ] Denied          [ ] More Research Needed

_____ RN          _11-19-01_
Resolved By:          Date:

# Tab 20

| | |
|---|---|
| **From:** | Larry Neinstein |
| **To:** | wleavitt@usc.edu |
| **Sent:** | |
| **Subject:** | Fwd: Interviews with the Health Center |

```
<html>
i think we need to discuss this email and the two student concerns this week regarding Dr.
Tyndall.<br>
In looking at pyramed, this student has positive mono and hgb of 14.2 and mcv of 94.4.<br>
why would George tell this patient her mono is negative but that she is anemic and start
her on iron.<br>
also starting OCPs in the midst of acute mono with no need for contraception is not ideal.
<br><br>
thanks,<br>
larry<br><br>
<blockquote type=cite class=cite cite>From: <br>
Date: Thu, 13 Dec 2001 16:10:54 EST<br>
Subject: Interviews with the Health Center<br>
To: neinstei@usc.edu<br>
<br>
XXX, 18, a track runner majoring in psychology, said she was <br>
stunned when Dr. Tyndall suggested birth control to her because she was an <br>
athlete.  "I'm not sexually active so I wasn't sure how I would benefit," she <br>
said, "he then he told me I could skip my period for three months."<br>
     XXX said she was baffled because she was going to the health center to <br>
get the results of a mono test she had taken three weeks prior and leaving <br>
with a prescription for birth control.  XXX said she was most upset <br>
because Dr. Tyndall had previously told her the results of the mono test were <br>
negative.<br>
     "Three weeks ago, I went to the health center to find out the results of <br>
the mono test which I had just taken.  The lady at the desk called him [Dr. <br>
Tyndall] from downstairs and asked him," said XXX.  The receptionist then <br>
informed XXXX the results were negative but that Dr. Tyndall believes she <br>
might be anemic.  "He [Dr. Tyndall] told me that was why I had passed out at <br>
a meet and that I should take iron supplements," XXXX said.<br>
     XXXX started taking iron supplements and continued to run.  Her <br>
symptoms did not get better so she went to another doctor.  "I told him I had <br>
already taken a mono test so he didn't give me another one," she said.  The <br>
doctor did however notice XXXs inflamed throat and diagnosed her with <br>
strep throat. <br>
Then three weeks later she Dr. Tyndall contacts her.  "I get a call on my <br>
cell phone as I'm leaving class.  He [Dr. Tyndall] tells me 'Oh! I'm looking <br>
at your file and it appears that you have mono."  Dr. Tyndall then <br>
recommended she come in so they could discuss her diagnosis. <br>
     By this point XXX was disturbed because "here I am taking iron <br>
supplements and antibiotics for strep throat when all the time time I had <br>
mono," she said, "I just wanted to get a copy of the blood test so that I <br>
could bring it to my doctor." <br>
     After briefly meeting with Dr. Tyndall to obtain a copy of her positive <br>
blood tests, XXXX was on her way out when Dr. Tyndall said "I did want to <br>
talk to you about something before you left."  XXX was then given the <br>
prescribed lecture on birth control and all its benefits. <br>
     XXX confesses she was caught off guard and found the recommendation a <br>
little weird.  "Since I am a runner, he told me that when I have meets, I <br>
probably want to be off my period . . . birth control would allow me to skip <br>
my period for months at a time," she said, " So I asked him if there were any <br>
side-effects to going on birth control and he said 'no not at all' and he <br>
gave me the actual prescription."<br>
     XXXX was a little concerned because Dr. Tyndall hadn't even given her a <br>
complete medical exam.  "So I went home and asked my mom about it," she said. <br>
 After consulting with her mom and her regular doctor XXXX decided that <br>
birth control wasn't for her.</blockquote></html>
```