# EXHIBIT 14

# Tab 98



## University of Southern California Engemann Student Health Center Consultation

**Report of Consultation Performed By:**

Kimberly Schlichter, MD, FACOG
Sharon Beckwith, CEO, MDReview

**Date of Consultation:**

The site visit for the consultants took place November 15-16, 2016.

**Purpose of Engagement:**

MDReview was asked by the interim co-medical directors, William Leavitt, MD, and Mildred Wenger, MD, of University of Southern California (USC) Engemann Student Health Center to assist with the internal investigation concerning Dr. George Tyndall, a staff gynecologist who sees students in the Women's Health Division at the Engemann Student Health Center. The leadership of the Student Health Center received a report that described certain practices used by Dr. Tyndall during his examinations of female patients. Dr. Schlichter and Ms. Beckwith were appointed to an ad hoc committee to review Dr. Tyndall's clinical practice and behavior.

Dr. Tyndall came to the Student Health Center in 1989. He has held the position of staff physician in the Women's Health Division since then. During his time at USC, several complaints have been made about Dr. Tyndall's behavior and/or practice of medicine. In 2013, Dr. Larry Neinstein, then executive director of Student Health, reported to the Office of Equity and Diversity (OED) that several personnel, as well as a patient, had made allegations related to Dr. Tyndall. Several of the personnel were interviewed, but a formal investigation was never opened.

Earlier this year, allegations regarding Dr. Tyndall's behavior were again taken to the OED. This complaint was initiated by the nursing supervisor. She felt that his comments and conduct constituted sexual harassment. In the course of the investigation, several other members of the Nursing Department and two patients also made similar complaints regarding Dr. Tyndall. During the course of this investigation, Dr. Tyndall was put on administrative leave. Several people have been interviewed by an investigator for the OED. Dr. Tyndall has also been interviewed twice and has defended his behavior and medical care verbally and in writing as appropriate. As many of the issues are related to the appropriateness of his medical care, MDReview was hired to act as an ad hoc committee to assist with the investigation, including a determination as to whether Dr. Tyndall's practices constituted standard of care.

In addition, in relation to the need to fumigate his office while he was on administrative leave, Dr. Tyndall's office was entered and searched for the source of an infestation. In so doing, a

locked cabinet was found containing photographs and slides of female genitalia. A separate inquiry was started regarding the appropriateness of Dr. Tyndall possessing this material, and Dr. Tyndall responded. The ad hoc committee was also asked to address this issue, including Dr. Tyndall's responses.

This report used information obtained during interviews done over the course of two days with colleagues and coworkers of Dr. Tyndall, as well as Dr. Tyndall himself; review of 28 medical records, documents provided by USC regarding the allegations, including Dr. Tyndall's responses, and documents related to photographs and slides found in Dr. Tyndall's office; and Dr. Tyndall's explanation regarding his possession of these images.

**Background:**

Dr. Tyndall came to the Student Health Center at USC immediately after completion of a residency (information not verified by ad hoc committee) in obstetrics and gynecology at Kaiser Foundation Hospital, Sunset Boulevard. He has stated that he passed the written board exam at the completion of his residence (information not verified by ad hoc committee). As his work as a staff physician in Women's Health did not involve performance of gynecologic surgery or obstetrics, he was not allowed to sit for oral boards for the American Board of Obstetrics and Gynecology, and therefore could not become board certified. It is assumed that he has maintained a license in the state of California to practice medicine. His job responsibilities have consisted of caring for female patients at the Student Health Center. At no point during his employment at the Student Health Center has Dr. Tyndall had teaching responsibilities of any type or been involved in university-sanctioned research or any outside research to the knowledge of the current co-interim directors of the Student Health Center.

Prior to 2013, complaints regarding Dr. Tyndall's behavior and conduct had been taken to Dr. Neinstein. These included Dr. Tyndall interviewing female patients in his office with the door locked and insisting that medical assistants (MA) remain on the other side of the curtain while he examined patients. Dr. Neinstein reported that he counseled Dr. Tyndall and that following counseling, Dr. Tyndall had responded by altering his behavior. Other complaints included Dr. Tyndall keeping an excessive amount of material, primarily papers but also food wrappers and other trash, in his office to the point it was felt to be a safety and hygiene hazard, and he was forced to discard of some of the material.

**Scope of Engagement:**

The ad hoc committee performed an onsite evaluation and series of interviews to obtain a broad set of opinions regarding Dr. Tyndall's conduct and medical care. It was felt that an onsite evaluation would allow coworkers and employees to be more willing to express their concerns without fear of recrimination and to maximize candor and openness. Those interviewed were told that all efforts would be made to preserve anonymity and confidentiality.

On November 15 and 16, 2016, Dr. Schlichter and Ms. Beckwith interviewed and/or participated in discussions with 17 people, including:

1. Administrators, both physicians and nursing
2. Colleagues in the Women's Health Division
3. Nursing staff (RN's and MA's) in the Women's Health Division
4. Dr. George Tyndall

It should be noted that the majority of those interviewed had worked with Dr. Tyndall for more than 10 years, and that eight had worked with him for 14 or more years.

In addition, medical records of 28 students were reviewed by Dr. Schlichter; these included encounters from 2009 through 2016. Eight of these records were of colposcopies only. Reports related to this review were submitted separately. Information obtained from this clinical review is included in this report.

Other documents provided to the ad hoc committee included memorandums related to the complaint made by the nursing supervisor; the inquiry regarding Dr. Tyndall's possession of images of female genitalia, some of which have student/patient identification information on them; and a curriculum vitae provided by Dr. Tyndall.

**Summary Findings from Interviews:**

All Student Health Center personnel who were interviewed, save Dr. Tyndall, expressed a desire to maintain high standards of care for the student-patients at the Student Health Center. While some concerns were expressed about possible involvement in legal action, the majority of interviewees were open and forthcoming and provided detailed information regarding Dr. Tyndall's conduct and medical care. Based upon these discussions, several consistent themes became evident:

1. Frustration with prior lack of action on concerns raised regarding Dr. Tyndall

   Several people interviewed expressed frustration with the administration of the Student Health Center. This was related to their feeling that prior complaints were either ignored or resulted in only limited and/or temporary improvement in Dr. Tyndall's behavior. Personnel indicated they felt it was necessary to take their concerns outside the Student Health Center to be taken seriously and/or result in any permanent improvement in a situation they felt put patients at risk and made them very uncomfortable professionally. Several were concerned that the current investigation would again be fruitless. Multiple people said they had seen Dr. Tyndall's behavior as worsening significantly in the last few years.

2. Both personnel and patients were frequently upset after their encounters with Dr. Tyndall.

   Several interviewees indicated that patients frequently asked to see other providers after seeing Dr. Tyndall. At times, this seemed to be due to a lack of comfort with Dr. Tyndall's care that they were either unwilling or unable to express. At other times, it was due to Dr.

Tyndall's inability to complete the needed services in the scheduled time, either because he was running late or because he took an inordinate amount of time to perform the scheduled services. It was also noted that those patients who did indicate a desire not to return to Dr. Tyndall's care, if they were international students, had better command of the English language.

In addition, several nursing staff said they had reached a point that they preferred not to go into a patient exam room with Dr. Tyndall because the way he dealt with the patients made them uncomfortable. This included seeing patients who were in tears, upset, or obviously offended by Dr. Tyndall's conduct, all of which Dr. Tyndall would be oblivious to, or he would make condescending comments to the patients about their discomfort.

3. Belief that Dr. Tyndall had a preference for a particular patient population

Almost all interviewees commented emphatically that Dr. Tyndall had a clear preference for the type of patient he saw. These patients were described as international and/or Asian, most typically non-American Asian, with a lower level of fluency with English. The opinion was that these patients had a reduced understanding of what they were being told. In addition, Dr. Tyndall's exams and behavior differed depending on what type of patient he was seeing. If the patients were young or Asian, they were more likely to have a pelvic exam completed, while if they were non-Asian, obese, or older, it was less likely that a pelvic exam would be deemed necessary (by Dr. Tyndall or the patient). Also, comments made to patients that the nursing staff were uncomfortable with or felt were inappropriate were more likely to be made to students for whom English was their second language.

4. Reports of inappropriate, unprofessional, and/or unusual behavior

Nursing staff were particularly troubled by what they saw as inappropriate comments being made to patients. The description of the comments was uniformly similar among multiple interviewees who indicated this was a concern. Patients were frequently told they had "flawless skin." During the pelvic exam, Dr. Tyndall would make comments about vaginal caliber or tightness by saying "you are toned" or "your PC (pubococcygeus) muscle is tight," and ask whether the patients exercised, typically whether they ran or swam. If patients asked what that meant, he would tell them that running and other forms of exercise led to a tight PC muscle and that their boyfriend or spouse would be "really happy about it." Dr. Tyndall would comment on the status of the patient's hymen. He would tell patients they had "perky breasts" and frequently ask if they had breast implants.

Nursing staff were uncomfortable when Dr. Tyndall asked them to stand beside him while the patient was in lithotomy position to hold a light rather than use the available self-supporting light source. He would then frequently ask them to "look at this" and point out an area of the patient's anatomy.

When chaperones were allowed to stand at patients' sides, they were frequently instructed not to talk to patients and/or hold patients' hands as a gesture of support during pelvic exams. Several years ago, Dr. Tyndall refused to allow chaperones into the room during his exams

or insisted that chaperones stay on the other side of a dividing curtain. Dr. Neinstein counseled Dr. Tyndall on this inappropriate behavior in the past, and he ceased, but the MAs indicated that they frequently felt Dr. Tyndall preferred chaperones not be in the room with him or interact with the patient.

In interviewing Dr. Tyndall, he indicated he was aware that the nursing staff had raised this issue and seemed perplexed by it. He raised two issues relevant to this. He contended that his patients would never need a person to support them or hold their hand as his exams never caused patient discomfort. He also contended that the patient holding someone's hand interfered with performing an accurate exam.

While several of the staff described Dr. Tyndall as being nice, several also described his making comments to them personally that involved racial stereotypes. When some of them told Dr. Tyndall that these comments were not appropriate, he was perplexed and did not understand why they were inappropriate.

Two separate members of the nursing staff said that Dr. Tyndall asked to keep an intrauterine device (IUD) that had been removed from a patient. In one case, he asked the patient's permission. In the other, after the patient had left, he came back into the room and asked the MA to clean it and put it in a bag for him.

Multiple people stated that Dr. Tyndall's office was full of papers, trash, and old food wrappers. They said it caused the office to have a bad odor and they felt it was behavior that would be considered hoarding. They also commented that his personal hygiene was not good. It was noted that he would wear an obviously dirty shirt and would smell bad. This latter issue was reported by several to be getting worse recently.

Multiple interviewees also reported that Dr. Tyndall kept some type of rag or cloth in his pocket that he would always use to grasp a door knob to open it, but that he would also use this same cloth to wipe his face or blow his nose. He was also said to be unwilling to shake hands. (The latter was noted when Dr. Tyndall was interviewed by the ad hoc committee. He claimed he did not want to shake hands as he had a cold, although both interviewers noted that during the hour that was spent with him, no outward signs of illness were observed.)

5. Poor or questionable medical care

    a. Inadequate exams

    Several people interviewed reported that Dr. Tyndall seemed to lead students into saying they did not want an exam or a part of it. In addition, his breast exams were described as brief or not thorough. He would comment to patients either prior to doing the breast exam, when it was still under discussion, or during the exam itself that they were too young to get breast cancer.

    Dr. Tyndall's answers to questions regarding breast exams during his interview supported the above statement. He indicated that he felt that if he palpated a breast lump in a young woman and referred her for evaluation, it would always result in an open biopsy for what

would be found to be a benign lesion. In addition, he said that he felt a breast exam when the patient had implants was not useful as the implant was in front of the breast tissue, which is factually incorrect.

Uniformly, he was described by those interviewed as rarely obtaining a biopsy when a colposcopy was performed. One interviewee also stated that in cases in which he did do an endocervical curettage (ECC, a form of biopsy), he would always remove the curette and say "there's no tissue" and not submit it, but that the patients never reacted with the typical discomfort related to this procedure being performed correctly.

Review of medical records supported the staff's contentions regarding Dr. Tyndall's performance of colposcopies. Medical records of 13 colposcopies were reviewed. No biopsies were performed because in all cases, the findings were documented as normal. In five cases, Dr. Tyndall said he performed an ECC but did not submit the specimen due to "no tissue obtained." This procedure does not produce grossly visible tissue when done correctly.

b.  Infection control issues

Almost all interviewees either volunteered or confirmed, when asked, that Dr. Tyndall was never seen to wash his hands, and that in many instances, he even commented to or asked a patient if it was OK not to wash his hands and "just wear gloves" as the soap was "too harsh."

Dr. Tyndall started performing what sounds to be total body checks for skin lesions in the last several years. He did this after the pelvic exam. He removed the first set of gloves and donned clean gloves. He turned the patient prone and then separated the buttocks to check the anal area. Without changing his gloves, he then went on to examine the patient's upper torso, neck, and scalp. As described, this is a violation of the standard to proceed from "clean to dirty" in the course of an exam or procedure.

Several personnel reported that he poorly controlled body fluids that can accumulate on the speculum or his gloves during the exam, resulting in frequent contamination of surrounding equipment and his own clothes. In addition, he used the gloved hand that he has just used to perform a pelvic exam to touch the exam room curtain.

c.  Inappropriate pelvic exam technique

Dr. Tyndall was described by multiple interviewees of modifying his pelvic exam technique in the last several years. He is now described uniformly as always beginning his pelvic exam by asking the patient's permission to insert one gloved lubricated finger, regardless of the purpose of the exam, his prior experience examining the patient, or her sexual experience or history of traumatic exam. He would then remove and ask the patient's permission to insert two fingers. It was during this portion of the exam he typically made comments about the patient being "toned" or having a "tight PC muscle," frequently seeming to palpate this tight area while he talked with the patient. Typically, a bimanual exam was not done at this time. Dr. Tyndall would then perform the speculum exam and then might, but not always, perform a bimanual exam. At times, the patient would be

uncomfortable and ask him to stop, which some personnel reported he did not always do, and that if the patient did complain of pain, he would make a condescending comment that she should not be feeling any discomfort.

(Dr. Tyndall stated during his interview that his patients never experienced any discomfort during his exams because he thoroughly explained everything to them ahead of time.)

**Ad Hoc Committee Feedback to Dr. Tyndall's Responses to the Initial Complaint:**

One of the issues raised was Dr. Tyndall's insistence that the Student Health Center's policy (stated by Dr. Tyndall) of only requiring a chaperone in the room when a male provider does a pelvic exam is a violation of "APGO/ACOG standard." Dr. Tyndall stated that "according to APGO/ACOG, there should always be an assistant/chaperone present during physical exams of unclothed women ... regardless of the gender of the clinician"; he attached a footnote to this statement to *Obstetrics and Gynecology*, 7th edition, Wolters Kluwer/Lippincott, Williams & Wilkins, 2014. During his interview, he referenced this book as containing the standards of care by which he practices. This book was not written to establish guidelines but rather is a medical student textbook. That said, it actually does not state what Dr. Tyndall contends. There is a short reference to chaperones that states that any request for a chaperone by physician or patient, regardless of sex, should be accommodated. A better resource for guidelines, *Guidelines for Women's Health Care: A Resource Manual*, 4th edition, The American College of Obstetrics and Gynecology, 2014, states that a chaperone is not required and at times can be deleterious (page 100).

Dr. Tyndall also contended that his technique for performing pelvic exams is "by the book." But the technique described by all nursing personnel is not by the book. *Guidelines for Women's Health Care: A Resource Manual*, 4th edition, states that the speculum exam is to be done after the external inspection, and that if lubricant is used it should be minimized to prevent contamination of any specimens that should be collected (page 228). That said, there are isolated instances in which it may be appropriate to probe the vagina before the speculum exam is done to check for any obstructions or anatomic abnormalities that may hinder the speculum exam, most typically if the patient's history suggests such an issue. But these are isolated instances and clearly not present in all of the patients that Dr. Tyndall examines.

Dr. Tyndall also defended his statements to a patient being "toned" or having a "tight PC muscle" as a response to their answer to Question 12 on the Student Health Center health history form. He stated he does this only under certain circumstances: if the patient checks (reviewer assumes this means checks in the affirmative) Question 12, and if he also notes a "toned PC muscle" during the exam. He then educates the patient about Kegel exercises and how they relate to orgasms. Dr. Tyndall stated that if the patient was not complaining about sexual functioning, no comment about vaginal muscles or Kegel exercises would be made. Per documents supplied to the reviewer, Dr. Tyndall stated that "he cannot remember a single incident where a patient did not check question 12." Question 12 is actually a four-part question. In fact, upon review of 20 Student Health Center health history forms attached to the medical records sent for review, none of the four parts of Question 12 were ever checked in the affirmative.

Upon interviewing Dr. Tyndall, he confirmed that he felt there was a connection between Kegel exercises and orgasms. Dr. Tyndall stated during his interview that he only practiced "evidence-based medicine," but when asked for the source of this belief, he referred to a *Reader's Digest* article he read more than 20 years ago. The belief that there is a connection between doing Kegel exercises and orgasms is certainly not widely accepted among gynecologists, and the reviewer is unaware of any scientific literature supporting this connection.

The other defenses Dr. Tyndall gave of doing a digital exploration of the vagina before doing the speculum exam was to check to see if the patient would tolerate the speculum exam as she may have vaginismus, or because if the "PC muscle is highly toned" and she is not sexually active, he would give the patient the opportunity to skip having a speculum exam as it might cause pain. If the patient gave a history suggesting vaginismus, this would be appropriate. But according to nursing staff, regardless of whether he had examined the patient previously or she gave a history suggestive of vaginismus, the exam was done the same way. The medical records that were reviewed supported that in many cases, Dr. Tyndall examined patients he had previously examined himself without difficulty. ACOG standards recommend a pelvic exam, including speculum exam, in patients older than 20 regardless of their sexual history (see *Guidelines for Women's Health Care: A Resource Manual*, 4th edition, and the ACOG Committee Opinion *Well-Woman Visit*, August 2012, reaffirmed 2016). While these guidelines allow for flexibility depending on the patient's preferences and history, routinely exploring the vagina before the speculum exam to determine if the patient might have discomfort is not standard of care or appropriate.

Dr. Tyndall defended questions he asked patients about whether they ran or exercised based upon his assessment of their PC muscle as relevant to informing the patient about what he found during the exam. But this does not in any way explain or defend his questioning of the patient. And, factually, while many muscle groups may be strengthened by running, the pelvic floor (of which the PC muscle is a part) may actually be damaged by running because of the repetitive impact. The only form of exercise that is commonly felt to strengthen the pelvic floor is Kegel exercises.

Dr. Tyndall's statement that he comments on the status of the patient's hymen to determine if she is having problems with intercourse contradicts his own contention that he has paid attention to her answer to Question 12 on the Student Health Center health history form, which includes whether the patient has questions or concerns about sexual functioning. The appearance of the hymen even after a patient has become sexually active is highly variable, and there is no medical reason to make an issue of this with the patient unless the patient herself raises questions regarding it.

Telling a patient that she has "flawless skin" is not the way it would typically be described from a medical standpoint. In that case, it would be more appropriate to say, "I don't see any suspicious areas." This may simply be a poor choice of words on Dr. Tyndall's part, as it sounds more like a compliment than a medical statement. Complimenting a patient on any aspect of her appearance may confuse the physician-patient relationship and should be avoided.

As discussed above, Dr. Tyndall's contention that a breast exam is unnecessary if the patient has implants is simply incorrect. There is also no risk of rupturing an implant by a clinical breast exam, as he stated he was concerned might happen if he examined a patient with breast implants. At no time would it be appropriate for a physician to comment to a patient that she has "perky

breasts," a statement Dr. Tyndall denied making but which multiple personnel stated they had heard him make.

It is impossible to determine if the way in which Dr. Tyndall discussed contraceptive options unduly emphasized IUDs/intrauterine systems (IUS). It is certainly appropriate to try to fit the method of contraception to the patient's needs and habits, and it is well documented that long-acting reversible contraception methods, including IUDs, IUSs, and Nexplanon, have a lower failure rate. Dr. Tyndall's documentation in his medical records showed a very high level of concern about contraceptive failure, including advising a patient to fill a prescription for emergency contraception before it was needed and carry it with her in a Ziploc bag he provided to the patient (a highly atypical and puzzling practice). It is possible that because of his very strong concern about contraceptive failure that he, without recognizing it himself, unduly emphasized use of IUDs/IUSs to patients.

**Ad Hoc Committee Feedback to Dr. Tyndall's Explanations of His Possession of Images of Female Genitalia:**

The ad hoc committee was asked to consider the issues and comment upon standard of care relevant to the discovery in Dr. Tyndall's office of slides and photographs of female genitalia, both external and cervices. These items were found when the office required fumigation while Dr. Tyndall was on administrative leave. Of the more than 200 images found, 38 had patient identifying information on them (22 of which were slides of cervices). The remainder were unlabeled. The photographs included some taken using Polaroid-type film. The images that contained identifying information were dated between 1990-1991. There were also receipts for film development by a commercial processing lab in Rochester, New York (date information was not provided). It should be noted that neither the images nor the receipts themselves were reviewed by the ad hoc committee.

Dr. Tyndall stated that he obtained consent to take the photographs, but medical records to support this contention were not available for those dates. Information provided by other medical personnel who have been at the Student Health Center for more than 20 years indicated that there has never been a consent for photography included on the standard forms. At this time, there does not appear to be any way to determine whether the patient's consent for photography was obtained.

The use of photography to document findings was somewhat more pervasive in the late 1980s and early 1990s than it is today. At one time, the use of a specialized camera with a close-up lens to perform "cervicography" as an adjunct to the Pap smear was promulgated by a company that would then interpret the photographs. This does not sound consistent with what Dr. Tyndall described as a camera attached to a colposcope. Due to the magnification on the colposcope, it is difficult to imagine how anything other than a very small area of the external genitalia could be photographed in one frame. Without seeing the images, it could not be determined whether the images were likely to have been taken through a colposcope or whether a different type of camera was used.

Dr. Tyndall's defenses for possessing these photographs were dubious, at best. He stated that he retained an extra copy of the patients' cervices as a defense in the event the patient later

developed cervical cancer. But since less than 15% of the images contained any patient identifying information, that justification fails to explain the possession of more than 85% of the images.

Dr. Tyndall also stated that he used the photographs to educate patients on the findings of his exams. The problem with that defense is that only the Polaroid images would have been available immediately for the patient's viewing. It is certainly much more typical to use a mirror to show a patient a finding if this is needed. He also stated that the patients liked seeing the photographs and would even make a return appointment solely to see the pictures after they were developed. But again, in light of the very low percentage of the images that had patient identifying information, this explanation does not support his possession of the vast majority of the images.

The document provided to MDReview regarding these images stated that they appeared to show abnormalities such as warts and skin lesions, but Dr. Tyndall apparently disputed this. Dr. Tyndall's ongoing possession of the unidentified images was not standard of care unless they were of notable pathology, which is contrary to Dr. Tyndall's statement.

The use of photography to record images of the cervix and external genitalia might have had some benign clinical purpose 25-plus years ago, which Dr. Tyndall no longer recollects, but his current defenses are not plausible.

**Considerations:**

After considering all information provided to and obtained by the ad hoc committee, including the interviews and review of patient records, significant concern exists that many of Dr. Tyndall's practices are not within current standard of care. In addition, he repeatedly exhibits behavior that is unprofessional, inappropriate, and/or unusual. Of greatest concern are the issues with infection control and inadequate or inappropriate breast, pelvic, and colposcopic exams. The issue with Dr. Tyndall refusing to wash his hands is a serious violation of infection control standards. *Guidelines for Women's Health Care: A Resource Manual*, 4th edition, devotes an entire section to hand hygiene (pages 147-148). It specifically states that the use of gloves alone is not adequate.

Dr. Tyndall has some unusual and potentially dangerous opinions about breast exams. While he stated in his records that he discusses the "controversy" regarding breast exam with his patients and lets them decide whether to have one, his bias against breast exams would make it likely that the information he provides is similarly biased, and therefore, the patient cannot make a true informed decision. Dr. Tyndall's reviewed medical records documented that the exam was "offered" rather than recommended, as it should have been.

His technique for pelvic exam by performing a digital exploration of the vagina before doing the speculum exam in all patients is not standard of care. While he asked the patient's permission at the time of the exam, if he told the patient that was how an exam was done, the patient, again, was not allowed to make a truly informed consent to what could be considered a violation of her body.

It is simply not plausible that 100 percent of 13 colposcopies done because of Pap smear abnormalities or the presence of high-risk human papilloma virus would be normal. It also

appeared likely that the ECC was not being performed correctly. Nursing personnel indicated that when Dr. Tyndall did this procedure, the patients did not react to what is uniformly an uncomfortable or painful procedure if performed correctly. In addition, Dr. Tyndall made the unusual decision not to submit the specimen he purportedly obtained because of "no tissue obtained"; even when the procedure is done correctly, there is no grossly visible tissue obtained. Fortunately, none of the colposcopies that were reviewed were for the more concerning high-grade abnormalities, and therefore, the plan for repeat Pap smear in one year would be appropriate even if a low-grade lesion were present but was not identified by Dr. Tyndall.

Dr. Tyndall was reported to exhibit several behaviors that would be considered unusual at best, and inappropriate or unprofessional at worst. As previously discussed, comments made to patients about "being toned," the status of their hymen, or the appearance of their breasts were not adequately defended by Dr. Tyndall and were inappropriate and not within standard of care. To answer a question from a patient about what it means if she has a "tight PC muscle" by saying to "ask your boyfriend" is demeaning to a woman and highly unprofessional. While he stated that he performs a pelvic exam in the unusual way discussed above to avoid patient discomfort, he unrealistically contended that his exams never cause patient discomfort and was resistant to allowing the nursing and MA personnel to provide support and comfort to the patient during the exam, which is unprofessional.

Some of Dr. Tyndall's behaviors are potentially indicative of underlying psychopathy. These include his request to save removed IUDs, his hoarding behavior and poor personal hygiene, as well as the use of a rag to open doors and refusal to shake hands. While MDReview was not specifically asked to address these behaviors, including the issues with infection control, the repetitive description of these very concerning behaviors during the interviews makes them impossible to ignore.

Lastly, the ad hoc committee was very concerned that the bulk of the patients whom Dr. Tyndall sees are unusually vulnerable. Younger women in general are less familiar with the normal conduct of a female exam. Language and cultural barriers would make it even more difficult to know what to expect during the exam. It would be easy for a healthcare provider to take advantage of this and perform medically unnecessary exams and make comments that patients may assume are appropriate. The patient, not recognizing that she has undergone an inappropriate exam or that an inappropriate/unprofessional comment has been made, would make no complaint regarding the behavior.

**Potential Interventions and Remedies**

Officials at the Student Health Center need to decide whether to maintain Dr. Tyndall's employment as a Women's Health provider. Based on the ad hoc committee's comprehensive review, a number of significant concerns exist that would raise serious questions about patient physical and psychological safety were Dr. Tyndall to return to practice. These include but are not limited to:

- Gaps in fund of knowledge, clinical judgment, and adherence to current accepted practice guidelines regarding women's health.
- Failure to acknowledge and follow current basic fundamentals of hygiene and infection control practices.
- Applying differing practice patterns based on the age, ethnicity, and appearance of patients, based on multiple similar reports from staff members.
- Using physical exam techniques that vary from standard accepted practices and could be, and likely were (based on patient feedback), considered to represent inappropriate physical contact with patients that would likely be considered serious boundary violations by a professional conduct, licensing, or credentialing committee.
- Making highly inappropriate comments to patients, particularly those more vulnerable based on young age and language barriers, regarding physical appearance and behaviors that would also constitute significant professional boundary violations.
- Taking and retaining photographs of patient genitalia without clear informed consent, appropriate patient identification, and safe storage and disposal, and lacking any clear clinical reasons for such images to exist.
- A combination of behaviors, physical hygiene, and interpersonal relations that raise questions about the presence of some underlying physical or mental health condition affecting his safe practice of medicine.

Should the officials at Engemann Student Health Center decide to try to remediate these concerns and create a pathway for Dr. Tyndall's safe return to practice, the ad hoc committee has included some potential interventions and remedies that could be instituted to further evaluate and remediate Dr. Tyndall's current practice and limit risk to patients. Options include the following:

1. Contemporaneous proctoring of all exams and patient interactions by a board-certified obstetrician-gynecologist with experience in the student health setting. This would allow a shoulder-to-shoulder evaluation of current clinical skills, exam techniques, and interactions with patients. Staff who currently have concerns about inappropriate exams and behavior are likely to see this as the most definitive intervention that would show that their voices have been heard by leadership and administration. This is a costly and labor-intensive intervention that would require the collegial cooperation of Dr. Tyndall.

2. Dr. Tyndall could agree to undergo a full and comprehensive physical, medical, and psychological evaluation, based on concerns about his practice patterns, personal hygiene, infection control concerns, and interactions with patients. The ad hoc committee was not equipped to diagnose physical or psychological conditions that could be affecting Dr. Tyndall's clinical practice. However, issues such as undiagnosed psychiatric conditions are often a major contributing factor in similar situations. Entities such as California Public Protection & Public Health, Inc., offer a comprehensive evaluation to look for both physical

and or psychological/psychiatric concerns that may lead to some degree of physician impairment or decreased performance capabilities (please see Appendix B for a list of potential programs). Dr. Tyndall would have to agree to undergo such a comprehensive evaluation as well as be willing to share all results, uncensored, with leadership at the Student Health Center.

3. Dr. Tyndall could undergo a comprehensive evaluation of his clinical capabilities, including fund of knowledge, adequacy of training, exam techniques, and decision-making, to determine whether there are gaps in his overall approach to patient care. There are a number of national organizations, such as the Center for Personalized Education for Physicians in Colorado or the Physician Assessment and Clinical Education Program in California, that have the capacity to perform this kind of evaluation (please see Appendix B for a list of potential programs). Once again, Dr. Tyndall would have to agree to undergo such a comprehensive evaluation and be willing to spend the time and resources necessary to have such an evaluation completed.

While items 2 and 3 both can be costly and time-consuming, they can also help identify possible underlying issues affecting the physician's current practice. From previous experience with comprehensive physician evaluation programs required by leadership, the cost of such evaluations is often shared between the physician and the facility.

Kimberly Schlichter MD (Nov 30, 2016)                                               Nov 30, 2016

**Kimberly Schlichter, MD**

Sharon Beckwith (Nov 30, 2016)                                               Nov 30, 2016

**Sharon Beckwith, CEO, MDReview**

**Appendix A:**

The following are a few verbatim quotes from the interviews of nursing and other medical personnel. These quotes stand out as they reflect behaviors exhibited or statements made by Dr. Tyndall that were repeatedly stated to be of concern and were highly troubling to those who observed them:

- Described as a hoarder. Office is very unclean.
- Never washes hands.
- Uses a rag in his pocket to open doors.
- Rarely does biopsy during colposcopy.
- Prefers Asian and/or international patients.
- One finger and then two fingers.
- "Flawless skin."
- "At your age you won't have breast cancer."
- "You are very toned."
- "Are you a runner?"
- "Ask your boyfriend."
- "Your husband will be happy."

**Appendix B:**

Below are referral details for organizations that are able to provide recommended comprehensive medical knowledge/skill and mental health/fitness for duty evaluations.

1.  The Center for Personalized Education for Physicians (CPEP). http://www.cpepdoc.org/

    a.  Competence Assessment

        This in-depth evaluation is tailored to the participant's specialty and practice and provides detailed information about clinical competence in the areas of medical knowledge, clinical decision-making, interpersonal communication skills, documentation skills, and practice systems, while also identifying areas of educational need. The components of an assessment vary and are dependent upon a participant's specialty and scope of practice and may include structured clinical interviews, multiple-choice examinations, technical skills simulations, cognitive function screening, review of health information, simulated patient encounters, documentation review and evaluation, electrocardiogram interpretation, fetal monitor strip interpretation, and a radiology documentation exercise. The competence assessment generally takes place over a two-day period. The fee for the assessment and report compilation is $8,995 to $11,995 depending on specialty.

    b.  Assessment Report Compilation

        The medical director or associate medical director has primary responsibility for collecting assessment data, interpreting performance results, and preparing a detailed report of the assessment findings. Reports are generally produced within eight weeks of the assessment.

        •   Assessment performance data is reviewed and interpreted by specialty-matched physicians, neuropsychologists, and communication consultants.
        •   Educational recommendations as part of a formal education intervention are included based on the participant's performance.
        •   Participant's performance on the cognitive function screen is commented upon.
        •   Observed behaviors or health concerns that could impact ability to practice are noted.

    c.  Educational Intervention

        Based on the assessment findings, a highly personalized educational plan is developed from a broad range of learning resources and is measured through patient case review as well as ongoing progress and compliance monitoring. Every effort is made to take advantage of educational resources within the physician's home and practice area. As a result, licensed physicians can maintain normal clinical practice activities while participating in the process. The components of the educational intervention may include a supervised practice experience with a preceptor, professional reading and self-study, specialty field updates and continuing medical education courses, and documentation and communication courses. The duration of an educational intervention averages between six and 12 months, and the fee ranges from $1,900 to $2,200, depending on specialty, with a monthly monitoring fee of $725-$925 for the duration of the plan.

2. Physician Health Program for California (CPPPH). http://www.cppph.org/

   a. Program Overview

      CPPPH is dedicated to the establishment of an ideal physician health program in California. The program is designed to encourage and assist all organizations, institutions, and entities where physicians practice or affiliate in their efforts to maintain the health of their physician population. Its services are available to assist the citizens of California, the regulatory board, associations, hospitals, clinics, and individual physicians. California's ideal physician health program (PHP) identifies, provides, or supports clinically based health services for physicians with physical, mental health, or addiction issues, which, if undetected or not appropriately treated and monitored, could compromise the physician's ability to practice medicine safely.

   b. Program Components

      A well-designed PHP will include:

      - Education throughout the medical community
      - Orientation to the role and function of physician health committees
      - Consultation to physician health committees and all with the responsibility for physician health, public safety, and the maintenance of quality-of-care advocacy for activities that promote wellness
      - Activities designed to support case-finding intervention evaluation, both initial assessment and continuing evaluation as needed, including evaluation for the resumption of patient care responsibilities
      - Design of treatment and monitoring plan referral to initial treatment
      - Referral to ongoing treatment monitoring, case management, and quality assurance activities

   c. Policies and procedures for the operation of the PHP

      Once a PHP is established, it will provide consistency and continuity in approaching and managing physician health across the state. Referrals into the program are accepted from all sources. Eligibility for the program is designed for persons with substance use, mental health disorders, or physical illness when a clinical evaluation determines that the condition can be monitored and treated with the resources available to the program. The length of time a person is required to be in the program is in the range of three to five years, based on the severity of illness and clinical recommendation.

      The program does not report information about a participant to any person or organization other than the referring person or entity, unless there has been failure to comply with the agreement and it was determined that the physician was a danger to the public. The organization will assign the resources necessary for appropriate quality assurance activities.

3. Colorado Physician Health Program (CPHP). http://cphp.org/welcome

   a. Evaluation

   CPHP evaluates any health issue including medical, psychiatric, emotional problems, or situational stresses. A client is provided a clinician and psychiatrist who will manage the case during the course of involvement with CPHP. The initial intake evaluation by CPHP will take approximately 2.5 hours.

   Components of a CPHP evaluation include:

   - An electronic questionnaire (inclusive of health history)
   - A full psychiatric assessment by a medical director
   - Execution of materials such as releases and confidentiality agreements

   b. Assessment

   CPHP assessments take place over time, typically 30 to 45 days but potentially up to 90 days if an extended evaluation is warranted, and may involve multiple phone interviews with collateral sources, other data collection such as laboratory or further medical testing, gathering any additional collateral information, appointments with CPHP, and/or referrals for outside evaluation or testing.

   Evaluation and assessment fees vary but are generally about $3,600.

   c. Treatment Referral and Monitoring

   Treatment referrals and monitoring with CPHP may include:

   - Referral for further evaluation or treatment
   - Regular monitoring appointments with CPHP
   - Urine drug screen monitoring
   - Case management services
   - Reports generated to various entities
   - Family services

   Useful points pertaining to treatment referral and monitoring:

   - CPHP does not provide treatment. It does provide treatment referrals, with an elite cadre of highly qualified professionals in the community who specialize in working with medical professionals.
   - CPHP also refers to specialized national programs if a condition requires treatment not available locally.
   - CPHP may monitor an individual for several months to several years, depending on the particular clinical aspects.

- CPHP may collect ongoing collateral data gathered from treatment providers, family members, and/or workplaces, if the CPHP client approves the requisite release to do so within CPHP's confidentiality guidelines.

4. Other Programs

   a. University of California San Diego PACE Program offers a two-phase physician competence assessment program. When inquiring, any referring organization should seek information about phase 1 and phase 2 of this program. http://www.paceprogram.ucsd.edu/

   b. University of Florida CARES Program offers competence assessment and remedial education services. http://floridacares.med.ufl.edu/

   c. Professional Renewal Center in Kansas offers individualized, comprehensive assessment programs depending upon the need. It provides a thorough, in-depth, total health evaluation. http://www.prckansas.org/

# Tab 99

**To:** Trina Wallace <trinawal@usc.edu>
**Cc:** cindygilbert@earthlink.net
**Subject:** Follow Up

Hi Trina,

I am resending the documentation because I believe it did not go through first attempt due to size. Please let me know when you receive it and are able to open attachments. It is with a heavy heart that I send this after hearing today that it was announced yesterday that Tammie was offered and accepted a promotion as Executive Director of Clinical Operations. Knowing how dysfunctional the management is under her guidance this is not good news for those remaining at the health center or our students. With Tammie Akiyoshi and Maria Francisco at the helm the health center, we don't follow our own Core Values of communication in a respectful manner, integrity, positive attitudes while maintaining a friendly and pleasant atmosphere. Treating each other, students, co-workers with mutual respect, understanding and kindness or maintain flexible, positive approach when working as a multidisciplinary team. At ESHC the listed Core Values are not upheld or even encouraged by leadership which results in chaos and hostility. I will however follow through and submit a few of the examples of mismanagement and lack of integrity.

There is a document showing that Tammie not only was aware, but was the one to schedule appointments to interview the MA's and nurses following my reporting to her Dr. Tyndall's inappropriateness back in 2013. She was also involved in investigation involving him while still in the old health center/building prior to my involvement so the statement she had no idea is just not true. Once Dr. Neinstein was gone the reporting of events to Tammie went unanswered requiring us to go outside of our health center for assistance. Our Quality & Safety Director and Center for Women and Men Director did assist us and lead us to HR and OED for reporting where we finally got a true investigation even though we were told to not go to HR by our leadership.

Unfortunately after hearing confirmation of the promotion it is clear that the health center, students and good caring staff will continue dealing with an uphill battle. They will continue to have to deal with hostile, intimidating and retaliatory behavior if they speak up. It is Tammie, Maria Francisco and Dr. Wenger who continually tell staff they are not to go to HR, or talk to anyone from Keck concerning problems. Now they are even more fearful about speaking up. I find it hard to believe Keck would make this decision without hearing from the people working under her. The current leadership have a way of being the only contact outsiders have so it continues.

I really do appreciate all your assistance and will continue to hope for the best that people will look into to concerns so many have. I do hope that Keck will bring new leadership in to work along with the current leadership so the staff have someone available to be honest with without feeling afraid of losing their jobs.

Thank you,

Cindy

# Tab 100



MEMORANDUM

To:          Karen Nutter, Director, Office of Equity & Diversity

From:       Tatiana Small, Senior Equity & Diversity Specialist

Date:        January 31, 2017

Subject:     Dr. George Tyndall Investigation Regarding Allegations of Race Harassment

On June 6, 2016, Cindy Gilbert, Nursing Supervisor (Employee ID # 0162045), at the University of Southern California ("USC") Engemann Student Health Center ("Engemann") filed a complaint against Dr. George Tyndall, Physician (Employee ID # 0018650), also employed at Engemann, regarding conduct and comments she believed constituted both race and sexual harassment. During the investigation into Ms. Gilbert's concerns, two patients, two Nurses, and six Medical Assistants alleged similar complaints against Dr. Tyndall.

In response to the allegations of sexual harassment, Dr. Tyndall offered medical justifications that he argued constituted proper patient care.  Because only other members of the medical community may properly assess whether or not Dr. Tyndall was providing an appropriate standard of care, the facts of the investigation regarding these allegations will be forwarded to the Ad Hoc Subcommittee for review and assessment.  Therefore, this memorandum only analyzes whether Dr. Tyndall violated the University policy against race harassment.

## I.    BACKGROUND

In June of 2013, Dr. Larry Neinstein, then-Executive Director of Engemann, contacted OED and reported that a number of staff members and a student had recently alleged that Dr. Tyndall made inappropriate comments or otherwise made them feel uncomfortable.  Dr. Neinstein reported to the OED Investigator that in 2002, Dr. Tyndall was not permitting Medical Assistants behind the curtain with him while doing pelvic exams; in 2009, Dr. Tyndall complimented a student on her pubic hair; and in 2010, a student came forward complaining that in 2003, Dr. Tyndall performed a pelvic exam on the student without wearing gloves.  According to Dr. Neinstein, he counseled Dr. Tyndall on the foregoing allegations, and Dr. Tyndall complied and commenced allowing Medical Assistants behind the curtain.

Dr. Neinstein also reported to the Investigator that two individuals complained that Dr. Tyndall had mentioned in a conversation that "Mexicans are taking over," and that there was going to be a "Reconquista."  The Investigator interviewed Tammy Akyoshi, Director of Clinical Operations, a female student who complained to the Center and declined to provide her name, Medical Assistants Lizette Esparza and Elizabeth Rangel, Nurses Cindy Gilbert and Bernie Degener, Nurse

University of Southern California

3720 South Flower Street, Second Floor, Los Angeles, California 90089-0704 · Tel: 213 740 5086 · Fax: 213 740 5090 · oed@usc.edu

Practitioner Donna Beard, and Licensed Vocational Nurse Irene Martinez. The Investigator's memo stated that interviews with these individuals yielded mixed opinions of Dr. Tyndall, but none yielded actionable evidence of any policy violation. An investigation was never opened; instead, the general information gleaned from the interviews was communicated to Dr. Neinstein for appropriate action. Dr. Tyndall was not interviewed by OED.

Dr. Tyndall's current supervisor is Dr. William Leavitt, Interim Medical Director. On August 26, 2016, Dr. Leavitt was interviewed and he confirmed that he was present in a 2013 meeting with Dr. Tyndall and Dr. Neinstein. Dr. Leavitt also confirmed that Dr. Neinstein counseled Dr. Tyndall regarding the above concerns. Dr. Leavitt did not provide any other information relative to this investigation.

**██████████ Complaint**



On or about January 29, 2016, USC student ████████ left a comment card with the Engemann Quality & Assurance Department. On the comment card, Ms. ████ wrote "Dr. Tyndall is a racist. He treated me like a criminal and made me feel less than a person." Ms. ████ is African-American.

After receipt of the comment card, Sandra Villafan, Director of Quality & Safety at Engemann, reached out to Ms. ████ regarding her complaint. On January 29, 2016, Ms. Villafan sent an e-mail to Dr. James Jacobs, former Acting Executive Director of Engemann regarding her discussion with Ms. ████. In said e-mail, Ms. Villafan stated that Ms ████ recounted the following:

"On Wednesday night I was on my way to the health center because my Faculty Advisor is on the physical therapy floor. I had lost my keys, but I know the security guard, Charles, and I was waiting outside to see if I saw him and ask if anyone had turned in my keys. It was around 8:45 p.m. or 8:50 p.m. when a man was about to exit the building. When he saw me, he immediately closed the door. I think it was because of the color of my skin and because I'm a black woman. I didn't understand the reaction, as I had my USC backpack and my laptop out. The man finally opened the door a quarter of an inch, and I was able to ask for Charles. He said, 'he already left' and then under his breath he said 'go away,' and then left the building in a hurry. The next day, I came back during regular hours, and I was talking to my friend at the concierge desk and the man walked in. I told my friend, 'he's the one,' and my friend responds, 'That's Dr. Tyndall. I saw him on[ce] for a visit. He had me wait for over two hours. When I commented to the nurse, she said that is typical for the appointments with Black women.'"

On February 1, 2016, Dr. Jacobs forwarded the e-mail from Ms. Villafan to OED.

On February 5, 2016, Ms. ████ was interviewed via phone regarding her complaint about Dr. Tyndall. Ms. ████ reiterated the statement of facts set forth in Ms. Villafan's e-mail. Further, Ms. ████ provided the contact information for ████, the USC student Ms. ████ referenced who waited for almost two hours for an appointment with Dr. Tyndall. Additionally, Ms. ████ stated that her roommate was also a patient of Dr. Tyndall's and while Dr. Tyndall did not do anything that was racist to her roommate, her roommate complained that he was not polite and had bad bed side manners.

2

On February 5, 2016, Ms ███████ was interviewed via phone. Ms. ████████████. Ms. ████r works at ████████████████. During the interview, Ms. ███r stated that she could not recall the exact date, but at some point last year she waited for an hour and a half for an appointment with Dr. Tyndall. Further, Ms. ████ stated that Dr. Tyndall did not provide her with the proper instructions for an Intrauterine Device (IUD) appointment. The day after her appointment with Dr. Tyndall, Ms███ had a conversation with Linda Byrd, a Medical Assistant at Engemann. According to Ms. ████, Ms. Byrd told her that Dr. Tyndall always makes African-American patients wait longer than other patients for their visits.

On February 12, 2016, Ms. Byrd was interviewed. During the interview, Ms. Byrd stated that Dr. Tyndall makes African-American patients wait longer than Asian-American patients. In response to a question regarding how Dr. Tyndall would know the race of his patients prior to their respective visit, Ms. Byrd stated "maybe in the chart," or "maybe by the names [of the patients]." After the interview with Ms. Byrd, Monique Menke, Director, Administrative Operations, was contacted in order to inquire if the Engemann Technology Department (ETD) could provide data regarding the waiting time of each patient. Ms. Menke advised that ETD did not have this data available.

After evaluating Ms. █████ and Ms. █████ complaints, it was determined that there was not enough evidence to substantiate a violation of USC's policy against race discrimination. However, an appointment with Dr. Tyndall was scheduled to discuss their allegations. Prior to the scheduled appointment with Dr. Tyndall, Ms. Gilbert filed the instant complaint with OED, which led to the expanded investigation.

## II.   INDIVIDUALS INTERVIEWED AND DOCUMENTARY EVIDENCE

The following witnesses were interviewed on the dates listed. All dates are 2016, and unless otherwise stated were conducted in person:

| | | |
|---|---|---|
| 1. | ███████ | February 5  (via phone) |
| 2. | ███████ | February 5 (via phone) |
| 3. | Linda Byrd, MA | February 12, June 15 |
| 4. | Cindy Gilbert, RN | June 6 |
| 5. | Cynthia Bobo, MA | June 15 |
| 6. | Marlina Pinney, MA | June 15 |
| 7. | Juan Alonso, MA | June 15 |
| 8. | Jerri Kosydar, RN | June 15 |
| 9. | ███████ | June 27 (via phone) |
| 10. | ███████ | August 24 (via phone) |
| 11. | Dr. George Tyndall | August 10, 12, and 22 |

3

12. Dr. William Leavitt          August 26

███████████ a USC graduate student, who Ms. Villafan suggested may have a complaint regarding her experience with Dr. Tyndall was contacted. However, Ms. ██████ declined the request for an interview.

Before each interview, each witness was advised that he or she was protected from retaliation for participating in the investigation and had a duty not to retaliate against anyone else for that person's participation in the investigation.

On October 24, 2016, Dr. Tyndall submitted a memorandum to Gretchen Means, Executive Director of the Office of Equity & Diversity, which Dr. Tyndall wrote represented his recollection of his responses during the interviews to the foregoing allegations. Dr. Tyndall requested that this memorandum only be reviewed by Ms. Means. Dr. Tyndall's written responses are discussed below.

## III.   FACT FINDING: ALLEGATIONS AGAINST DR. TYNDALL

**Complaints from the Medical Assistants and Nurses at Engemann**

Cindy Gilbert, R.N.

Ms. Gilbert's complaint initiated the instant investigation. Ms. Gilbert could not recall the date, but reported that she witnessed Dr. Tyndall proclaiming that he prefers Hispanic gardeners because they have green thumbs. According to Ms. Gilbert, she told Dr. Tyndall, "you shouldn't say that," and Dr. Tyndall responded, "why?" Ms. Gilbert could not recall her response to Dr. Tyndall.

Cynthia Bobo, M.A.

Ms. Bobo reported that in October of 2015, Dr. Tyndall walked by the Medical Assistants' work station and proclaimed, "I like to get Hispanics to watch my plants because they know how to make things grow."

Marlina Pinney, M.A.

Ms. Pinney's statement was not included in this report because her complaint concerned only allegations of sexual harassment.

Juan Alonso, M.A.

Ms. Alonso did not report anything relative to this investigation.

Linda Byrd, M.A.

In addition to her allegation that Dr. Tyndall makes African-American patients wait longer than
Asian-American patients, Ms. Byrd reported that about ten years ago, Dr. Tyndall told her that she
was the first Black woman he knew to say the word, "ask" correctly.  Ms. Byrd reported that she
was not offended by Dr. Tyndall's comment and considered it to be a compliment.  Therefore,
there is no finding regarding this comment, but it is included in this memorandum for context.

Jerri Kosydar, R.N.

Ms. Kosydar reported that last summer before Dr. Tyndall took a vacation, he walked by the
Nursing station and said, "I'm going to have Mexican girls water my plants because they have
green thumbs."

Lisbeth Ramirez, M.A.

Ms. Ramirez could not recall the exact date, but reported that in the Spring of 2015, Dr. Tyndall
asked her if she could take care of his plants and said something to the effect of, "Latina women
have a certain touch to keep plants alive," and she responded, "you shouldn't say that, that's
inappropriate."  Ms. Ramirez could not recall Dr. Tyndall's response.

**Patient Complaints**

██████████

██████████ statement was not included in this report because her complaint concerned
allegations of sexual harassment.

██████████

Sandra Villafan, Director of Quality & Assurance at Engemann forwarded a complaint to OED
regarding Dr. Tyndall from patient, ██████████.

Ms. █████s reported that she had an appointment with Dr. Tyndall in November of 2015 to
discuss birth control options.  Ms. █████ reported that during this visit, Dr. Tyndall asked her
about her career interests and she responded that she wanted to become a social entrepreneur in the
Black community.  Ms █████ could not recall Dr. Tyndall's exact statement, but reported that he
said something along the lines of, "you should open a clinic for Black women because they have
too many babies."  Ms. █████ reported that she was in shock and responded, "umm…no, that's
not what I want to do," and the conversation ended.  Ms. █████ also reported that she felt that Dr.
Tyndall was pushing her to get an IUD.  According to Ms. █████, Dr. Tyndall sent her a secure
message inquiring if she went to Planned Parenthood to get an IUD.  Ms. █████ did not respond.

The portion of Ms. █████ complaint regarding Dr. Tyndall's process and procedures for
recommending an IUD was forwarded to the Ad Hoc Sub-Committee for assessment and will not
be analyzed in this memorandum.

## IV.  FACT FINDING:  DR. TYNDALL'S RESPONSE TO THE ALLEGATIONS

As demonstrated above, the Medical Assistants and Nurses had similar complaints against Dr. Tyndall.  Thus, Dr. Tyndall's responses to their complaints are separated by allegation rather than individual.

**Alleged Comments:  "Hispanics have green thumbs" and/or "Latina women have a certain touch to keep plants alive," or any similar comment**

During his interviews, Dr. Tyndall responded to these allegations, by stating "guilty."  Dr. Tyndall then explained that he thought the foregoing comments were compliments.  When questioned as to how the foregoing comments were complimentary, he failed to articulate an answer.

In his written memorandum, Dr. Tyndall wrote, "There was a time, when I was going away on vacation, that I asked one of the MAs, who happened to be a Latina, whether she would be willing to water the plant in Rm. 215 while I was away.  When I returned, the plant was looking better than when I departed.  So I asked her whether she could be the one to water my plant in the future." "Also, when I asked her whether she would water my plant during my absence, it was not because she is a Latina.  It merely happened that she was the one present when I was exiting the building to go away on vacation."

**Alleged Comment:  Black women's pronunciation of the word, "ask"**

During the interviews, Dr. Tyndall stated that he asked Lynda Byrd why most Black women pronounce "ask," with an "x," instead of a "k," yet she pronounces the term, "ask."  During the interview, it was explained to Dr. Tyndall that question to Ms. Byrd could be perceived as offensive because some could view it as promulgating negative stereotypes about the African-American community.  Dr. Tyndall responded that he did not understand how this question could be offensive because it was based on his observation.

In Dr. Tyndall's written memorandum, he wrote, "I do recall asking a black client who had pronounced the word as "asked" whether she knows why some of my clients would pronounce the word as "aksed"?  Keep in mind that I am dealing in that clinic every day with some of the sharpest and most inquisitive people in the world, especially the many grad students, and I am Mr. Inquisitive.  So, if I have an opportunity to learn something from one of them, and if we have sufficient time, I'm naturally going to go for it."  Dr. Tyndall also provided positive e-mails and other written documentation from students, which he expressed supported his written statement that he is inquisitive.  Dr. Tyndall also wrote the following, "I never said, or implied, that blacks in general cannot articulate.  I simply asked a client whether she knew why some of my clients, like her, would say "ask," while others would say "aks".  There's no stereotyping whatsoever there.  I'd be the last person in the world to engage in stereotyping."

6

**Dr. Tyndall's Response to Patient, ██████████ Complaint**

████████████

Dr. Tyndall denied saying something to the effect of, "you should open a clinic for Black women because they have too many babies," stating, "that is completely ridiculous."

## V.   CONCLUSION

Under University policy, race harassment is defined as any physical or verbal hostility, or any unwelcome or offensive conduct or communication, directed toward someone or toward a group of individuals, because of their protected category status.  Here, it was found that Dr. Tyndall *did* violate University policy against race harassment.

Medical Assistants and Nurses reported that on various separate dates Dr. Tyndall made comments that Hispanics have green thumbs and/or Latina women have a certain touch to keep plants alive. These Medical Assistants and Nurses all reported that these comments were unwelcome and they were offended.  During his interview, Dr. Tyndall admitted to making said comments; nonchalantly stating, "guilty," and that he thought the comments were complimentary.  When questioned how these comments were complimentary, Dr. Tyndall failed to articulate a response. Several months after the interviews, Dr. Tyndall submitted a written memorandum, which he requested to be reviewed only by Ms. Means.  In this memorandum, Dr. Tyndall materially alters his response to the foregoing allegation stating that he asked a Latina MA to water his plant while he was on vacation, but did not ask her this because she was Latina.  There is a clear discrepancy between his verbal and written statements, which diminishes the credibility of his written statement.  Further, it is significant that all five Medical Assistants reported a very similar statement.

During the interview, Dr. Tyndall admitted to asking Ms. Byrd why most Black women pronounce "ask," with an "x," instead of a "k."  In his written memorandum, he wrote that he recalled asking a black client who had pronounced the word "asked," whether she knew why some of his Black clients pronounce the word as "aksed."  These admissions, combined with Dr. Tyndall's comments regarding Latina gardeners and evidence that in 2013, individuals reported to Dr. Neinstein that Dr. Tyndall stated "Mexicans are taking over," and there is going to be a Reconquista, illustrate a pattern of racial and/or culturally offensive behavior and conduct.  Dr. Tyndall's professed disbelief that his comment regarding Ms. Byrd's pronunciation of the word "ask," could be considered offensive, also demonstrates his inability to understand culturally or racially offensive language.

Dr. Tyndall denied stating to Ms. ███████ that "Black women have too many babies," or anything similar.  However, there is absolutely no evidence of an underlying motive for Ms. ██████ to falsify said claim.  The prior contradictory statements regarding Latino gardeners also diminish Dr. Tyndall's overall credibility.  Further, Dr. Tyndall's pattern of behavior illustrates that he has no filter or recognition of when comments are racially or culturally offensive.  Therefore, it was found that more likely than not Dr. Tyndall also said "Black women have too many babies," or something to that effect to Ms. ██████.

In conclusion, Dr. Tyndall violated the University policy against race harassment when he stated to the Medical Assistants and Nurses that Hispanics have green thumbs and/or Latina women have a certain touch to keep plants alive and when he stated to Ms. ███████ that "Black women have too many babies"

Please contact me at (213) 740-5086 if you have any questions.

cc:   James M. Ball

8